**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| WESTCHESTER PUTNAM COUNTIES HEAVY & HIGHWAY LABORERS LOCAL 60 BENEFIT FUNDS, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>KYNDRYL HOLDINGS, INC., MARTIN J. SCHROETER, DAVID B. WYSHNER, and VINEET KHURANA,<br><br>Defendants. | Case No.:<br><br>CLASS ACTION<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>DEMAND FOR A JURY TRIAL |

Plaintiff Westchester Putnam Counties Heavy & Highway Laborers Local 60 Benefit Funds ("Plaintiff"), by and through counsel, alleges the following upon information and belief, except as to allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, its counsel's investigation, which includes, without limitation: (a) review and analysis of public filings made by Kyndryl Holdings, Inc. ("Kyndryl" or the "Company") with the U.S. Securities and Exchange Commission (the "SEC"); (b) review and analysis of press releases and other publications disseminated by Defendants (defined below) and other parties; (c) review of news articles, shareholder communications, and conference calls concerning Defendants' public statements; and (d) review of other publicly available information concerning the Company and the Individual Defendants (defined below).

1

**NATURE OF THE ACTION**

1.      This is a federal securities class action on behalf of a Class of all persons who purchased or otherwise acquired Kyndryl securities between August 1, 2024 and February 6, 2026, inclusive (the "Class Period"), against Kyndryl and certain of its officers and executives (collectively, "Defendants"), seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2.      Kyndryl is a global information technology ("IT") infrastructure services provider offering cloud hosting, enterprise and mainframe support, application and data services, and artificial intelligence solutions, among other services.

3.      After completing the spinoff from International Business Machines Corporation ("IBM") in 2021, Kyndryl began operating as a standalone, publicly traded company.

4.      Since the spinoff, Kyndryl consistently emphasized the importance of free-cash-flow metrics to investors, presenting free cash flow as a key measure of the Company's financial condition and its prospects for sustained, profitable growth.

5.      Consistent with that emphasis, the Company's 2025 Proxy Statement underscored the importance of cash-flow performance, explaining that the Compensation and Human Capital ("CHC") Committee "determined to link the vesting of the PSUs [performance share units] to the achievement of the Company's business objectives and the creation of stockholder value ***by basing the vesting of the PSUs on the Company's adjusted operating cash flow***, total signings and TSR[.]"

6.      The action alleges that Defendants misled investors about Kyndryl's reported free-cash-flow metrics and improperly presented those metrics as evidence of the strength and

2

durability of its financial condition and prospects.  In truth, the Company's reported cash generation depended on undisclosed and unsustainable cash management practices that concealed Kyndryl's true financial condition and prospects from investors.

7.    On August 4, 2025, after markets closed, the truth began to emerge when Kyndryl announced its first-quarter fiscal year 2026 results, ended June 30, 2025,[1] reporting revenue of $3.743 billion and free cash flow use of $222 million, missing analysts' estimates of $3.788 billion and $219 million, respectively.

8.    Nonetheless, Chief Financial Officer David B. Wyshner ("CFO Wyshner") continued to assure investors that "we remain committed to delivering significant margin expansion and generating free cash flow growth[,]" while emphasizing that "[w]e have a solid game plan to drive our strategic progress, [] start[ing] with the steps we've already taken to expand our technology alliances, realize the numerous growth opportunities available to us, manage our costs and earn a return on all of our revenues."

9.    On this news, the price of Kyndryl common stock fell $7.76 per share, or about 21%, from a closing price of $36.70 per share on August 4, 2025, to a closing price of $28.94 per share on August 5, 2025.

10.    On February 9, 2026, before markets opened, the truth fully emerged when Kyndryl filed a Notification of Late Filing on Form 12b-25 with the SEC (the "NTL Filing"), disclosing that it was "unable to file within the prescribed time period, without unreasonable effort and expense, its Quarterly Report on Form 10-Q for the quarter ended December 31, 2025."

11.    The NTL Filing further revealed that:

> ***The Company, through the Audit Committee of its Board of Directors, is reviewing its cash management practices, related***

---

[1] Kyndryl's fiscal calendar runs from April 1 to March 31.

*disclosures (including regarding the drivers of the Company's adjusted free cash flow metric), the efficacy of the Company's internal control over financial reporting, and certain other matters following the Company's receipt of voluntary document requests from the Division of Enforcement of the Securities and Exchange Commission ("SEC") relating to such matters.* Due to this review, the finalization of the Quarterly Report, including the Company's assessment of internal control over financial reporting, requires additional time to complete.

\* \* \* \*

*In connection with the filing of the Quarterly Report, when made, the Company anticipates reporting material weaknesses in the Company's internal control over financial reporting for the period covered in the Quarterly Report, as well as for the full fiscal year ended March 31, 2025, and the first two fiscal quarters of fiscal year 2026*, which are expected to include, but may not be limited to, the effectiveness and strength of certain functions at the Company, including with respect to controls related to information and communication and tone at the top. As a result, the Company notes that its assessment of internal control over financial reporting and the related opinion of PricewaterhouseCoopers LLP only with respect to the effectiveness of the Company's internal control over financial reporting as of March 31, 2025 included in the Company's Annual Report on Form 10-K for the full fiscal year ended March 31, 2025 should no longer be relied upon.

(Emphasis added)

12. That same day before markets opened, Kyndryl announced the abrupt departures of CFO Wyshner and General Counsel Edward Sebold ("Sebold"), while also informing investors that Global Controller Vineet Khurana ("GC Khurana") "stepped down from his position" and "assumed a different role at the Company."

13. Additionally, that same day before markets opened, Kyndryl announced its third-quarter fiscal 2026 financial results, disclosing adjusted earnings per share ("EPS") of $0.52 and revenue of $3.86 billion, missing analysts' estimates of $0.61 per share and $3.89 billion, respectively. Notably, the Company dramatically reduced its full-year fiscal 2026 guidance for free cash flow to a range between $325 and $375 million (from $550 million).

4

14.     On this news, Kyndryl common stock fell $12.90 per share, or more than 54%, from a closing price of $23.49 per share on February 6, 2026, to a closing price of $10.59 per share on February 9, 2026.

15.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in market value of the Company's securities when the truth was disclosed, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

16.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

17.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

18.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts and omissions charged herein, including the dissemination of materially false and misleading information to the investing public, and the omission of material information, occurred in substantial part in this Judicial District, as Kyndryl is headquartered in this Judicial District.

19.     In connection with the acts, transactions, and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the U.S. Mail, interstate telephone communications, and the facilities of a national securities exchange.

**PARTIES**

20.    Based in Hawthorne, New York, Plaintiff provides pension and other benefits for union members.  Plaintiff is responsible for the retirement income of these employees and their beneficiaries.  Plaintiff manages more than $550 million in assets for the benefit of more than 4,000 participants.  As set forth in the accompanying certification, incorporated by reference herein, Plaintiff purchased Kyndryl securities during the Class Period and suffered damages as a result of the federal securities laws violations and false and/or misleading statements and/or material omissions alleged herein.

21.    Defendant Kyndryl is incorporated under the laws of Delaware with its principal executive offices located in New York, New York.  Kyndryl's common stock trades on the New York Stock Exchange (the "NYSE") under the ticker symbol "KD."

22.    Defendant Martin J. Schroeter ("CEO Schroeter") was the Company's Chief Executive Officer ("CEO") and Chairman of the Board at all relevant times.

23.    Defendant David B. Wyshner was the Company's Chief Financial Officer ("CFO") at all relevant times, until his departure in February 2026.

24.    Defendant Vineet Khurana has served as the Company's Senior Vice President, Global Controller ("GC"), and Principal Accounting Officer at all relevant times, until he stepped down and assumed another role at the Company in February 2026.

25.    Defendants CEO Schroeter, CFO Wyshner, and GC Khurana (collectively, the "Individual Defendants"), because of their positions with Kyndryl, possessed the power and authority to control the contents of, *inter alia*, Kyndryl's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  The Individual Defendants were provided with copies of Kyndryl's reports and press

releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false and misleading statements pleaded herein.

26.    Kyndryl and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

27.    Based in New York, New York, Kyndryl operates internationally as a technology and IT infrastructure services company.  The Company provides a range of technology and managed services.  These include cloud hosting, enterprise and mainframe support, application and data services, artificial intelligence solutions, digital workplace management, cybersecurity and resiliency services, and network and edge-computing services.  Its customers span multiple sectors, including financial services, healthcare, government, technology, media and telecommunications, retail, travel, and automotive industries.

28.    Kyndryl began operating as a publicly traded company in 2021 following its spinoff from IBM.

29.    Since the spinoff, Kyndryl repeatedly highlighted free-cash-flow metrics in its communications with investors, identifying free cash flow as an important measure of the Company's operational performance and its prospects for sustained, profitable growth.

30.    Reflecting that focus, the Company's 2025 Proxy Statement explained that the CHC

Committee "determined to link the vesting of the PSUs to the achievement of the Company's

business objectives and the creation of stockholder value by basing the vesting of the PSUs on the

Company's adjusted operating cash flow, total signings and TSR[.]"

**Defendants' Materially False and Misleading Statements**

31.    The Class Period begins on August 1, 2024, when, before markets opened, Kyndryl

held its earnings call for the first quarter of its fiscal year 2025, ended June 30, 2024.  During the

earnings call CEO Schroeter touted that, "in the first quarter, pretax earnings were up significantly

year-over-year, and we remain on track to deliver significant cash flow this year."  In announcing

Kyndryl's updated guidance for fiscal 2025, he stated:

> [A]djusted pretax income of at least $460 million reflecting a year-over-year increase of at least $295 million.  As David will explain in more detail, the margins at which we're signing contracts and ***the other actions we're taking to grow our profitability*** have us on a path to deliver high single-digit adjusted pretax margins by fiscal 2027 and ***yes, the math associated with that is ultimately a $1 billion or more of adjusted pretax income with strong conversion of our earnings into cash flow***.

> (Emphasis added)

32.    On that same call, CFO Wyshner discussed the Company's cash flow and balance

sheet stating:

> As expected, our first quarter was a seasonal user of cash due to annual software and incentive payments and our adjusted free cash flow was negative $116 million in the quarter.  Our gross capital expenditures were $122 million, and we received $24 million of proceeds from asset dispositions.  We've provided a bridge from our adjusted pretax income to our free cash flow as well as a bridge from our adjusted EBITDA to our free cash flow in the appendix.

> ***Importantly, our use of cash in the first quarter doesn't change our expectation of generating roughly $300 million of positive adjusted free cash flow this year.  Our financial position remains strong***.  Our cash balance at June 30 was $1.3 billion.  Our cash,

combined with available debt capacity under committed borrowing facilities gave us nearly $4.5 billion of liquidity at quarter end. Our debt maturities are well laddered from late 2026 to 2041. We had no borrowings outstanding under our revolving credit facility and our net debt at quarter end was $2 billion.

(Emphasis added)

33.     CFO Wyshner also assured investors that "[o]ver the medium term, we remain committed to delivering significant margin expansion in generating free cash flow growth[,]" and that "[w]e have a solid game plan to drive our strategic progress[,] and this game plan starts with the steps we've already taken to expand our technology alliances, manage our costs and earn a return on all of our revenues."

34.     The following week, on August 7, 2024, Kyndryl issued its quarterly report on Form 10-Q for the first quarter of fiscal year 2025 (the "2025 Q1 Report"). The 2025 Q1 Report stated the following, in relevant part, about the Company's internal controls and procedures:

> Item 4. Controls and Procedures
>
> The Company's management evaluated, with the participation of the Chief Executive Officer and Chief Financial Officer, the effectiveness of the Company's disclosure controls and procedures (as such term is defined in Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this report. Based on that evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures were not effective as of the end of the period covered by this report due to a material weakness in internal control over financial reporting in the area of our information technology general controls ("ITGCs") that was disclosed in Part II, Item 9A of the Company's Form 10-K. The deficiencies in ITGCs were related to access and program development and change management controls associated with the Company's large-scale migration in a compressed timeframe of its internal operating systems to a new enterprise resource planning system, which was required to replace the systems temporarily being made available to the Company by our former Parent following our Spin-off. These control deficiencies did not result in a misstatement to the annual or interim consolidated financial statements previously filed or included in this Form 10-Q.

9

Changes in Internal Control over Financial Reporting

> ***There have been no changes in the Company's internal control over financial reporting*** (as such term is defined in Rule 13a-15(f) of the Exchange Act) ***that occurred during the period covered by this report that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting other than the ongoing remediation of the ITGC deficiencies described below***.

(Emphasis added)

35.     Pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), CEO Schroeter and CFO Wyshner signed and filed certifications together with the 2025 Q1 Report attesting to the accuracy of Kyndryl's financial reporting, the disclosure of any material changes to the Company's internal controls, and the disclosure of all fraud.

36.     GC Khurana was the authorized signatory of the 2025 Q1 Report pursuant to the requirements of the Exchange Act.

37.     On November 7, 2024, during the Company's second-quarter fiscal year 2025 earnings call, CEO Schroeter reiterated that second quarter "adjusted pretax earnings were up substantially year-over-year and we remain on track to deliver significant cash flow this year." He also addressed the Company's long-term ability to convert earnings into cash flow, stating, in relevant part:

> [T]he margins at which we're signing contracts and ***the other actions we're taking to grow our profitability***, keep us well on track to deliver high single-digit adjusted pretax margins by fiscal 2027. And ***yes, the math associated with that is ultimately a $1 billion or more of adjusted pretax income with strong conversion of our earnings into cash flow***. Our confidence stems from Kyndryl's unique set of attributes that position us well for sustainable growth.

(Emphasis added)

38.     On that same call, while discussing the Company's cash flow and balance sheet, CFO Wyshner asserted that "[o]ur financial position remains strong." He again insisted that,

10

"[o]ver the medium term, we remain committed to delivering significant margin expansion and generating free cash flow growth[,]" as the Company had "a solid game plan to drive our strategic progress, and this, [starting] with the steps we've already taken to expand our technology alliances, manage our costs and earn a return on all of our revenues."

39.     That same day, Kyndryl issued its quarterly report on Form 10-Q for the second quarter of fiscal year 2025 (the "2025 Q2 Report").  The 2025 Q2 Report stated the following, in relevant part, about the Company's internal controls and procedures:

> Item 4. Controls and Procedures
>
> The Company's management evaluated, with the participation of the Chief Executive Officer and Chief Financial Officer, the effectiveness of the Company's disclosure controls and procedures (as such term is defined in Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this report.  Based on that evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures were not effective as of the end of the period covered by this report due to a material weakness in internal control over financial reporting in the area of our information technology general controls ("ITGCs") that was disclosed in Part II, Item 9A of the Company's Form 10-K.  The deficiencies in ITGCs were related to access and program development and change management controls associated with the Company's large-scale migration in a compressed timeframe of its internal operating systems to a new enterprise resource planning system, which was required to replace the systems temporarily being made available to the Company by our former Parent following our Spin-off.  These control deficiencies did not result in a misstatement to the annual or interim consolidated financial statements previously filed or included in this Form 10-Q.
>
> Changes in Internal Control over Financial Reporting
>
> ***There have been no changes in the Company's internal control over financial reporting*** (as such term is defined in Rule 13a-15(f) of the Exchange Act) ***that occurred during the quarter ended September 30, 2024 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting other than the ongoing remediation of the ITGC deficiencies described below***.

(Emphasis added)

40. Pursuant to SOX, CEO Schroeter and CFO Wyshner signed and filed certifications together with the 2025 Q2 Report attesting to the accuracy of Kyndryl's financial reporting, the disclosure of any material changes to the Company's internal controls, and the disclosure of all fraud.

41. GC Khurana was the authorized signatory of the 2025 Q2 Report pursuant to the requirements of the Exchange Act.

42. On February 3, 2025, Kyndryl issued a press release announcing its third-quarter fiscal year 2025 financial results, ended December 31, 2024. In the press release, CFO Wyshner touted, "Once again, we delivered strong progress on our three-A's initiatives and robust signings growth that demonstrate customer demand for the essential services and insights we offer[,]" while highlighting that "margins associated with our signings continue to support our outlook for future earnings and free cash flow growth."

43. On February 4, 2025, Kyndryl held its associated earnings call. During the call, CEO Schroeter boasted to investors that the Company had "generated more than $170 million of adjusted free cash flow in the quarter[,]" which was, among other financial metrics, purportedly "led by double-digit revenue growth in Kyndryl Consult and demand for modernization, cloud, security and AI services." He further stated:

> As we've highlighted before, our evolving business mix, where we're focusing on higher value services for our customers is driving increased profitability and fueling future top line growth. We have confidence in our ability to continue to set ambitious goals and achieve them. And with that in mind, in November, we introduced our medium-term outlook with a triple double single mnemonic. ***We're projecting to triple our adjusted free cash flow in fiscal 2028 compared to fiscal 2025 to roughly $1 billion.*** We're projected to more than double our adjusted pretax income to at least $1.2 billion over that same time period, ***and we project that we only need***

12

*revenue to reach mid-single-digit annual growth in fiscal 2028 and beyond to deliver those goals*.

*With strong conversion of our earnings to free cash flow, we'll balance our approach to capital allocation by investing in organic growth opportunities and occasional tuck-in acquisitions, and at the same time, return capital to shareholders through our share repurchase program*.   Because of our recognized industry leadership, expertise, scale and financial strength, customers trust us to manage their most missioncritical systems.   And in the last 3 years, we've become an integral part of the broad IT ecosystem that is relevant to our customers.   The mission-critical infrastructure services we provide are our foundation for sustained profitable growth.

(Emphasis added)

44.    On February 6, 2025, Kyndryl issued its quarterly report on Form 10-Q for the third quarter of fiscal year 2025 (the "2025 Q3 Report").  The 2025 Q3 Report stated the following, in relevant part, about the Company's internal controls and procedures:

Item 4. Controls and Procedures

* * * *

Changes in Internal Control over Financial Reporting

There have been no changes in the Company's internal control over financial reporting (as such term is defined in Rule 13a-15(f) of the Exchange Act) that occurred during the quarter ended December 31, 2024 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting other than the ongoing remediation of the ITGC deficiencies described below.

45.    Pursuant to SOX, CEO Schroeter and CFO Wyshner signed and filed certifications together with the 2025 Q3 Report attesting to the accuracy of Kyndryl's financial reporting, the disclosure of any material changes to the Company's internal controls, and the disclosure of all fraud.

46.    GC Khurana was the authorized signatory of the 2025 Q3 Report pursuant to the requirements of the Exchange Act.

47.    On May 7, 2025, Kyndryl issued a press release announcing its fourth-quarter and full-year fiscal year 2025 financial results, ended March 31, 2025.  In the press release, CFO Wyshner stated, "We delivered strong signings growth in fiscal year 2025, with attractive margins built into these signings . . . demonstrate[ing] the potential our business has to continue to grow our revenue, increase our earnings and generate cash flow."  Additionally, Kyndryl provided investors with fiscal year 2026 guidance for adjusted free cash flow of approximately $550 million.

48.    The next day, the Company held its related earnings call, during which CEO Schroeter touted that, "our fiscal 2025 results not only exceeded the earnings, cash flow and three-A's projections we laid out at the beginning of the year[]" but "also proved the investment thesis for Kyndryl's evolution that we laid out 3 years ago."  He further added that "[w]e can execute on our strategy that is unique to us.  We can grow.  We are profitable and we generate cash."

49.    During that same call, CFO Wyshner again reiterated that, "[o]ver the medium term, we remain committed to delivering significant margin expansion and generating free cash flow growth," while having "a solid game plan to drive our strategic progress . . . start[ing] with the steps we've already taken to expand our technology alliances, manage our costs and earn a return on all of our revenues."

50.    On May 30, 2025, Kyndryl issued its annual report for the fiscal year 2025, ended March 31, 2025, on Form 10-K (the "2025 Annual Report").  Pursuant to SOX, CEO Schroeter and CFO Wyshner signed and filed certifications together with the 2025 Annual Report attesting to the accuracy of Kyndryl's financial reporting, the disclosure of any material changes to the Company's internal controls, and the disclosure of all fraud.

14

Item 9A. Controls and Procedures

*Disclosure Controls and Procedures*

The Company's management evaluated, with the participation of the Chief Executive Officer and Chief Financial Officer, the effectiveness of the Company's disclosure controls and procedures (as such term is defined in Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of March 31, 2025, the end of the period covered by this report. ***Based on that evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures were effective as of the end of the period covered by this report***.

\* \* \* \*

*Changes in Internal Control over Financial Reporting*

***There have been no changes in the Company's internal control over financial reporting*** (as such term is defined in Rule 13a-15(f) of the Exchange Act) ***that occurred during the quarter ended March 31, 2025 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting other than the remediation of our information technology general controls as part of our previously disclosed remediation activities***.

(Emphasis added)

51.    The above statements identified in ¶¶ 31-50 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects to make the statements made, in light of the circumstances under which they were made, not false and misleading.  Specifically, Defendants failed to disclose that: (1) certain executive officers manipulated the Company's free cash flow metrics by systematically deferring vendor payments from one quarter to the next; (2) in turn, Kyndryl misleadingly portrayed its reported free cash flow metrics as evidence of the quality and sustainability of its earnings and revenue growth, when in fact the cash generation was dependent on undisclosed and unsustainable cash management practices; (3) the Company's disclosure processes, accounting practices, and internal

15

controls over financial reporting were materially deficient; (4) due to the foregoing, Kyndryl's business, financial condition, and prospects of profitable growth were materially worse than represented; and (5) as a result, Defendants' positive statements Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**The Truth Begins to Emerge**

52.    The truth began to emerge after markets closed on August 4, 2025, when Kyndryl issued a press release announcing its first-quarter fiscal year 2026 results.  Specifically, the Company reported revenue of $3.743 billion and free cash flow use of $222 million, both of which missed analysts' estimates of $3.788 billion and $219 million.  Nonetheless, in the press release, the Company attributed the unexpected use of free cash flow to "typical seasonal outflows."

53.    The next day, during the related earnings call, CEO Schroeter explained that first quarter "revenue declined in constant currency as we continue to drive progress on our accounts initiative[,] and that "[i]n fact, all of the Q1 revenue change was attributed to our actions to address 8 focus accounts where we reduced our revenue by half and significantly increased our gross margin over the last year."  He further added that "[w]e also saw some deals we had targeted for Q1 move out of the quarter."

54.    CEO Schroeter also continued to assure investors that, "[w]ith strong conversion of our earnings to free cash flow, we're optimizing our capital allocation by investing in organic growth opportunities, returning capital to shareholders through our share repurchase program and occasionally pursuing tuck-in acquisitions."

55.    On that same call, CFO Wyshner downplayed the "significant use of cash" in the first quarter and blamed "annual software and incentive compensation payments," stating:

On the topic of cash flow, for the year as a whole, we're forecasting roughly 100% conversion of adjusted pretax income less cash taxes into free cash flow.  With cash taxes of roughly $175 million, this implies free cash flow of approximately $550 million.  We also project roughly $700 million of net capital expenditures and about $700 million of depreciation expense.  ***From a timing perspective, while Q1 was a significant user of cash due to annual software and incentive compensation payments, subsequent quarters will be more favorable***.

(Emphasis added)

56.    Later, during the question-and-answer portion of the call, in response to an Oppenheimer analyst's question about using free cash flow for stock buybacks, CFO Wyshner continued to assure investors of the Company's strength in terms of free cash flow, stating:

> Just on the buyback question, we repurchased $65 million of stock in the quarter.  And since we've launched the program in November, we've repurchased almost 2% of our shares outstanding.  As we go into this quarter, we'll look at our cash flow.  We'll look at the share price.  We'll look at market conditions, we'll look at other factors and make a decision about how much stock to buy back.  But we have over $140 million of available capacity under the existing authorization.  ***And you're absolutely right, we're moving into the cash flow generating portion of the year for us.  So[,] we will have additional cash flow to deploy.***

(Emphasis added)

57.    On this news, the price of Kyndryl common stock fell $7.76 per share, or about 21%, from a closing price of $36.70 per share on August 4, 2025, to a closing price of $28.94 per share on August 5, 2025.

58.    Analysts immediately reacted.  For example, J.P. Morgan analysts issued a report titled "F1Q First Look: Guidance Maintained, But Slower Start to Year on FXN Rev Growth Basis Implies Dreaded Steeper Ramp," noting:

> ***We expected a slow start to the year on revenue with F2H26 growth expected to exceed F1H, but the magnitude of the F1Q decline and the reiterated +1% FXN growth for FY26 implies a steeper ramp that will likely not be well received by investors given***

17

*how peer stocks have reacted to similar outlooks*. Encouragingly, margin progress enabled in-line earnings on the 2% sales miss, ***but investors need visibility into sustainable positive revenue growth to award KD a double-digit free cash flow multiple, so we expect a negative stock reaction***, despite the strong Consult results.

59.     The same J.P. Morgan analysts further noted:

Gross margins of 21.3% were on the softer end of JPMe/Street 22.0%/21.0% against a tough comp in F1Q25, while adj pre-tax margin came 10bps ahead at 3.4% to support in-line adj pre-tax income of $128M vs JPMe/Street $125/127M. ***In-line margins on below expected MS declines reflects favorable Advanced Delivery initiatives and leads us to suspect that the revenue shortfall in MS came from low-margin work***. ***F1Q adjusted FCF burn of ($222M) came just below Street ($219M)***, but GAAP FCF burn of ($266M) came just better than JPMe ($270M).  Cash flow from operations included two offsetting $950M accounting entries that drove (1) elevated cash drag from additions to deferred costs and (2) elevated cash inflow from other assets and liabilities, which together reflect the extension and amendment of a multi-year software license that should net out to zero impact on cash in the quarter.

(Emphasis added)

60.     The above statements identified in ¶¶ 52-56 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects to make the statements made, in light of the circumstances under which they were made, not false and misleading.  Specifically, Defendants failed to disclose that: (1) certain executive officers manipulated the Company's free cash flow metrics by systematically deferring vendor payments from one quarter to the next; (2) in turn, Kyndryl misleadingly portrayed its reported free cash flow metrics as evidence of the quality and sustainability of its earnings and revenue growth, when in fact the cash generation was dependent on undisclosed and unsustainable cash management practices; (3) the Company's disclosure processes, accounting practices, and internal controls over financial reporting were materially deficient; (4) due to the foregoing, Kyndryl's business, financial condition, and prospects of profitable growth were materially worse than

represented; and (5) as a result, Defendants' positive statements Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### The Truth Fully Emerges

61.     The truth fully emerged before markets opened on February 9, 2026, when Kyndryl filed the NTL Filing, revealing that it was "unable to file within the prescribed time period, without unreasonable effort and expense, its Quarterly Report on Form 10-Q for the quarter ended December 31, 2025."

62.     The NTL Filing further revealed that:

> **The Company, through the Audit Committee of its Board of Directors, is reviewing its cash management practices, related disclosures (including regarding the drivers of the Company's adjusted free cash flow metric), the efficacy of the Company's internal control over financial reporting, and certain other matters following the Company's receipt of voluntary document requests from the Division of Enforcement of the Securities and Exchange Commission ("SEC") relating to such matters.** Due to this review, the finalization of the Quarterly Report, including the Company's assessment of internal control over financial reporting, requires additional time to complete.

> \* \* \* \*
>
> **In connection with the filing of the Quarterly Report, when made, the Company anticipates reporting material weaknesses in the Company's internal control over financial reporting for the period covered in the Quarterly Report, as well as for the full fiscal year ended March 31, 2025, and the first two fiscal quarters of fiscal year 2026**, which are expected to include, but may not be limited to, the effectiveness and strength of certain functions at the Company, including with respect to controls related to information and communication and tone at the top. As a result, the Company notes that its assessment of internal control over financial reporting and the related opinion of PricewaterhouseCoopers LLP only with respect to the effectiveness of the Company's internal control over financial reporting as of March 31, 2025 included in the Company's Annual Report on Form 10-K for the full fiscal year ended March 31, 2025 should no longer be relied upon.

(Emphasis added)

63.     That same day before markets opened, the Company filed a Current Report on Form 8-K, announcing the departures of CFO Wyshner and General Counsel Sebold, "effective immediately."  Kyndryl also stated that GC Khurana "stepped down from his position" and "assumed a different role at the Company."

64.     Additionally, that same day before markets opened, Kyndryl issued a press release disclosing its third-quarter fiscal year 2026 financial results.  The Company reported adjusted EPS of $0.52 and revenue of $3.86 billion, falling short of analysts' estimates of $0.61 per share and $3.89 billion, respectively.  Third-quarter adjusted EBITDA of $696 million and adjusted pre-tax profit of $168 million fell well below analysts' expectations of $701.2 million and $192.4 million, respectively. Significantly, the Company also slashed its full-year fiscal 2026 guidance for free cash flow to a range between $325 and $375 million—dramatically below the Company's prior guidance of $550 million.

65.     On this news, Kyndryl common stock fell $12.90 per share, or more than 54%, from a closing price of $23.49 per share on February 6, 2026, to a closing price of $10.59 per share on February 9, 2026.

66.     Analysts were stunned by these disclosures.  For instance, J.P. Morgan analysts downgraded the Company's stock and cut their price target, noting in their report that the downgrade stemmed from "sales and profit cuts plus a surprise CFO departure and delayed 10-Q filing." The J.P. Morgan analysts further explained that "we gave a pass last quarter on the revenue miss on the expectation that profits and FCF [Free Cash Flow] would hold," but that the latest "negative guidance revision and stunning CFO change delays the turnaround, creating new questions across the thesis and forcing bulls to return to the drawing board."

67.    Guggenheim analysts similarly reacted to these startling revelations, downgrading

Kyndryl stock, removing their price target, and issuing a report that highlighted:

> While we believed investors were largely braced for downside to KD's FY26 outlook, *we do not believe investors were ready for: the magnitude of the revision; departures of CFO David Wyshner, General Counsel Edward Sebold, and Global Controller Vineet Khurana; nor the disclosure of an anticipated material weakness in KD's internal controls over financial reporting (following the company's receipt of voluntary document requests from the Division of Enforcement of the SEC)*. Taken together, F3Q26 results and the associated disclosures draw more questions than answers, particularly around KD's path to achieving its FY28 targets. The revised FY26 revenue growth outlook of (2)% to (3)% y/y cc (vs. +1% y/y cc prior) defers the company's inflection to stabilization, *while the company's revised free cash flow outlook of $325mm–$375mm (vs. $550mm prior) draws questions around the path to KD's FY28 $1bn adjusted free cash flow target*.

> (Emphasis added)

### Post-Class Period Developments

68.    On February 17, 2026, Kyndryl filed its delayed Form 10-Q with the SEC for the

third quarter of fiscal 2026, ended December 31, 2025 (the "2026 Q3 Report"). The 2026 Q3

Report stated the following, in relevant part:

> Item 4. Controls and Procedures
>
> * * * *
>
> Material Weaknesses in Internal Control over Financial Reporting
>
> * * * *
>
> The Company identified the following material weaknesses in its internal control over financial reporting:
>
> - The Company's senior finance executives failed to set an appropriate tone at the top based on the principles associated with the control environment component of the COSO framework. *Specifically, there was a lack of transparency with the Company's Chief Executive Officer, the Audit Committee of the Board of Directors*

21

*(the "Board") and the Board, such that disclosure processes, including with respect to certain cash management practices regarding deferring vendor payments quarter to quarter, were impacted*. Additionally, the Company lacked an appropriate complement of finance personnel with sufficient understanding of their responsibilities as Disclosure Committee members and with adequate competency in their responsibilities regarding disclosure controls.

- *The Company did not design and maintain effective controls related to the information and communication component of the COSO framework to ensure appropriate communication pertaining to the disclosure process between certain functions within the Company*, including the Company's Disclosure Committee and the Chief Executive Officer, as well as with the Audit Committee and the Board.

- The aforementioned material weaknesses contributed to an additional material weakness. *The Company did not design and maintain effective controls regarding the internal investigation, escalation and documentation of complaints made through the Company's reporting hotline* and certain other available reporting channels, including with respect to appropriate escalation of certain complaints to the Audit Committee.

(Emphasis added)

## CLASS ACTION ALLEGATIONS

69.    Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Kyndryl securities between August 1, 2024 and February 6, 2026, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers, and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

22

70.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Throughout the Class Period, common stock of Kyndryl actively traded on the NYSE under the symbol "KD."  Millions of Kyndryl shares were traded publicly during the Class Period on the NYSE.  As of February 2, 2026, the Company had more than 225 million shares of common stock outstanding.  Record owners and other members of the Class may be identified from records maintained by Kyndryl or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

71.     Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

72.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests that conflict with those of the Class.

73.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a)      whether Defendants violated the Exchange Act by the acts and omissions as alleged herein;

b)      whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

23

c)       whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders misrepresented material facts about the business, operations, and prospects of Kyndryl;

d)       whether statements made by Defendants to the investing public misrepresented and/or omitted to disclose material facts about the business, operations, and prospects of Kyndryl;

e)       whether the market price of Kyndryl securities during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f)       the extent to which the members of the Class have sustained damages and the proper measure of damages.

74.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this suit as a class action.

<u>**UNDISCLOSED ADVERSE INFORMATION**</u>

75.     The market for Kyndryl securities was an open, well-developed, and efficient market at all relevant times.  As a result of the materially false and/or misleading statements and/or omissions particularized in this Complaint, Kyndryl's securities traded at artificially inflated prices during the Class Period.  Plaintiff and the other members of the Class purchased Kyndryl's securities relying upon the integrity of the market price of the Company's securities and market information relating to Kyndryl and have been damaged thereby.

24

76. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of the Company's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Kyndryl's business, operations, and prospects as alleged herein. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its business, thus causing the Company's securities to be overvalued and artificially inflated or maintained at all relevant times. Defendants' materially false and/or misleading statements directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class who purchased the Company's securities at artificially inflated prices and were harmed when the truth was revealed.

## SCIENTER ALLEGATIONS

77. As alleged herein, Defendants acted with scienter in that Defendants knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

78. As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Kyndryl, their control over, receipt, and/or modification of Kyndryl's allegedly materially misleading statements and omissions, and/or their

positions with the Company, which made them privy to confidential information concerning Kyndryl, participated in the fraudulent scheme alleged herein.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

79. As a result of their purchases of Kyndryl's securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

80. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Kyndryl who knew that the statement was false when made.

## LOSS CAUSATION

81. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss, *i.e.*, damages, suffered by Plaintiff and the Class.

82. As detailed herein, during the Class Period, Defendants made materially false and misleading statements and omissions and engaged in a scheme to deceive the market. This artificially inflated the prices of Kyndryl's securities and operated as a fraud or deceit on the Class. When Defendants' prior misrepresentations, information alleged to have been concealed, fraudulent conduct, and/or the effect thereof were disclosed to the market, the price of Kyndryl's stock fell precipitously, as the prior artificial inflation came out of the price.

**APPLICABILITY OF PRESUMPTION OF RELIANCE**
**(FRAUD-ON-THE-MARKET DOCTRINE)**

83.    The market for Kyndryl securities was open, well-developed, and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose particularized in this Complaint, Kyndryl securities traded at artificially inflated and/or maintained prices during the Class Period.  Plaintiff and other members of the Class purchased the Company's securities relying upon the integrity of the market price of Kyndryl securities and market information relating to Kyndryl and have been damaged thereby.

84.    At all times relevant, the market for Kyndryl securities was an efficient market for the following reasons, among others:

a)    Kyndryl was listed and actively traded on the NYSE, a highly efficient and automated market;

b)    As a regulated issuer, Kyndryl filed periodic public reports with the SEC and/or the NYSE;

c)    Kyndryl regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

d)    Kyndryl was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

85.    As a result of the foregoing, the market for Kyndryl securities promptly digested current information regarding Kyndryl from all publicly available sources and reflected such

27

information in the Company's stock price.  Under these circumstances, all purchasers of Kyndryl securities during the Class Period suffered similar injury through their purchase of stock at artificially inflated prices, and a presumption of reliance applies.

86.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded in Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business, operations, and prospects—information that Defendants were obligated to disclose but did not—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## COUNTS AGAINST DEFENDANTS

### COUNT I

**For Violations of Section 10(b) of the Exchange Act and
Rule 10b-5 Promulgated Thereunder Against All Defendants**

87.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

88.     Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Kyndryl's securities; and (iii) cause Plaintiff and other members of the Class to purchase Kyndryl securities

at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

89.    Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of conduct that operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Kyndryl securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

90.    Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Kyndryl's business, operations, and prospects, as specified herein.  Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Kyndryl's business, operations, and prospects, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Kyndryl and its business, operations, and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of conduct of business that operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

29

91.     Each of the Individual Defendants' primary liability and controlling person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company and a member of the Company's management team or had control thereof; (ii) each of the Individual Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's business, operations, and prospects; (iii) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to, other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public, which they knew and/or recklessly disregarded was materially false and misleading.

92.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Kyndryl's operating condition, business practices, and prospects from the investing public and supporting the artificially inflated and/or maintained price of its securities.  As demonstrated by Defendants' misstatements of the Company's business, operations, and prospects, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

93.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Kyndryl securities was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants or upon the integrity of the markets in which the securities trade, and/or in the absence of material adverse information that was known or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants, Plaintiff and the other members of the Class purchased Kyndryl securities during the Class Period at artificially inflated prices and were damaged thereby.

94.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known of the truth regarding the problems that Kyndryl was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased Kyndryl securities, or, if they had purchased such shares during the Class Period, they would not have done so at the artificially inflated prices that they paid.

95.     By virtue of the foregoing, Defendants each violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

96.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### Against All Individual Defendants

97.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

31

98.     The Individual Defendants acted as controlling persons of Kyndryl within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in, and/or awareness of the Company's operations, and intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.  Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

99.     In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

100.     As set forth above, Defendants each violated § 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their position as controlling persons, the Individual Defendants are liable pursuant to § 20(a) of the Exchange Act.  As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

101.    WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for relief and judgment as follows:

a)    Declaring this action to be a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b)    Awarding Plaintiff and the other members of the Class damages in an amount that may be proven at trial, together with interest thereon;

c)    Awarding Plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

d)    Awarding such other and further relief as this Court deems appropriate.

## JURY DEMAND

102.    Plaintiff demands a trial by jury.

Dated: March 17, 2026                              Respectfully submitted,

By: */s/ Marco A. Dueñas*

**SAXENA WHITE P.A.**
Marco A. Dueñas
10 Bank Street, Suite 882
White Plains, NY 10606
Tel.: (914) 437-8551
Fax: (888) 631-3611
mduenas@saxenawhite.com

Maya Saxena (*pro hac vice* forthcoming)
Lester R. Hooker
Nicholas Corso (*pro hac vice* forthcoming)
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Tel.: (561) 394-3399
Fax: (561) 394-3382
msaxena@saxenawhite.com

lhooker@saxenawhite.com
ncorso@saxenawhite.com

*Counsel for Plaintiff Westchester Putnam Counties Heavy & Highway Laborers Local 60 Benefits Fund*

34