**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

WESTCHESTER PUTNAM COUNTIES HEAVY & HIGHWAY LABORERS LOCAL 60 BENEFIT FUNDS, individually and on behalf of all others similarly situated,

Plaintiff,

vs.

KYNDRYL HOLDINGS, INC., MARTIN J. SCHROETER, DAVID B. WYSHNER, and VINEET KHURANA,

Defendants.

Case No. 26 Civ. 2211 (JPO)

CLASS ACTION

**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

DEMAND FOR A JURY TRIAL

# TABLE OF CONTENTS

Page

I. INTRODUCTION .......... 2

II. JURISDICTION AND VENUE .......... 7

III. PARTIES .......... 7

A. Lead Plaintiff .......... 7

B. Defendants .......... 8

C. Other Relevant Individuals .......... 9

IV. BACKGROUND ON KYNDRYL'S BUSINESS .......... 10

V. SUMMARY OF THE FRAUD .......... 12

A. Defendants Told Investors that Certain Legacy Burdens Made Traditional Financial Metrics Less Meaningful to Kyndryl's Financial Condition .......... 12

B. Before and During the Class Period, Defendants Emphasized Free Cash Flow as the Best Indicator of Kyndryl's Financial and Operating Performance .......... 14

C. During the Class Period, Defendants Concealed Kyndryl's Cash Management Practices, Instead Misleadingly Attributing Kyndryl's Cash Flow Growth Solely to Seemingly Legitimate Business Factors .......... 18

1. Defendants Misleadingly Attributed Kyndryl's Cash Flow to Factors Like Revenue and Margin Growth, Efficiency, and Innovation .......... 18

2. In Reality, Kyndryl's Cash Flow Metrics Were Driven by Undisclosed Cash Management Practices .......... 28

a. As a "Standard Practice," Kyndryl Deferred Vendor Payments Including Beyond Payment Terms and at Times In A "Magnitude" That "Exceeded $100 Million" .......... 29

b. Former Employees Confirm that Kyndryl Used Widespread "Q Blocks" to Block Vendor Payments from Being Made .......... 31

D. Defendants Made False and Misleading Statements About Kyndryl's Disclosure Controls and Procedures and About Its Internal Controls Over Financial Reporting .......... 39

1. Regulatory Framework for Disclosure and Accounting Controls .......... 39

2. Defendants Falsely Certified that Kyndryl Had Effective Internal Controls or Only One Material Weakness Unrelated to the Undisclosed Cash Management Practices ............................................... 44

3. In Reality, Kyndryl Had At Least Three Other Undisclosed Material Weaknesses in Internal Controls Over Financial Reporting, and Its Disclosure Controls and Procedures Were Ineffective ............................. 46

VI. THE TRUTH EMERGES .......................................................................................... 49

A. August 4-5, 2025: Investors Begin to Learn the Truth as Kyndryl Announces Cash Flow Below Market Expectations............................................ 49

B. February 9, 2026: Kyndryl is Forced to Make Bombshell Admissions, Finally Revealing the Truth ..................................................................... 51

VII. POST-CLASS PERIOD DEVELOPMENTS ............................................................... 54

VIII. ADDITIONAL SCIENTER ALLEGATIONS ............................................................... 58

IX. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ........ 75

A. False and Misleading Statements Regarding the Effectiveness of Disclosure Controls and Internal Controls over Financial Reporting.................................... 75

B. False and Misleading Statements in the MD&A Sections of Kyndryl's SEC Filings About Net Cash Provided by or Used in Operating Activities ................. 82

C. False Statement Denying the Gotham City Reports ............................................ 89

D. Additional False and Misleading Statements Regarding Free Cash Flow and Related Metrics ........................................................................................ 91

E. False and Misleading Statements Relating to Financial Guidance for Fiscal Year 2026......................................................................................... 107

X. LOSS CAUSATION.................................................................................................. 116

XI. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ................................. 119

XII. THE PRESUMPTION OF RELIANCE ..................................................................... 120

XIII. CLASS ACTION ALLEGATIONS ........................................................................... 122

XIV. CLAIMS FOR RELIEF ............................................................................................ 124

XV. PRAYER FOR RELIEF ............................................................................................ 130

XVI. JURY DEMAND ....................................................................................................... 131

Lead Plaintiff International Union of Operating Engineers, Local No. 793, Members Pension Benefit Trust of Ontario ("Lead Plaintiff" or "Local No. 793"), by and through its counsel Bernstein Litowitz Berger & Grossmann LLP ("Lead Counsel"), brings this action for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rules 10b-5(a)-(c), 17 C.F.R. § 240.10b-5(a)-(c), against Defendants Kyndryl Holdings, Inc. ("Kyndryl" or the "Company"), its Chief Executive Officer ("CEO") Martin J. Schroeter ("Schroeter"), its former Chief Financial Officer ("CFO") David B. Wyshner ("Wyshner"), and its former Global Controller Vineet Khurana ("Khurana") (collectively "Defendants"). Lead Plaintiff brings this action on behalf of all persons and entities who purchased or otherwise acquired Kyndryl common stock between July 31, 2024 and February 6, 2026 (the "Class Period") and were damaged thereby (the "Class").

Lead Plaintiff alleges the following based upon personal knowledge as to itself and its own acts and upon information and belief as to all other matters. Lead Plaintiff's information and belief is based on, among other things, the investigation of Lead Counsel, which includes, but is not limited to, a review and analysis of: (a) Kyndryl's public filings with the SEC; (b) transcripts of Kyndryl management's conference calls and other communications with investors and analysts; (c) press releases disseminated by Kyndryl; (d) analyst and press reports about Kyndryl; (e) other public information and data regarding Kyndryl; (f) interviews of certain former Kyndryl employees; (g) consultation with relevant experts and consultants; and (h) other sources cited herein. Lead Counsel's investigation is ongoing, many of the relevant facts are known only by Defendants or are exclusively within their custody or control, and Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. INTRODUCTION

1. Defendants deceived investors about Kyndryl's free cash flow and cash flow management practices to create the materially false and misleading impression that Kyndryl—a company saddled with financial problems when it was spun-off from IBM—was providing real value to investors and achieving organic growth, when it was not. Defendants primed the market to focus on Kyndryl's cash flow metrics but did not tell investors that Kyndryl's supposedly growing free cash flow was a mirage created by Defendants' years-long scheme of deferring its vendor payments from quarter to quarter. These undisclosed, recurring, and unsustainable practices sometimes involved more than $100 million of deferred payments per quarter, enabled Defendants to inflate Kyndryl's cash flow metrics, and were later tied to Kyndryl's admitted material weaknesses in its disclosure controls and internal controls over financial reporting.

2. Defendants' fraud eventually came to light, and the fallout and losses to investors were severe. The scheme's collapse: (i) spurred an ongoing SEC investigation and a Kyndryl Audit Committee investigation into Kyndryl's "cash management practices, related disclosure, and the efficacy of Kyndryl's internal controls over financial reporting"; (ii) forced Kyndryl to publicly admit three previously-undisclosed "material weaknesses in the Company's internal control over financial reporting" and that its "disclosure controls and procedures and internal control over financial reporting were ineffective," contrary to Defendants' repeated, false Class Period certifications; (iii) led to the termination of Defendant Wyshner, the demotion of Defendant Khurana, and the termination of Kyndryl's General Counsel, for failing "to set an appropriate tone at the top"; and (iv) tanked Kyndryl's stock price, causing it to lose more than 76% of its value by the end of the Class Period compared to its Class Period high.

3. Kyndryl states it is the "world's largest IT infrastructure services provider." As a result of its spin-off from IBM as an independent public company in 2021, Kyndryl inherited

various tax burdens, certain other costs, and problematic contracts, all of which negatively affected traditional indicators of financial performance, such as revenue and profit.

4. Before and during the Class Period, Defendants sought to reassure investors that those standard metrics did not paint a complete picture of Kyndryl's ability to provide value to investors. Defendants thus urged investors to instead focus on certain metrics in Kyndryl's financial statements—principally, its free cash flow and related metrics—as the most accurate and important indicators of Kyndryl's financial and operating performance.

5. Free cash flow is the extra money a company has after paying for its operations and capital assets. Effectively, it is liquidity a company can use to grow, pay off its debts, or share with investors. Consistent positive free cash flow is generally a sign of financial stability and flexibility, while negative or volatile free cash flow can signify operational strain. Defendants crafted a narrative about Kyndryl's supposedly compelling growth as measured by free cash flow and specifically highlighted free cash flow as a primary reason for investors to purchase Kyndryl stock.

6. Throughout the Class Period Defendants stated Kyndryl's cash flow performance was "***powered***" or "***driven***" by various legitimate factors, like an "ability to drive efficiency." Defendants also told investors that Kyndryl maintained effective disclosure controls and internal controls over financial reporting, assuring investors that Kyndryl's financial disclosures were accurate and that material information was timely and reliably relayed to Defendants and investors, reducing the risk of loss. Finally, on the back of Kyndryl's purportedly strong free cash flow, Defendants issued ambitious financial guidance, leading investors to believe Kyndryl's growth was sustainable and increasing, even though Defendants knew the guidance had no basis in reality.

7. Analysts relied on these representations as evidence of Kyndryl's "strong liquidity position" and that the cash flow metrics were driven by Kyndryl's "focus on organic growth to

drive long-term sustainable" upside. Kyndryl's stock price increased from $26.23 at the start of the Class Period to $43.41 on July 3, 2025.

8. However, unknown to investors, Kyndryl's cash flow narratives were an illusion created by a host of undisclosed and artificial cash management practices. Principally, throughout the Class Period Defendants directed the Company to systematically defer vendor payments from quarter to quarter—including in excess of $100 million in certain quarters—to artificially inflate Kyndryl's free cash flow and related metrics. Defendants disclosed none of this to investors, despite their repeated and extensive discussions of the supposed cash flow drivers.

9. These practices had no legitimate business purpose but greatly financially benefited the Individual Defendants. For one, the Individual Defendants' incentive compensation for fiscal year 2025 was highly dependent on Kyndryl's reported adjusted free cash flow and Kyndryl's stock price. By artificially inflating those figures, the Individual Defendants triggered tens of millions of dollars of additional compensation for themselves—including the maximum payout available to them based on Kyndryl's stock price. In addition, Defendants' scheme allowed them to keep Kyndryl's supposed growth story intact during the Class Period, allowing Defendant Khurana and Kyndryl's General Counsel to unload millions of dollars of their Kyndryl holdings at inflated prices, in quantities dramatically out of proportion to their pre-Class Period sales.

10. Defendants' scheme included emphatically denying and labeling as a stock manipulator Gotham City Research when it questioned the accuracy of Defendants' free cash flow given the significant dependence of Defendants' financial compensation on those figures. It also included directing employees to lie to vendors about the true reasons for the payment deferrals.

11. But Defendants could not keep the Company's unpaid vendors at bay forever and the scheme began to unravel. On August 4, 2025, Kyndryl announced disappointing financial

results, reporting lower-than-expected free cash flow and revenue. Analysts were surprised, emphasizing that "investors need[ed] visibility" from Defendants "into sustainable positive revenue growth to award [Kyndryl] a double-digit free cash flow multiple." On this news, Kyndryl's stock price declined by approximately 21% in one trading day. However, rather than tell investors the full truth, Defendants continued to conceal Kyndryl's deferral of vendor payments and continued to misrepresent that Kyndryl's free cash flow was the result of seemingly legitimate factors and Company achievements, and that its internal controls were effective.

12. Ultimately, Defendants were unable to conceal their fraud in perpetuity. On February 9, 2026, under investigation by the SEC, Kyndryl was forced to make a series of bombshell disclosures that stunned the market. ***First***, Defendants announced that Kyndryl was "unable" to timely file its upcoming Q3 2026 Form 10-Q.[1] ***Second***, Kyndryl stated that its Audit Committee was investigating Kyndryl's "cash management practices, related disclosures (including regarding the drivers of the Company's adjusted free cash flow metric), the efficacy of the Company's internal control over financial reporting, and certain other matters." ***Third***, Kyndryl disclosed the SEC investigation. ***Fourth***, Defendants stated that Kyndryl "anticipate[d] reporting material weaknesses in the Company's internal control over financial reporting" for the preceding seven financial quarters, and that Kyndryl's own "assessment of internal control over financial reporting" could "no longer be relied upon." ***Fifth***, Kyndryl announced that Defendants Wyshner and Khurana were terminated and demoted, respectively, and that Kyndryl's General Counsel was also terminated. ***Sixth***, Kyndryl slashed its financial guidance for fiscal year 2026, including a more than 36% decrease to Kyndryl's projected free cash flow. That decrease reflected, in

[1] References to Kyndryl's Form 10-Ks and 10-Qs are defined in the Appendix. Kyndryl's fiscal year begins on April 1 and ends on March 31 of the following year and is named after the year in which it ends. For example, the first quarter for Kyndryl's *2025* fiscal year ran from April 1 through June 30, 2024. Unless noted, all emphasis is added.

significant part, that Kyndryl now needed to satisfy vendor payment obligations that Defendants otherwise would have deferred into later reporting periods had the scheme continued.

13. Analysts were stunned, lamenting that investors were not "ready for" the tidal wave of disclosures, which one analyst described as "The Four Horsemen." On this news, Kyndryl's stock price cratered, declining by approximately 55% in a single trading day, closing at just $10.59 and causing investors massive losses.

14. After the Class Period, Kyndryl was forced to admit that management had ignored and suppressed internal complaints about Kyndryl's cash management practices, that management's Sarbanes-Oxley certifications about Kyndryl's internal controls were false, and, essentially, that Defendants' representations about the drivers of Kyndryl's free cash flow were materially false and misleading. Among other things, Kyndryl admitted that for years Defendants had deferred vendor payments, at times more than $100 million per quarter. Additionally, Kyndryl admitted that it had three material weaknesses in its internal controls over financial reporting: (i) Kyndryl's "senior finance executives failed to set an appropriate tone at the top"; (ii) "disclosure processes, including with respect to certain cash management practices regarding deferring vendor payments quarter to quarter, were impacted"; and (iii) Kyndryl "did not design and maintain effective controls … to ensure appropriate communication pertaining to the disclosure process." These material weaknesses rendered both Kyndryl's disclosure controls and procedures and its internal controls over financial reporting ineffective, contrary to Defendants' repeated Class Period representations to investors.

15. The consequences of Defendants' fraud continue to be felt by investors. Among other things, the SEC investigation is ongoing and Kyndryl's stock price has not recovered, trading at $12.33 as of market close on August 18, 2026, a fraction of its Class Period high.

## II. JURISDICTION AND VENUE

16. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5(a)-(c).

17. This Court has jurisdiction over the subject matter of this action under Section 27 of the Exchange Act, 15 U.S.C. § 78aa. In addition, because this is a civil action arising under the laws of the United States, this Court has jurisdiction under 28 U.S.C. §§ 1331 and 1337.

18. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), because Kyndryl's headquarters are located in New York City, Kyndryl's common stock trades on the New York Stock Exchange ("NYSE") in this District, Defendants conducted substantial economic activity in the District, and substantial acts in furtherance of the alleged fraud occurred in this District.

19. In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

### A. Lead Plaintiff

20. Local No. 793 is a Canadian Registered Pension Plan that provides retirement benefits to crane and heavy equipment operators and other skilled workers and their families. Local No. 793 manages over CAD $4.8 billion ($3.45 billion USD) in assets for the benefit of more than 24,000 active and retired members. As set forth in the certification previously filed with this Court (Dkt. No. 32-1), during the Class Period Lead Plaintiff purchased Kyndryl common stock and suffered damages as a result of Defendants' violations of the federal securities laws alleged herein.

**B. Defendants**

21. Kyndryl provides IT infrastructure services, including advisory, implementation, and managed service capabilities, to major companies across different industry sectors. Kyndryl is incorporated in Delaware and its common stock trades on NYSE under ticker symbol "KD."

22. Schroeter has served as Kyndryl's CEO and Chairman of its Board of Directors since Kyndryl's spin-off from IBM in 2021. As such, he has ultimate authority and responsibility for Kyndryl's operations and strategic objectives. Schroeter was a primary spokesperson for Kyndryl during the Class Period and made multiple false and misleading statements to investors about Kyndryl's performance, financial outlook, and internal controls. During the Class Period, Defendant Schroeter signed and certified each of Kyndryl's Form 10-Ks and Form 10-Qs, including the filings containing the misstatements at issue, as identified herein. Schroeter previously worked at IBM for nearly thirty years, including as IBM's CFO from 2014 to 2017.

23. Wyshner was Kyndryl's CFO from 2021 until February 5, 2026—when he was fired for committing the misconduct at issue. As CFO, Wyshner reported directly to Schroeter and shared responsibility with him for Kyndryl's operations and strategic objectives. Wyshner was a primary spokesperson for Kyndryl during the Class Period and made multiple false and misleading statements to investors about Kyndryl's performance, financial outlook, and internal controls. During the Class Period, Defendant Wyshner signed and certified each of Kyndryl's Form 10-Ks and Form 10-Qs including the filings containing the misstatements at issue, as identified herein.

24. Khurana (together with Schroeter and Wyshner, the "Individual Defendants") was Kyndryl's Senior Vice President and Global Controller and Principal Accounting Officer, from 2021 until February 5, 2026—when he was demoted for committing the misconduct at issue. In that role, Khurana reported directly to Schroeter and was responsible for Kyndryl's Group Finance team. During the Class Period, Khurana signed certain of Kyndryl's SEC Filings, including certain

filings containing the misstatements at issue, as identified herein. Khurana previously worked at IBM for twenty years, including as Vice President of Finance for IBM Global Business Services.

25. The Individual Defendants, because of their positions with Kyndryl, possessed the power and authority to control the contents of Kyndryl's reports to the SEC, press releases, and of its presentations to securities analysts, money and portfolio managers, institutional investors, and other members of the public. Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to the public, and that the positive representations which were being made were then materially false and/or misleading.

### C. Other Relevant Individuals

26. Edward Sebold ("Sebold") was Kyndryl's General Counsel and Secretary from 2021 until February 5, 2026—when he was fired for committing the misconduct at issue. Sebold reported directly to Defendant Schroeter, was identified by Kyndryl as a member of its executive "leadership" team throughout the Class Period, and was one of the five named executive officers in Kyndryl's 2024 and 2025 Proxy Statements dated June 12, 2024 and June 16, 2025 (along with Defendants Schroeter and Wyshner and Elly Keinan, described below).

27. Elly Keinan ("Keinan") has been Kyndryl's Group President since 2021. Keinan reports directly to Defendant Schroeter and was identified by Kyndryl as a member of its executive "leadership" team throughout the Class Period.

28. Jamie Rutledge ("Rutledge") has been President of Kyndryl U.S. since May 2025 and previously was Global Leader of Kyndryl Delivery since before 2025. Rutledge was identified

by Kyndryl as a member of its executive "leadership" team throughout the Class Period. Rutledge reports and reported directly to Keinan, who reported and reports to Defendant Schroeter.

29. Harsh Chugh ("Chugh") was Kyndryl's Chief Operating Officer ("COO") from 2021 until January 2026. Chugh was identified by Kyndryl as a member of its executive "leadership" team throughout the Class Period. Chugh reported directly to Keinan.

30. Graham Wright ("Wright") has been Kyndryl's Vice President and Chief Procurement Officer ("CPO") since 2021. Until January 2026, Wright reported directly to Chugh.

## IV. BACKGROUND ON KYNDRYL'S BUSINESS

31. During the years leading up to the Kyndryl spin-off, the infrastructure services unit within IBM's Global Technology Services division, which provided managed infrastructure services, experienced steady revenue decline and reported losses. Kyndryl was formed as an IBM wholly owned subsidiary. In November 2021, IBM completed the spin-off by distributing 80.1% of Kyndryl's shares to IBM shareholders.

32. Kyndryl's principal business consists of six different types of information technology ("IT") services for clients, including: (i) Cloud Services—building and running client computing systems on the cloud; (ii) Core Enterprise & zCloud Services—managing or migrating clients' existing technology; (iii) Application, Data & AI Services—managing client data and the software that runs on top of that data, and assisting in the adoption of AI and generative AI tools; (iv) Digital Workplace Services—IT services for clients' employees; (v) Security & Resiliency Services—cybersecurity and disaster planning services for clients; and (vi) Network & Edge Services—servicing clients' network, edge connectivity, and computer needs.

33. Kyndryl's services include an in-house consulting arm called Kyndryl Consult, which spans all the foregoing six technology domains. Kyndryl Consult assesses a client's technology environment and designs a plan for how to modernize or transform it. Kyndryl Consult

uses insights from Kyndryl's AI-powered business platform, "Kyndryl Bridge." Kyndryl Bridge provides a digital platform that connects to and monitors a customer's various technology systems in one place, rather than each piece being managed separately.

34. Since the spin-off, Kyndryl has described its business strategies in its SEC filings and other public statements as revolving around three strategic initiatives Kyndryl dubbed the "three As" or "3As": Alliances, Advanced Delivery, and Accounts.

35. "Alliances" are arrangements that Kyndryl has with various suppliers and vendors to jointly develop and sell services to clients. In its public statements, Kyndryl repeatedly highlighted the importance of suppliers to its competitive standing in the market, the relationship with those suppliers as something that differentiated Kyndryl from its competitors, and the relationship with suppliers as key to Kyndryl's profitability.

36. Kyndryl relies on its suppliers, vendors, and partners to provide the hardware, software, and cloud capacity Kyndryl needs to fulfill its customer contracts. Kyndryl's own procurement organization is internally structured around the hardware, software, and cloud capacity needs of Kyndryl's clients—each with dedicated category teams and leadership.

37. Among Kyndryl's key relationships, Cisco, Dell, HPE, NVIDIA, NetApp, and Palo Alto Networks primarily supply computing hardware and equipment. Dynatrace, Oracle, Red Hat, Rubrik, SAP, ServiceNow, and VMware primarily supply licensed software. Amazon Web Services, Google Cloud, and Microsoft supply cloud computing capacity and are known as "hyperscalers"—companies with massive global networks of data centers.

38. "Advanced Delivery" refers to Kyndryl's practice of training its workforce in new skills and in using automation and AI tools—including Kyndryl Bridge—to deliver IT services to customers, purportedly to make the services less labor intensive and therefore cheaper to Kyndryl.

39. “Accounts” refers to Kyndryl’s work to raise the profitability of existing customer contracts that currently generate lower-than-desired profit margins. Kyndryl says it pursues this in a few ways: by adding higher-value services to a contract in order to increase its overall value; eliminating or declining to renew unprofitable portions of a contract; replacing labor-intensive tasks with automated or standardized processes to cut delivery costs; and renegotiating pricing and other terms when a contract comes up for renewal.

## V. SUMMARY OF THE FRAUD

### A. Defendants Told Investors that Certain Legacy Burdens Made Traditional Financial Metrics Less Meaningful to Kyndryl’s Financial Condition

40. Following Kyndryl’s spin-off from IBM, Defendants told investors that traditional indicators of financial performance, such as revenue and profit, were less meaningful for Kyndryl because of legacy burdens that the Company had inherited from IBM, and because Kyndryl’s post-spin business growth strategy included attempting to shed those burdens.

41. One of the legacy burdens Defendants told investors Kyndryl had inherited was low-or-no margin contracts from IBM. Even before the Class Period, Defendants told investors that declines in Kyndryl’s revenue reflected its intentional reduction of low-margin components of inherited relationships. For example, in Kyndryl’s Q1 2024 Form 10-Q (filed on August 8, 2023), Kyndryl described a 2% revenue decline as “largely attributable to actions the Company has taken to reduce low-margin components of its customer relationships.”

42. Defendants continued to make similar representations during the Class Period. On August 7, 2024, just one week into the Class Period, Kyndryl in the Q1 2025 Form 10-Q described an 11% revenue decline as once again “largely attributable to actions the Company has taken to reduce low-margin components of its customer relationships.” Similarly, on September 3, 2025, during a Citigroup annual event for the technology, media, and telecom (“TMT”) sectors (the

"September 2025 Citi Global TMT Conference"), in response to a question regarding Kyndryl's Accounts initiative (one of the "3As"), Defendant Schroeter stated: "we inherited a set of relationships that essentially translated into an uneconomic situation for us. And so, our focus account initiative was really about re-imagining these relationships for the new reality."

43. A second legacy burden related to tax liabilities Kyndryl inherited from IBM. Specifically, and among others, (i) Kyndryl had to "indemnify IBM for all taxes, including income taxes, sales taxes, value-added and payroll taxes, relating to [Kyndryl's] business for all periods following" the separation; (ii) the transfer of Kyndryl's operations from IBM generated certain direct tax charges; (iii) certain Kyndryl foreign subsidiaries generated taxable income locally even while the consolidated entity reported pretax losses; (iv) certain net operating losses and tax credit carryforwards that had been available to IBM were not available to Kyndryl; and (v) Kyndryl had to record increasing liabilities associated with uncertain tax positions.

44. In its 2021 Form 10-K, the first that it filed with the SEC as an independent company, Kyndryl stated it was in a difficult position "related to taxes on foreign operations generating taxable income, uncertain tax positions, and tax charges related to the transfer of Kyndryl's operations from [IBM] in contemplation of [Kyndryl's] Separation from IBM."

45. During the September 2025 Citi Global TMT Conference, in response to another question regarding Kyndryl's financial goals, Defendant Schroeter stated Kyndryl had been "spun out with a horrible tax position" which resulted in the Company "paying very heavily cash taxes in the first few years, even though [it] didn't make a ton of money."

46. A third legacy burden Defendants stated Kyndryl inherited was large costs related to the spin-off. These included employee retention expenses, information technology costs, marketing expenses, and consulting and other professional service costs. As Kyndryl explained in

its SEC filings, these costs were necessary, both before and after the spin-off, "to prepare for and execute the Separation," and included "costs and benefits resulting from settlements with" IBM "associated with pre-Separation and Separation-related matters, and other costs related to contract and supplier novation and integration" associated with the spin-off.

47. Throughout the Class Period, Defendants emphasized that these legacy burdens made traditional financial metrics less meaningful. For example, on August 1, 2024, during Kyndryl's earnings call for the first quarter of fiscal year 2025, Defendant Wyshner described Kyndryl's financial progress as reflecting "stepping away from empty calorie revenues." On November 7, 2024, during the Kyndryl earnings call for the second quarter of fiscal year 2025, Defendant Schroeter emphasized that "half of our revenue is coming from post-spin signings that have higher margins than our backlog did at spin. And in fiscal 2026, it will be roughly two-thirds. This inflection point, when our P&L is largely determined by our post-spin signings, will dramatically strengthen our earnings and growth profile."

48. In its SEC filings throughout the Class Period, Defendants repeatedly told investors that Kyndryl provides "non-GAAP financial measures"—such as free cash flow and adjusted free cash flow—"as we believe it enhances visibility to underlying results and the impact of management decisions on operational performance, enables better comparison to peer companies and allows us to provide a long-term strategic view of the business going forward."

**B. Before and During the Class Period, Defendants Emphasized Free Cash Flow as the Best Indicator of Kyndryl's Financial and Operating Performance**

49. According to Defendants, once Kyndryl outgrew its inherited legacy burdens, Kyndryl's revenue metrics would more accurately reflect the Company's financial performance. Until then, however, including throughout the Class Period, Kyndryl aggressively emphasized to investors that they should pay particular attention to the Company's free cash flow metrics, namely

free cash flow, adjusted free cash flow, and net cash provided by (or used in) operating activities. Kyndryl's SEC filings, including its proxy statements, explicitly recognized that the Company's operating cash flow metrics were "used by investors to assess our business."

50. Kyndryl calculated free cash flow by starting with net cash provided by operating activities and subtracting net capital expenditures. Kyndryl then calculated adjusted free cash flow by adding back certain items such as transaction-related payments, charges related to lease terminations, payments related to workforce rebalancing charges, and significant litigation payments. Because both free cash flow and adjusted free cash flow began with operating cash flow, any deferral of vendor payments directly improved those reported metrics by allowing Kyndryl to retain cash that otherwise would have been paid to vendors during the reporting period.

51. Free cash flow can be a measure of liquidity and financial health. It is the additional money that a company retains after paying for its operations and capital assets and has available to grow the business, satisfy debts, or share with shareholders.

52. However, prior to the spin-off, high capital expenditures and restructuring and spin-off related cash outflows (one of the legacy burdens) weakened the free cash flow picture for the carve-out of IBM's Global Technology Services division that became Kyndryl. In the years leading up to the spin-off, the carve-out that became Kyndryl reported cash flow as follows:

| **Reporting Period** | **Free Cash Flow** |
|---|---|
| Year ended December 31, 2018 | $(775 million) |
| Year ended December 31, 2019 | $8 million |
| Year ended December 31, 2020 | $(324 million) |
| Six months ended June 30, 2021 | $(786 million) |

53. Thus, Kyndryl's spin-off era investor materials transitioned to presenting pro-forma "adjusted free cash flow," which was more favorable than the Company's historical free cash flow because, as noted above, it added back certain payments. After the spin-off and continuing into the Class Period, Kyndryl relied on "adjusted free cash flow" numbers to describe its financial condition to investors, reporting the following adjusted free cash flow figures:

| **Reporting Period** | **Pro Forma Adjusted Free Cash Flow** |
|---|---|
| Year ended December 31, 2020 | $794 million |
| Year ended December 31, 2021 | $904 million |
| Three Months Ended March 31, 2022 | $136 million (Adjusted Free Cash Flow) |

54. Defendants also began explicitly focusing investors on adjusted free cash flow as the measure of Kyndryl's success. For example, shortly before the Class Period, on May 8, 2024, Defendants highlighted that Kyndryl's positive adjusted free cash flow "demonstrate[ed] our focus on margin expansion and cash generation that will support our long-term strategy and goals." Defendants also stated that increasing cash flow would generate further growth and allow Kyndryl to "consider regularly returning capital to shareholders, all while remaining investment grade."

55. In mid-2025, after the amount of payments added back decreased significantly, Kyndryl began to focus on standard cash flow without adjustments, while also reporting net cash provided by (or used in) operating activities. During Kyndryl's August 5, 2025 earnings call Defendant Schroeter told investors that "with our free cash flow adjustments having become minimal as anticipated, you'll hear us talking about free cash flow rather than adjusted free cash flow." Kyndryl disclosed these metrics and its purported drivers, including in the Management

Discussion and Analysis ("MD&A") section of its Class Period Forms 10-K and Forms 10-Q. Certain of Kyndryl's Class Period free cash flow metrics, as reported, are compiled below:

| **Period** | **Free Cash Flow (Use)**[2] | **Adjusted Free Cash Flow (Use)** | **Net Cash provided by (used in) operating activities** |
|---|---|---|---|
| Q1 FY2025 (three months ended June 30, 2024), first reported July 31, 2024 | $(145) million | $(116) million | $(48) million |
| Q2 FY2025 (three months ended September 30, 2024), first reported November 6, 2024 | $45 million | $56 million | $149 million |
| Q3 FY2025 (three months ended December 31, 2024), first reported February 3, 2025 | $167 million | $171 million | $260 million |
| Q4 FY2025 (three months ended March 31, 2025), first reported May 7, 2025 | $353 million | $335 million | $581 million |
| FY2025 full year (twelve months ended March 31, 2025), first reported May 7, 2025 | $419 million | $446 million | $942 million |

[2] As noted above (*see* ¶55), Kyndryl began reporting standard free cash flow (use) figures in mid-2025. Figures in this column were reported after the contemporaneous Results of Operations and Financial Condition reported by Kyndryl.

### C. During the Class Period, Defendants Concealed Kyndryl's Cash Management Practices, Instead Misleadingly Attributing Kyndryl's Cash Flow Growth Solely to Seemingly Legitimate Business Factors

#### 1. Defendants Misleadingly Attributed Kyndryl's Cash Flow to Factors Like Revenue and Margin Growth, Efficiency, and Innovation

56. The Class Period begins on July 31, 2024, when Kyndryl publicly reported cash flow used in operations of $48 million for the quarter ended June 30, 2024. Kyndryl attributed this to being a "***seasonally weak*** quarter for cash flow." Kyndryl also reported an adjusted free cash flow loss of $116 million reflecting "workforce rebalancing actions implemented in the quarter."

57. During Kyndryl's August 1, 2024 earnings call, Defendants attributed Kyndryl's adjusted free cash flow figures to seemingly legitimate performance drivers. For example, Defendant Schroeter stated Kyndryl's adjusted cash flow was "***powered by*** strong growth in Kyndryl Consult and hyperscaler related revenue, as well as [Kyndryl's] ***ability to drive efficiency*** through automation and ***deliver innovation*** through Kyndryl Bridge."

58. Defendants similarly stated in the first quarter 2025 earnings presentation displayed during the earnings call that Kyndryl's "evolving business mix is ***driving*** increased profitability and free cash flow" and that there was a "***[s]trong conversion*** of earnings to free cash flow"—in other words, that Kyndryl was supposedly able to organically translate positive revenue directly to free cash flow rather than divert that money to other business expenses.

59. Analysts credited Kyndryl's explanations and characterized the quarter as in line with expectations. A J.P. Morgan analyst noted that Kyndryl's first quarter free cash flow "was seasonally weak as expected." An Oppenheimer analyst reported that "1Q results were in line with expectations and the company continues to progress well on its three-A initiatives."

60. Analysts also relied on the explanation of the drivers of Kyndryl's adjusted free cash flow. On August 2, 2024, J.P. Morgan analysts noted that "[r]evenue growth was good where

it counts including continued double-digit growth in KD Consult" and that Kyndryl Bridge "helps" Kyndryl Consult. Scotiabank analysts similarly stated that "[m]anagement showed increasing confidence in strengthening margin profile … with strong conversion of earnings into cash flow."

61. Then, on August 7, 2024, Kyndryl filed its Q1 2025 Form 10-Q, in which it stated its change in net cash provided by operating activities was "***primarily driven by*** increased net income and collection of receivables outpacing billing in the current quarter." Because Kyndryl calculates both free cash flow and adjusted free cash flow by starting from net cash provided by (or used in) operating activities, *i.e.*, operating cash flow, this change in net cash from operating activities supposedly directly determined Kyndryl's cash flow metric for the quarter.

62. Analysts relied on Defendants' statements about Kyndryl's liquidity. For instance, on August 22, 2024, Baptista Research analysts remarked that "the company maintained a strong liquidity position" while noting their "strategic realignments and efficiency improvements."

63. On November 6, 2024, Kyndryl issued a Press Release announcing the results of Kyndryl's operations for the second fiscal quarter of fiscal year 2025, ending on September 30, 2024, and filed a Form 8-K incorporating it (the "November 6, 2024 Press Release"). The November 6, 2024 Press Release reported adjusted free cash flow of $56 million for the quarter.

64. The next day, November 7, 2024, Kyndryl filed its Q2 2025 Form 10-Q, in which Defendants attributed an increase in net cash provided by operating activities to the Company generating "higher margins," which left more cash on hand, stating that "[n]et cash provided by operating activities was $101 million in the six months ended September 30, 2024, compared to a net cash use of $127 million in the prior-year period mainly due to higher margins."

65. That same day, during Kyndryl's earnings call, Defendant Schroeter stated "[o]ur performance was once again ***led by*** double-digit growth in Kyndryl Consult and strong momentum

in hyperscaler-related revenue as well as our ability to continue to drive efficiency and deliver innovation through automation and Kyndryl Bridge." Kyndryl's earnings presentation also reiterated that its "evolving business mix is ***driving*** increased profitability and free cash flow" and that there is a "***[s]trong conversion of earnings to free cash flow***."

66. Following the news, Kyndryl's stock price increased $3.42, from $24.13 on November 6 to $27.55 on November 7, approximately 14.1%.

67. Analysts continued to focus on the importance of adjusted free cash flow to Kyndryl's performance and relied on Defendants' representations about organic-sounding drivers of free cash flow. A Scotiabank analyst stated in a November 8, 2024 report that "management remains disciplined in capital allocation priorities, with an imminent focus on organic growth to drive long-term sustainable free cash flow generation."

68. On November 21, 2024, Kyndryl held an "Investor Day Conference" where Kyndryl's management met with investors to present their long-term strategy, financial targets, and business updates. During the conference, Defendants introduced so-called "'triple, double, single'" business targets, with free cash flow as a key component of the strategy. Specifically, Defendant Wyshner explained Kyndryl's financial goals of, by 2028, tripling adjusted free cash flow, doubling adjusted pre-tax income, and achieving annual revenue growth in the single digits.

69. Defendant Wyshner also emphasized that Kyndryl's adjusted free cash flow was "***driven by*** strong conversion of our adjusted pre-tax income, less cash taxes to cash flow" and that Kyndryl's "3As" were "delivering earnings and cash flow growth." Defendant Wyshner then also directly tied the cash flow metrics to shareholder value, stating that the "triple related to cash flow" was a "big deal" that would permit Defendants to "accelerate capital returns to shareholders even as we continue to invest in innovation and eminence in our business."

70. During the Investor Day Conference, Defendants used the below illustration to highlight and make sure investors understood the so-called “triple, double, single” strategy.




71. After the conference, Kyndryl’s stock price increased $3.96, from $28.53 on November 20, 2024 to $32.49 on November 21, or approximately 13.88%.

72. Analysts relied on Defendants’ representations, including the “triple, double, single” moniker, as a gauge of Kyndryl’s business prospects, and about the 3A initiatives as specific drivers of their expected value for Kyndryl’s stock. For example, J.P. Morgan analysts raised Kyndryl’s target stock price stating: “The company announced new FY28 financial targets, which it coined ‘triple, double, single’ for tripling adj free cash flow (to $1.0B+vs prior Street <$500M), doubling adj pre-tax income (to $1.2B+), and achieving sustainable mid-single-digit growth, each a big win for investors … [W]e raise our Dec-25 [price target] to $40 … given greater visibility to and certainty of cash flows.”

73. Defendants’ misrepresentations about what was driving adjusted free cash flow, coupled with exhortations that investors focus on those metrics, continued as Defendants announced results for the next quarter—the third of Kyndryl’s fiscal year 2025.

74. On February 3, 2025, Kyndryl issued a Press Release announcing the results of Kyndryl’s operations for the third fiscal quarter of fiscal year 2025, ending on December 31, 2024,

and filed a Form 8-K incorporating it (the "February 3, 2025 Press Release"). The February 3, 2025 Press Release reported adjusted free cash flow of $171 million in the quarter.

75. In discussing this result, Defendants continued to attribute Kyndryl's positive cash flow to supposedly improving business prospects. In the February 3, 2025 Press Release Defendant Schroeter stated: "***With sustained momentum in our signings coupled with higher operating margins***, we remain on track to deliver constant-currency revenue growth in the fourth quarter of this fiscal year." Defendant Wyshner similarly stated that the "***margins associated with our signings continue to support our outlook for future earnings and free cash flow growth***."

76. Similarly, on February 4, 2025, during Kyndryl's earnings call for the third quarter of fiscal year 2025, Defendant Schroeter stated that Kyndryl's adjusted free cash flow result "was ***led by*** double-digit revenue growth in Kyndryl Consult and demand for modernization" and the "3A's initiatives … ***continue to generate*** incremental signings, revenue and earnings."

77. During the call Defendant Schroeter again emphasized the "triple-double-single" targets as a barometer of the Company's prospects, stating that Kyndryl had introduced its "medium-term outlook with a triple-double-single mnemonic" and that Kyndryl was "project[ed] to triple [its] adjusted free cash flow in fiscal 2028 compared to fiscal 2025 to roughly $1 billion."

78. Kyndryl's stock price increased $3.53, from $39.92 on February 4, 2025 to $43.45 on February 5, or approximately 8.8%.

79. In Kyndryl's Q3 2025 Form 10-Q, Kyndryl attributed the increase in net cash provided by operating activities to be "***mainly due to*** higher margins."

80. Analysts again bought into Defendants' story—that the increasing adjusted free cash flow metric was a sign of Kyndryl shedding its IBM-days burdens and of its improving business prospects—and continued to highlight the importance of free cash flow to the market's

understanding of Kyndryl's future value. For example, on February 5, 2025, J.P. Morgan again raised its price target for Kyndryl stock, in a report titled, "Kyndryl F3Q Recap: Beat and Raise Where It Counts; Increasing PT to $45," stating "[w]e maintain our OW rating and raise our Dec-25 price target … mostly on higher earnings and one-turn higher free cash flow multiple." That same day, Scotiabank analysts similarly credited Defendants' statements about the key drivers, including the supposed "[s]olid [f]inancial performance led by double-digit revenue growth in Kyndryl Consult and demand for modernization, cloud security, and AI services." The Scotiabank report also noted that "[t]he 3As initiatives continue to generate incremental signings, revenue, and earnings, with pre-tax margins on signings in the high-single digits."

81. Not only did Defendants affirmatively give investors the misimpression that Kyndryl was achieving increased cash flow through legitimate means, they prevented the truth from being known when some investors started asking additional questions about those metrics.

82. On March 27, 2025, before the market opened, Gotham City Research, a diligence-based investment firm, published reports raising questions about Kyndryl's cash flow and accounting (the "Gotham City Report"), pointing to, among other things, the tie between Kyndryl's executives' compensation and free cash flow, *see infra* ¶¶246-57, 309-12, and how receivables factoring boosted cash flow. This, the Gotham City Report argued, meant Kyndryl's "adjusted" free cash flow was unreliable and manipulated to give investors "misleading impressions."

83. Kyndryl's stock price declined precipitously on the morning of March 27, 2025, slumping to as low as $28.75 that morning, from its $34.06 closing the prior day.

84. Later that morning, Kyndryl issued a forceful denial, describing the allegations in the Gotham City Report as "***inaccurate and deliberately misleading***" and stating that the Company "rejects in the strongest possible terms the conclusion reached within the report."

85. By the end of the March 27 trading day, Kyndryl's stock price had reversed some of its early morning decline, closing at $32.32.

86. Analysts credited Kyndryl's denial of the Gotham City Report. On March 28, 2025, analysts from J.P. Morgan wrote that, despite the Gotham City Report, free cash flow was still a key driver of Kyndryl's stock price, as the analysts felt "confident in KD's ability to achieve its Triple Double Single mid-term financial targets, which should earn the company a double-digit free cash flow multiple." Oppenheimer analysts similarly reported: "Overall, we do not believe there is a 'smoking gun.' Management also issued a statement indicating the short report contains claims that are inaccurate and deliberately misleading." Oppenheimer analysts also stated: "we do not see a meaningful attempt to manipulate [free cash flow]." And analysts from Scotiabank on that same day wrote that "Kyndryl's management put out a statement refuting these claims, stating that the claims are inaccurate and intended to manipulate stock prices."

87. Undaunted, Defendants' misrepresentations and omissions about the drivers of Kyndryl's financial condition continued after the Gotham City Report, with Defendants reiterating only seemingly legitimate business factors as driving Kyndryl's free cash flow numbers.

88. For example, on May 7, 2025, Kyndryl issued a Press Release announcing the results of Kyndryl's operations for the fourth fiscal quarter of fiscal year 2025, ending on March 31, 2025, and filed a Form 8-K incorporating the release (the "May 7, 2025 Press Release"). The May 7, 2025 Press Release reported adjusted free cash flow of $446 million for the full fiscal year 2025 (well above Kyndryl's previously-stated $350 million guidance).

89. During the earnings call the next day, Defendant Schroeter stated, "our fiscal 2025 results not only exceeded the earnings cash flow in 3A's projections we laid out at the beginning of the year, they also prove the investment thesis for Kyndryl's evolution that we laid out three

years ago." He again invoked the "triple, double, single," stating: "I want to reiterate the targets we set for fiscal 2028 at our Investor Day in November. We expect to deliver more than a $1 billion in adjusted free cash flow." He emphasized that "[w]ith strong conversion of earnings to free cash flow, we'll balance our approach to capital allocation by investing in organic growth opportunities and occasional tuck-in acquisitions … It should be clear that the fiscal 2026 outlook we published yesterday is consistent with the path we previously laid out for our growth."

90. Similarly, in Kyndryl's 2025 Form 10-K, Defendants said Kyndryl's increase in net cash provided by operating activities was "***mainly due to*** higher earnings," and continued to remind investors of the key importance of their relationship with vendors (the "alliances" in the "3As") to achieving corporate objectives, stating, "[o]ur robust ecosystem of strategic global alliances … allows us to provide industry-leading technologies and capabilities for our customers." Defendants also stated that Kyndryl's "profitability depends on the ability of subcontractors, vendors and service providers to deliver their products and services in a timely manner."

91. Analysts continued to credit Defendants' statements about the drivers of Kyndryl's free cash flow. For example, on May 7, 2025, Oppenheimer analysts again relied on Defendants' continued story that increasing free cash flow was a sign of improving business prospects for Kyndryl, labeling the quarter as "an important milestone in returning to constant-currency revenue growth." On May 19, 2025, analysts from J.P. Morgan wrote that "[m]argin expansion driven free cash flow growth could support a multi-year increasing capital returns story." On July 28, 2025, a Scotiabank analyst stated, "Kyndryl's consistent cash flow generation and margin expansion continue to demonstrate its differentiated market positioning and strength."

92. In the May 7, 2025 Press Release Kyndryl also issued guidance for fiscal year 2026, which included adjusted free cash flow of approximately $550 million.

93. Analysts also credited Kyndryl's 2026 guidance. On May 7, Oppenheimer analysts called it "solid" and stated that Kyndryl "is poised for sustainable growth." The following day, J.P. Morgan analysts described it as a "critical milestone" and coming out "ahead of [] expectations." On May 16, a Scotiabank analyst stated that the outlook "reflects belief in strategic foundations."

94. Kyndryl's stock price again increased significantly, rising $3.49, from $33.14 on May 7, 2025 to $36.63 on May 8, or approximately 10.5%. Kyndryl's stock price reached its Class Period high with a closing price of $43.41 on July 3, 2025.

95. On July 31, 2025, during Kyndryl's annual meeting of stockholders, Defendant Schroeter stated that Kyndryl significantly grew its adjusted free cash flow, "***demonstrating … focus on margin expansion and cash generation***" and that Kyndryl had "***transformed [the] business*** through [the] three As initiatives."

96. On August 4, 2025, Kyndryl issued a Press Release announcing the results of Kyndryl's operations for the first fiscal quarter of fiscal year 2026, ending on June 30, 2025, and filed a Form 8-K incorporating the release (the "August 4, 2025 Press Release"). The August 4, 2025 Press Release "reaffirm[ed] [Kyndryl's] outlook for its fiscal 2026," reiterating the financial projections from May 2025, including adjusted free cash flow of approximately $550 million.

97. On August 5, 2025, Kyndryl filed its Q1 2026 Form 10-Q, which stated that net cash used by operating activities had increased "***mainly due to*** a decline of $117 million in accounts receivables as a source of cash in the current quarter compared to the prior-year quarter when the collection of receivables outpaced revenues." On Kyndryl's earnings call that day, Defendants showed a slide on the "triple, double, single" growth objectives and Defendant Schroeter also cited Kyndryl's "***strong conversion of our earnings to free cash flow***."

98. At the September 3, 2025 Citi Global TMT Conference, Defendant Schroeter stated that "cash taxes ***are the driver*** that allows us to triple cash flow while profits double."

99. Investors continued to rely on these representations. A Scotiabank analyst highlighted that "[t]he company reiterated its F2026 guidance implying sequential top-line recovery as the year progresses with notable growth across Consulting and AI based engagements." On September 22, 2025 J.P. Morgan wrote that "the triple on [free cash flow] comes from the double on adj pre-tax earnings on steady cash taxes, while the double on adj pre-tax income comes from the mix shift towards higher-margin post-spin signings feeding revenue."

100. Defendants continued to make materially false and misleading representations about the drivers of Kyndryl's cash flow through late 2025.

101. On November 4, 2025, Kyndryl issued a Press Release announcing the results of Kyndryl's operations for the second fiscal quarter 2026, ending on September 30, 2025, and filed a Form 8-K incorporating the release (the "November 4, 2025 Press Release"). The November 4, 2025 Press Release stated, "[o]ur second quarter performance ***reflects the momentum*** we're building across key growth priorities – Kyndryl Consult, alliances with hyperscalers and other leading technology providers, and our innovative services in AI, cloud and security."

102. It then "reaffirm[ed] its outlook for its fiscal 2026," reiterating the financial projections from May 2025, including adjusted free cash flow of approximately $550 million.

103. Defendants Schroeter and Wyshner also verbally reaffirmed the guidance during the November 5, 2025 earnings call for the second quarter of fiscal year 2026. Specifically, Defendant Schroeter again invoked the "triple, double, single" framework and stated that Kyndryl was "operating with a clear, long-term mindset, all fully aligned with our triple, double, single fiscal year 2028 objectives and we remain on track to achieve them." He further emphasized that

"by fiscal 2028, which for us, begins less than 17 months from now, we expect to deliver more than $1 billion in adjusted free cash flow" and reiterated that the Company's "fiscal 2026 outlook is consistent with our expected growth trajectory from fiscal 2025 to fiscal 2028" calling for "approximately $550 million of free cash flow this year."

104. And in its Q2 2026 Form 10-Q, Kyndryl stated that it experienced a decrease in net cash provided by operating activities "***mainly due to*** a decline of $187 million in accounts receivables as a source of cash in the current year compared to the prior year when the collection of receivables outpaced revenues, partially offset by $161 million in higher earnings."

105. Analysts once again credited Defendants' statements. Baptista analysts wrote that "[t]he company was able to convert about -3.37% of its revenues into operating cash flows in the recent quarter." On November 25, Guggenheim analysts wrote that Kyndryl "management has been actively reshaping its business through the 'Triple A' program … to elevate quality of signings, automate and standardize delivery, and enforce contract discipline, driving improved profitability and positive free cash flow."

106. Analysts also again credited Defendants' reaffirmation of Kyndryl's 2026 outlook. On November 5, a Susquehanna analyst stated "KD was able to reiterate the guidance thanks to the anniversary of a divestiture, hyperscaler revenues … and an expansion of both backlog and bookings." On November 7, Baptista analysts stated "[d]espite revenue coming in ~$100 million below expectations, management reiterated full-year guidance and outlined a stronger second half powered by a record pipeline, elevated Kyndryl Consult revenues, and hyperscaler momentum."

### 2. In Reality, Kyndryl's Cash Flow Metrics Were Driven by Undisclosed Cash Management Practices

107. While making the statements summarized above, Defendants omitted critical information from investors—that Kyndryl's cash flow figures would not be possible without

Defendants' undisclosed cash management practices, including the deceptive practice of deliberately delaying significant quantities of vendor payments until after the reporting period in which they were due. In so doing, Kyndryl inflated its adjusted free cash flow during the reporting period in which those invoices were due and throughout the Class Period.

108. Those admissions are corroborated, and detailed further, by the consistent and detailed accounts of several former Kyndryl employees interviewed by Lead Counsel. Defendants' deceptive practices were a substantial driver of Kyndryl's cash flow during the Class Period and were also tied to acknowledged material weaknesses in disclosure controls and internal controls over financial reporting. It was materially misleading to discuss purported drivers of cash flow without disclosing these critical practices and their central impact on cash flow.

### a. As a "Standard Practice," Kyndryl Deferred Vendor Payments Including Beyond Payment Terms and at Times In A "Magnitude" That "Exceeded $100 Million"

109. The full truth Defendants kept from investors was that during the Class Period Kyndryl was delaying certain cash payments due to vendors from quarter to quarter beyond vendor payment terms, and that the deferred vendor payments were greater than $100 million in some reporting periods, all as Kyndryl admitted after the Class Period.

110. Under investigation by the SEC for these practices, Kyndryl finally was forced to disclose them at the end of the Class Period on February 9, 2026, and then to confirm them in subsequent SEC filings on February 17, 2026.

111. Specifically, on February 9, 2026, Kyndryl disclosed:

> As part of the Company's ongoing cash and commercial management strategy with customers and suppliers and as previously disclosed, the Company's standard practice since the time of the Company's spin-off from International Business Machines Corporation is to actively manage the Company's working capital, including accounts receivables and accounts payables. This includes optimizing payment terms and conditions, accelerating certain cash receipts and ***delaying certain cash***

> ***payments (including deferring vendor payments quarter to quarter***), and undertaking other discretionary cash and working capital management initiatives. The magnitude of these practices (including deferrals) has varied from quarter to quarter and ***impacted the Company's cash flows*** (and related non-GAAP financial measure of adjusted free cash flow), ***including positively in certain periods***.

112. On February 17, 2026, Kyndryl disclosed:

> As part of our ongoing cash and commercial management strategy with customers and suppliers and as previously disclosed, ***our standard practice*** since the time of our spin-off from IBM ***is to actively manage our working capital***, including accounts receivables and accounts payables. This includes optimizing payment terms and conditions, accelerating certain cash receipts (including through the sale of trade receivables to third-party financial institutions) and ***delaying certain cash payments (including deferring vendor payments quarter to quarter, in certain cases beyond vendor payment terms)***, and undertaking other discretionary cash and working capital management initiatives. ***The magnitude of these practices (including deferrals) has exceeded $100 million in current or prior periods but varied from quarter to quarter***.

113. These deferred vendor payments were highly material to investors. Qualitatively, Kyndryl's narrative of Kyndryl's supposed financial health during the Class Period depended on free cash flow, which Defendants specifically tied to Kyndryl's ability to deliver capital returns to investors. As Defendants themselves repeatedly encouraged investors to do, and as they recognized, for example, in their 2023, 2024, 2025 Proxy Statements, investors "use" the cash flow metrics "to assess [Kyndryl's] business." Thus, analysts' understanding of the value of Kyndryl stock derived significantly from free cash flow and its composition.

114. Quantitatively, $100 million constituted significant percentages of the reported cash flow figures and was large enough at times to change whether quarterly and annual cash flow results met Kyndryl's guidance and analyst expectations. For example, for fiscal year 2025, Kyndryl reported adjusted free cash flow of $446 million, beating the Company's stated guidance (of $350 million) by $96 million. A reduction, for example, of $100 million of adjusted free cash

flow—a conservative assumption because the deferrals of vendor invoices increased at year end—would have changed the reported result from a guidance beat to a guidance miss.

115. Defendants further disclosed that, contrary to six of the certifications by Defendants Schroeter and Wyshner attesting that they had evaluated Kyndryl's disclosure controls and procedures and had concluded such controls were "***effective***" in all material respects, or were ineffective only due to a single material weakness, *see* ¶¶ 162-69, 267-81, Kyndryl instead had three undisclosed material weaknesses in its internal controls over financial reporting such that its disclosure control and procedures were ***ineffective*** as of those dates for those three reasons, and such that its auditor's opinion as to the effectiveness of Kyndryl's internal controls over financial reporting for fiscal year 2025 should no longer be relied upon.

### b. Former Employees Confirm that Kyndryl Used Widespread "Q Blocks" to Block Vendor Payments from Being Made

116. Numerous former employees confirmed that, before and during the Class Period, Kyndryl used what it internally termed "Q blocks" to intentionally block vendor payments from being processed in the reporting period in which those payments were due. Q blocks were implemented with "Q" codes in Kyndryl's enterprise resource planning system, which was provided by SAP (the "SAP System"). The Q in "Q blocks" referred to an accounting "Q"uarter.

117. Q blocks prevented vendor payments from being processed without the express approval of Kyndryl senior executives, including Chugh (COO) and Wright (CPO).

118. The use of Q blocks was especially widespread in the final days and weeks of a given quarter, with some Q blocks being lifted as soon as a new accounting quarter began. Many vendors complained to Kyndryl about the payment delays, escalated their complaints to Kyndryl's senior executives, or threatened to implement—or actually implemented—credit holds.

119. Kyndryl's accounts payable and procurement employees were directed to give vendors false explanations—such as a system issue—to conceal that payments were being intentionally withheld to inflate the free cash flow number that Kyndryl reported to investors.

120. FE-1[3] was an Associate Director, Strategic Sourcing at Kyndryl from the time of Kyndryl's spin-off to April 2025. FE-1 reported to a director of procurement, and then to Hunter Bostwick, Director, Hardware Procurement. Both the director of procurement, then Bostwick, reported indirectly to Kyndryl's CPO Graham Wright. Functionally, FE-1 was a global supplier relationship manager ("GSRM") for original equipment manufacturers ("OEMs") on the hardware side of Kyndryl's business. FE-1 covered particular OEMs globally, which included NetApp, Hewlett Packard Enterprise ("HPE"), including its many subsidiaries, and Palo Alto.

121. FE-1 explained that Kyndryl used "quarter blocks" or "Q blocks" at the end of quarters to block vendor payments in the SAP System. FE-1 stated that, to their knowledge, the Q blocks happened every quarter from sometime in 2023 until FE-1 left Kyndryl in April 2025. FE-1 stated that Q blocks were standard practice in Kyndryl's procurement department. Each quarter, FE-1's managers would always remind FE-1 that the Q blocks were coming up. FE-1 stated that there were exceptions to Q blocks for payments deemed critical. FE-1 defined "critical" as payments where the vendor was threatening a credit hold. FE-1 stated that, when a Q block was in effect, the protocol for payment release required approval, including approval from CPO Wright. FE-1's managers did not have the authority to go to Kyndryl's procurement team and tell them to push the money through in the case of a Q block.

122. FE-1 was aware of complaints from the vendors FE-1 covered, including some that had to do with nonpayment by Kyndryl. Kyndryl's contracts that FE-1 covered, including the

[3] Former Kyndryl employees are referred to herein as "FE-#" and are all referenced using plural pronouns to maintain their confidentiality.

global contract with HPE, provided for 90-day payment terms; there was no wiggle room within the contract. Yet, FE-1 saw payments delayed in excess of 90 days. FE-1 stated that HPE threatened Kyndryl with a credit hold sometime between October and December 2024.

123. FE-1 recalled that, in late 2024 or early 2025, Kyndryl's relationship managers were pulled into a massive virtual meeting regarding vendor back payments. The attendees included CPO Wright and COO Chugh. Subsequent meetings regarding vendor payments included attendees from all of Kyndryl's different procurement categories (including cloud and hardware)—so FE-1 knew that Q blocks affected all vendors. The purpose of these meetings was for Kyndryl to pull in the GSRMs (including FE-1) to work alongside procurement in managing all the vendor complaints about delayed payments, which had gotten very bad by that time.

124. FE-1 recalled that Jamie Rutledge—then Kyndryl's Global Leader of Delivery and later Kyndryl's President—attended at least one or two meetings about the project where employees had to report their numbers (of delayed payments) and what they were doing. It stood out to FE-1 that Rutledge was an executive who was not in (or over) Kyndryl's procurement department; in effect, Rutledge was a "big gun" sent to pass over the CPO and COO. As a result, FE-1 understood that Rutledge was sent by someone to be involved, someone who FE-1 assumed was someone higher than the CPO. According to FE-1, Rutledge would have been reporting directly back to Defendants Schroeter and Wyshner, the CEO and CFO, about these issues, because the Q blocks were standard at Kyndryl, which was not the type of organization that could move without the executives knowing.

125. FE-1 had a spreadsheet that showed delayed payments not only for FE-1's own vendors but also the money owed to FE-1's colleagues' vendors as well. FE-1 was shocked and astounded by the dollar amounts in the spreadsheet, which were eye-wateringly high. FE-1 is

highly confident that an amount in one spreadsheet was over $100 million because it grabbed FE-1's attention so hard.

126. FE-2 was Kyndryl's Director, Procurement Strategic Sourcing, Hardware & Maintenance from September 2021 to September 2024. FE-2 previously worked at IBM and went to Kyndryl as part of the spin-off. FE-2 was the Global Category Lead for Hardware at Kyndryl, worked in procurement, and was responsible for strategic sourcing for the hardware department. FE-2 reported directly to Dominik Amrein, Kyndryl's Vice President, Head of Global Procurement Strategic Sourcing; and later reported directly to Mark Colley, Kyndryl's Vice President, Procurement - Strategic Sourcing Hardware, Maintenance and Network Services. Amrein and then Colley reported indirectly to Graham Wright, Kyndryl's CPO.

127. FE-2 stated that every quarter, during their tenure with Kyndryl, Kyndryl deferred payment on vendor invoices that were due into subsequent reporting periods. FE-2 stated that every quarter end, Kyndryl would put a "Q block" on all the affected vendors in SAP. FE-2 stated that, if the Q block was not removed, the vendor does not get paid—it was literally a payment stop criteria. FE-2 stated that, typically, the Q block would automatically be removed at quarter end and then the vendor would get paid.

128. FE-2 stated that approval to release payments subject to a Q block had to come from Harsh Chugh, Kyndryl's COO. Earlier on in FE-2's tenure, CPO Wright could approve the release of payment, but for the last year to year and a half of FE-2's tenure (and thus the start of the Class Period), only COO Chugh could approve the release. FE-2 explained that, during that period, approvals for payment had to come from both Wright and Chugh, but really it was Chugh who made the decisions. FE-2 made requests to make payments directly to Wright, who would go to Chugh and then inform FE-2 that Chugh had approved it.

129. FE-2 stated that employees needed really good justification to get a payment hold removed. The only way FE-2 could get approval for payment release during a block was if it was going to impact a customer delivery. FE-2 stated that there were instances where vendors would put Kyndryl on credit hold because of non-payment. FE-2 gave the example that Arrow would put Kyndryl on credit hold regularly. FE-2 almost always had to request to get Arrow paid to get off credit hold because it would affect customers' delivery. FE-2 also recalled that Cisco put Kyndryl on credit hold multiple times and that Dell put Kyndryl on credit hold a couple of times. A credit hold means that the vendor will hold product and not ship to Kyndryl.

130. Notably, Cisco and Dell are two key partners that Kyndryl identifies in its SEC filings as part of Kyndryl's "Alliances" initiative, which it says focuses on "[d]riving signings, certifications and revenues with our new ecosystem partners and capabilities."

131. FE-2 stated that Kyndryl employees were instructed to lie and tell vendors on Q blocks that there was a system issue with their payments. FE-2 related that this was the regular speech and standard reason given to vendors every quarter.

132. FE-2 explained that the fourth quarter of Kyndryl's fiscal year was handled differently. FE-2 stated that, in Q1 to Q3, employees were able to get approval to release certain payments if not doing so would have an impact; in Q4, Kyndryl would almost never remove the payment block, rather than approving some payments like in other quarters. FE-2 explained that it was tougher to get a Q block removed in Q4 because it was year-end.

133. FE-2 stated that delayed payments were happening with all of FE-2's vendors—except IBM, which was exempt from the Q blocks. FE-2 also knew, from speaking with colleagues, that delayed payments were happening with non-hardware vendors as well, across all

the categories in procurement; all of the big vendors were put on hold to ensure Kyndryl had that cash on hand.

134. FE-2 stated that Kyndryl would withhold vendor payments until after the end of the quarter to make its cash flow look better. FE-2 knew that the purpose and intent for withholding payments because it was openly discussed, every quarter, with just about the entire procurement department, including CPO Wright, that the reason the payments were being withheld was to make cash flow look better. FE-2 stated that buyers, other category leads, and leadership talked about it openly because it became such an issue with vendors calling in and issuing credit holds.

135. FE-2 brought up the withholding of vendor payments as a grievance because FE-2 did not think Kyndryl should be withholding payments, but they were overruled by the C-suite. FE-2 brought the grievance up to CPO Wright, VP Colley, and anyone who would listen. FE-2 brought up the grievance towards the beginning of FE-2's tenure and continued to complain about the practice every single quarter, every three months.

136. FE-2 stated that all of Kyndryl's procurement leaders, including CPO Wright, regularly received reports on the blocked invoices, called Q block reports, which were generated through SAP. FE-2 explained that Kyndryl would produce a Q block report almost daily for the last week or two of the month, which was shared with the leaders. FE-2 explained that the Q block report would show what counterparties Kyndryl had on Q block and how much cash was being held. FE-2 recalled that, for instance, if they owed Cisco a certain amount, CPO Wright would ask FE-2 to see what would happen if they released a lesser amount and told Cisco that Kyndryl would pay Cisco the rest a day or two after the quarter.

137. FE-2 confirmed that the strategy of using the Q block at Kyndryl came directly from the top. FE-2 knew the strategy was coming from the C-suite because employees would be

told by Wright that the decision was being made at the top level. It was made very clear to FE-2 by CPO Wright and other leaders that this practice was coming from the top.

138. FE-2 stated that this practice of intentionally delaying vendor payments was still going on when FE-2 left Kyndryl; in fact, it was one of the reasons FE-2 left.

139. FE-3 was an Accounts Payable Specialist for Kyndryl from February 2022 until December 2024 and worked for Kyndryl, employed through a contractor, from the time of the spin-off from IBM. FE-3 stated that Kyndryl intentionally blocked invoices with Q blocks and that, if Accounts Payable personnel saw the Q code, they were supposed to tell the vendors that there were some problems and that Kyndryl needed some time to unblock the invoices. FE-3 stated that Accounts Payable personnel were not supposed to tell vendors that Kyndryl was intentionally blocking payment of the invoice, even though Accounts Payable personnel knew that to be the case because they saw the Q code. FE-3 saw this practice every quarter from after the spin-off up until December 2024. FE-3 stated that all invoices would be delayed with that code for one quarter and that invoices would unblock automatically after quarter end. FE-3 further stated that the invoices that were due to be paid in a certain quarter would be automatically blocked until the following quarter.

140. FE-4 was a Global Supplier Relationship Manager at Kyndryl from January to August 2024, reporting to a director of procurement. FE-4 dealt with procurement in the hardware division and was assigned to a Fortune 100 account, Wesco Anixter. FE-4 stated that Kyndryl was using Q blocks in the SAP Ariba system to block payments until after quarter end. FE-4 further stated that this practice was already going on at the start of FE-4’s tenure and that FE-4 had taken over an account that had been dealing with these same issues prior to their joining. FE-4 stated that the point of the block was to delay payments near quarter end until after the quarter closed. FE-4

stated that at least everyone on their global team, which covered the Fortune 100s, the biggest accounts (such as Cisco, Lenovo, and Hewlett Packard), was dealing with that issue. FE-4 was personally in meetings with CPO Wright, who stated how much they could pay their accounts. FE-4 corroborated that employees could ask for an exception to a Q block if, for instance, the counterparty was going to do a credit hold and that the process for requesting an exception was well known. To request an exception, FE-4 would go through a procurement director.

141. FE-5 worked as a manager of Kyndryl's IT systems from the start of the Company until mid-2025. As part of FE-5's routine duties in this position, they oversaw some of the Company's internal IT systems and support, including for the Company's SAP System. In that role, they knew that the Company implemented a project to delay vendor payments.

142. FE-5 stated that the project was driven by Defendant Wyshner, and that the goal of the project was to delay vendor payments. FE-5 further stated that payment was delayed just for the close period at the end of the quarter. FE-5 explained that numerous IT and business leaders would have been aware of the project and Wyshner's involvement because they attended meetings together to report on ongoing projects.

143. FE-5 stated that the Company had weekly tracking of all open projects, and this project was on that list as it was being rolled out. FE-5 further stated that every Friday there were weekly status calls with Defendant Wyshner, and this project was always on the list to track. FE-5 attended many of these calls. FE-5 was told by a coworker that Defendant Wyshner had access to the SAP System. FE-5 stated that the payment delay project was discussed during these weekly calls. FE-5 stated that the payment delay project was added to the list of projects sometime in 2024, and it was mentioned in the weekly meetings from that point until it was fully implemented 16-17 months later. FE-5 stated that the payment delay project was discussed during these weekly calls.

144. In addition to the delayed payments being shown in SAP, as described by FE-6, *see infra* § V.D.3, Defendants Wyshner and Khurana (as well as other management-level executives, such as Group President Elly Keinan) would have been informed that the management self-assessment for Accounts Payable was "unsat" (unsatisfactory).

145. The widespread use of Q blocks to intentionally block vendor payments, for the purpose of pushing those payments to subsequent reporting periods, and to therefore misleadingly report higher free cash flow in the period in which the payments were due, rendered materially false and misleading Defendants' representations about the drivers of Kyndryl's free cash flow. Moreover, the use of Q blocks and the false and misleading explanations given to Kyndryl's vendors were an integral part of Defendants' scheme to defraud investors.

## D. Defendants Made False and Misleading Statements About Kyndryl's Disclosure Controls and Procedures and About Its Internal Controls Over Financial Reporting

### 1. Regulatory Framework for Disclosure and Accounting Controls

146. The Sarbanes-Oxley Act of 2002 ("SOX"), together with implementing and other regulations adopted by the SEC, require U.S. public companies such as Kyndryl to design and maintain two kinds of controls, both meant to help ensure that public companies' representations to investors are accurate and to decrease the risk of fraud: (1) disclosure controls and procedures ("DCP"), 15 U.S.C. § 7241 (SOX Section 302), 17 C.F.R. §§ 229.307, 240.13a-15(a), (b), (e); and (2) internal controls over financial reporting ("ICFR"), 15 U.S.C. § 7262(a) (SOX Section 404), 17 C.F.R. §§ 229.308(a), 240.13a-15(a), (c), (d), (f).

147. DCP are designed to ensure that all material company information—both financial and non-financial—is captured, evaluated, and disclosed accurately. DCP ensure that all "information required to be disclosed by the issuer" is "accumulated and communicated to the issuer's management, including its principal executive and principal financial officers ... as

appropriate to allow timely decisions regarding required disclosure." 17 C.F.R. § 240.13a-15(e). At the end of each quarter, an issuer's management and principal executive and principal financial officers (here, Defendants Schroeter and Wyshner), must evaluate the effectiveness of the company's DCP and disclose the conclusions regarding the effectiveness of these controls. *Id.* §§ 229.307, 240.13a-15(b); *see also* 15 U.S.C. § 7241(a)(4)(D).

148. ICFR are financial reporting controls, distinct from DCP, that are critical to investors because they help ensure the reliability of financial statements and reduce the risk of fraud. An issuer's principal executive and financial officers must establish and maintain ICFR that "provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes." 17 C.F.R. § 240.13a-15(a), (f).

149. SEC Staff has explained that "[a]n overall purpose of internal control over financial reporting is to foster the preparation of reliable financial statements." SEC Staff, *Staff Statement on Management's Report on Internal Control Over Financial Reporting* (May 16, 2005), *available at* https://tinyurl.com/ys5ynmfp. One of the largest accounting firms in the world described extensively in its public materials the importance of a company's representations concerning its ICFR, writing that these "form[] the bedrock of public and investor confidence in the capital markets. Without effective ICFR, entities risk significant financial and reputational harm." KPMG, *Internal Control Over Financial Reporting Handbook* (July 2023). The Center for Audit Quality has reiterated the same, explaining that "[p]reparing reliable financial information is a key responsibility of the management of every public company," including because "investors must be able to place confidence in a company's financial reports." The Center for Audit Quality, *Guide to Internal Control Over Financial Reporting* (May 9, 2019).

150. Kyndryl's SEC filings, including its annual reports filed on Forms 10-K, acknowledged the importance of effective ICFR and the "damage to [its] reputation" that could "adversely impact [Kyndryl's] business" should it experience "internal control deficiencies."

151. SOX Section 302 requires each periodic report filed with the SEC to contain a certification by the issuer's principal executive and principal financial officers stating that: (1) they reviewed the report; (2) based on their knowledge the report does not contain any false or misleading material statement; (3) based on their knowledge, the financial statements and financial information in the report fairly present in all material respects the issuer's financial condition and results of operations; (4) they designed DCP to ensure that material information about the issuer "is made known" to them, and also state their "conclusions about the effectiveness" of the DCP; and (5) they disclosed to the company's auditors and audit committee of its board of directors all significant deficiencies in the design or operation of ICFR and any fraud, whether or not material, that involves management, and have disclosed to the company's auditors any material weaknesses in ICFR. 15 U.S.C. § 7241(a)(1)-(5).

152. SOX Section 404 and implementing regulations require annual SEC reports to include an internal control report stating the responsibility of management for establishing and maintaining an adequate ICFR. 15 U.S.C. § 7262(a)(1). Management must also evaluate the effectiveness of the ICFR and include in the filing "a statement as to whether or not [ICFR] [are] effective," but cannot conclude that the ICFR are effective "if there are one or more material weaknesses in the" ICFR. 17 C.F.R. § 229.308(a)(3); *see also* 15 U.S.C. § 7262(a)(2).

153. In addition to management, the company's outside auditor must annually attest to and report on management's assessment of the effectiveness of ICFR, including by expressing an

opinion on whether the company maintained effective ICFR and identifying any material weaknesses. 15 U.S.C. § 7262(b); 17 C.F.R. § 229.308(b).

154. In evaluating the effectiveness of ICFR, management may choose a suitable, recognized control framework and disclose its choice to investors. 17 C.F.R. §§ 229.308(a)(2), 240.13a-15(c). In its SEC periodic reports during the Class Period, Kyndryl represented that it used the "COSO Internal Control – Integrated Framework," developed by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO *Framework*").

155. The COSO *Framework* includes five components: (i) Control Environment, (ii) Risk Assessment, (iii) Control Activities, (iv) Information and Communication, and (v) Monitoring Activities. These components, in turn, encompass seventeen (17) principles that describe the elements of an effective system of internal controls. Another major accounting firm has explained that the COSO *Framework*'s components and principles "are interrelated with operational, reporting, and compliance objectives throughout an organization" and that when "all principles are present and functioning, an effective system of internal control is achieved." Deloitte, *Using the COSO Framework to Establish Internal Controls Over Sustainability Reporting (ICSR)* (Apr. 21, 2023), *available at* https://tinyurl.com/mrxh8h5x.

156. The first component, the "Control Environment," is defined as:

> the set of standards, processes, and structures that provide the basis for carrying out internal control across the organization. The board of directors and senior management ***establish the tone at the top*** regarding the importance of internal control including expected standards of conduct. Management reinforces expectations at the various levels of the organization. The control environment comprises the integrity and ethical values of the organization; the parameters enabling the board of directors to carry out its governance oversight responsibilities; … and the rigor around performance measures, incentives, and rewards to drive accountability for performance. The resulting control environment has a pervasive impact on the overall system of internal control.

157. Control Environment Principle #1 is that "[t]he organization demonstrates a commitment to integrity and ethical values," and the first Point of Focus for Control Environment Principle #1 is: "Sets the Tone at the Top—The board of directors and management at all levels of the entity demonstrate through their directives, actions, and behavior the importance of integrity and ethical values to support the functioning of the system of internal control."

158. Control Environment Principle #2 is that "[t]he board of directors demonstrates independence from management and exercises oversight of the development and performance of internal control." The COSO *Framework* gives examples of oversight activities of the board, including: "Challenge senior management by asking probing questions about the entity's plans and performance, and require follow-up and corrective actions, as necessary (***e.g., questioning transactions that occur repeatedly at the end of interim or annual reporting periods***)."

159. Risk Assessment Principle #8 is that "[t]he organization considers the potential for fraud in assessing risks to the achievement of objectives." One type of fraud to be assessed is "management override"—an "***action taken to override an entity's controls for an illegitimate purpose including personal gain or an enhanced presentation of an entity's financial condition or compliance status***."

160. Information and Communication Principle #14 is that "[t]he organization internally communicates information, including objectives and responsibilities for internal control, necessary to support the functioning of internal control[,]" and one of the Points of Focus for Information and Communication Principle #14 is: "Separate communication channels, such as whistle-blower hotlines, are in place and serve as fail-safe mechanisms to enable anonymous or confidential communication when normal channels are inoperative or ineffective." The COSO *Framework* explains that "[i]nformation systems should include mechanisms for anonymous or confidential

reporting" and that "[e]scalation procedures ensure that necessary communication will be made to a specific board member who is responsible for ensuring that timely and proper assessments, investigations, and actions are carried out."

161. Finally, SOX Section 906 requires each periodic SEC report to contain a certification by the issuer's CEO and CFO that the periodic report containing the financial statements fully complies with the requirements of Section 13(a) or 15(d) of the Exchange Act and "that information contained in the periodic report fairly presents, in all material respects, the financial condition and results of operations of the issuer." 18 U.S.C. § 1350(a), (b).

### 2. Defendants Falsely Certified that Kyndryl Had Effective Internal Controls or Only One Material Weakness Unrelated to the Undisclosed Cash Management Practices

162. Each of Kyndryl's six periodic reports filed during the Class Period—the Q1, Q2, and Q3 2025 Forms 10-Q, the 2025 Form 10-K, and the Q1 and Q2 2026 Forms 10-Q (the "Six Periodic Reports")—included two certifications required by SOX (the "SOX Certifications").

163. First, Defendants Schroeter and Wyshner certified, pursuant to SOX Section 302, that they had designed DCP and ICFR in compliance with SOX and SEC regulations, had "[e]valuated" and "presented … [their] conclusions about the effectiveness" of Kyndryl's DCP and had "disclosed, based on [their] most recent evaluation of" ICFR, all "significant deficiencies and material weaknesses" in ICFR and all "fraud, whether or not material, that involves management," to Kyndryl's auditors and the "Audit Committee of [its] board of directors."

164. Second, Defendants Schroeter and Wyshner certified, pursuant to SOX Section 906, that the information in each of the Six Periodic Reports "fairly present[ed] in all material respects[,] the financial condition, [and] results of operations" of Kyndryl.

165. In each of Kyndryl's Q1, Q2, and Q3 2025 Forms 10-Q Defendants Schroeter and Wyshner further presented their conclusions about the effectiveness of Kyndryl's DCP by stating

that they evaluated the effectiveness of the DCP and "[b]ased on that evaluation … concluded" that Kyndryl's DCP "were not effective as of the end of the period covered by [each] report," i.e., June 30, September 30, and December 31, 2024, "due to a material weakness in internal control over financial reporting in the area of our information technology general controls ("ITGCs")," but ***did not disclose any other material weakness*** in Kyndryl's DCP or ICFR.

166. The ITGCs deficiencies were "related to access and program development and change management controls associated with the Company's large-scale migration in a compressed timeframe of its internal operating systems to a new enterprise resource planning system … which was required to replace the systems temporarily being made available to the Company by [its] former parent following [the] Spin-off."

167. In each of Kyndryl's 2025 Form 10-K and Q1 and Q2 2026 Forms 10-Q, Defendants Schroeter and Wyshner further presented their conclusions about the effectiveness of Kyndryl's DCP by stating that they evaluated the effectiveness of the DCP and "[b]ased on that evaluation … concluded" that Kyndryl's DCP "***were effective*** as of the end of the period covered by [each] report," i.e., March 31, June 30, and September 30, 2025, respectively, and ***did not disclose any material weakness*** in Kyndryl's DCP and ICFR. Put differently, Defendants stated Kyndryl had resolved the ITGC issues as of the effective date of the 2025 Form 10-K, and that the Company's ICFR and DCP were not impaired by anything and were, instead, "***effective***."

168. In Kyndryl's 2025 Form 10-K, Defendants Schroeter and Wyshner also presented, pursuant to SOX Section 404 and implementing SEC regulations, their conclusions about Kyndryl's ICFR, after evaluating them under the COSO *Framework*, stating they concluded that their ICFR "was effective" as of March 31, 2025. And in the Q1 and Q2 2026 Forms 10-Q,

Defendants affirmed that there had "been no changes in the Company's [ICFR]," incorporating their 2025 Form 10-K representations that Kyndryl's ICFR were effective.

169. Also in Kyndryl's 2025 Form 10-K, Kyndryl's auditor stated that, in their opinion, Kyndryl "maintained, in all material respects, effective internal control over financial reporting as of [the effective date of the report], based on criteria established in Internal Control - Integrated Framework (2013) issued by the COSO."

### 3. In Reality, Kyndryl Had At Least Three Other Undisclosed Material Weaknesses in Internal Controls Over Financial Reporting, and Its Disclosure Controls and Procedures Were Ineffective

170. Contrary to Defendants' statements in Kyndryl's Q1, Q2, and Q3 2025 Forms 10-Q that Kyndryl's DCP and ICFR were only not effective due to the ITGCs material weakness, and contrary to Defendants' statements in Kyndryl's 2025 Form 10-K and Q1 and Q2 2026 Forms 10-Q that Kyndryl's DCP were "***effective***," and contrary to Defendants' statement in Kyndryl's 2025 Form 10-K that Kyndryl's ICFR were "***effective***," and contrary to Defendants' statements in Kyndryl' Q1 and Q2 2026 Forms 10-Q that there were "no changes" to the supposed effectiveness of Kyndryl's ICFR since the 2025 Form 10-K, there were at least three undisclosed material weaknesses in Kyndryl's ICFR as of the effective dates of each of those Six Periodic Reports, which rendered both Kyndryl's DCP and its ICFR not effective, as Kyndryl was later forced to publicly admit and as Former Employees interviewed by Lead Counsel confirmed.

171. The three undisclosed material weaknesses were: (1) Kyndryl's senior finance executives created an inappropriate tone at the top, including with respect to deferring vendor payments from quarter to quarter; (2) Kyndryl had ineffective controls related to information and communication; and (3) Kyndryl had ineffective controls regarding its whistleblower hotline and escalation of whistleblower reports to Kyndryl's Audit Committee. *See* §§ VI.B, VII.

172. As set forth above, multiple former employees confirmed the conduct giving rise to these material weaknesses (including the use of Q blocks as a "cash management practice" to defer vendor payments until after the reporting period when due) and that they existed throughout the Class Period, including on each of Six Periodic Reports' effective dates.

173. Moreover, the senior finance executives who created Kyndryl's inappropriate tone at the top, and who failed to communicate effectively with Kyndryl's Board and Audit Committee, included Defendants Wyshner and Khurana, as Kyndryl later admitted. *See* §§ VI.B, VII.

174. The executives who designed Kyndryl's DCP included Defendants Schroeter and Wyshner, and one of their designs was to end IBM's legacy practice of automatic and "unfiltered" escalation to the Audit Committee of whistleblower reports concerning financial results.

175. FE-6 was a long-time IBM employee who moved to Kyndryl when it was spun off. FE-6 was a Director, General Auditor Organization Operations from the spin-off to July 2024. In that role, when FE-6 came over from IBM, FE-6 was in Financial Investigations. Then FE-6 moved to Business Controls around July 2022, where they covered Accounts Payable. In addition, Kamal Dua, Kyndryl's Chief Audit Executive, put FE-6 in charge of a program under Business Controls called management self-assessment. Then FE-6 was a Director, SOX Compliance from August 2024 to June 2025, where FE-6 led a team responsible for accounting processes, Accounts Receivable, Treasury, Human Resources (including payroll and pensions), and income taxes. At various times, FE-6 reported to Bob Martire, to Timo Mohr (Kyndryl's Vice President of Worldwide Business Controls), and to Kamal Dua (Kyndryl's Chief Audit Executive).

176. FE-6 stated that Kyndryl's Accounts Payable was delaying payments and that the delayed payments were intentional. FE-6 learned this in late 2022, during a quarter close month (likely September 2022), and knows that it occurred until at least August 2024 (when FE-6 moved

out of Business Controls). Upon learning that Kyndryl was intentionally delaying payments, FE-6 called Accounting and the business process owner. FE-6 also talked to FE-6's supervisor, Timo Mohr, about it, and based on that conversation thinks that Mohr discussed it with Dua.

177. FE-6 stated that the delayed payments were shown in key control points, including the management self-assessments, including an aging breakout, which was part of the controls package. FE-6 stated that, from at least July 2022 until FE-6's departure in June 2025, the Accounts Payable business process owner rated Accounts Payable "unsat" (or unsatisfactory) in the management self-assessment. FE-6 further stated that Accounts Payable rolled up under Operations, and the individual responsible for Operations rated Operations "unsat" for all of its processes.

178. FE-6 also stated that late payments were noted in the management self-assessment. FE-6 stated that, as part of the management self-assessment, Accounts Payable presented its key performance indicators, which included an aging breakout of how much was paid in a quarter, how much was 30, 60, 90, or more than 90 days late.

179. FE-6 stated that the purpose of the management self-assessments was for Defendants Schroeter and Wyshner to provide SOX certifications. FE-6 helped organize a meeting that included all of Defendant Wyshner's direct reports (*i.e.*, the process owners). FE-6 recalls that, at that meeting, Defendant Khurana would read from a script and ask whether each process owner had disclosures. FE-6 knows that, after that, there would be another meeting (which FE-6 did not attend) with Defendant Wyshner and Elly Keinan, Kyndryl's Group President. Wyshner and Keinan would have been aware that Accounts Payable was "unsat" because they were in that meeting. In addition, Harsh Chugh, Kyndryl's COO, would have received the controls package for Accounts Payable.

180. FE-6 stated that, at IBM, if a whistleblower submitted a report that was coded in the system as a financial reporting matter, it was taken "unfiltered" to the Audit Committee—meaning that exactly what the submitter said was brought to the Audit Committee. FE-6 tried to carry over this same robust process to Kyndryl. After being informed of the material weakness regarding whistleblower reports that Kyndryl disclosed on February 17, 2026, FE-6 agreed that Kyndryl would not have had that material weakness if it had unfiltered presentations like IBM's. FE-6 attended and took notes at three to four meetings of the Audit Committee of Kyndryl's Board of Directors, from January 2022 to April or May 2022. During these meetings, reports from Kyndryl's internal whistleblower program ("Confidentially Speaking"), were not part of the main deck and were not presented in FE-6's presence.

## VI. THE TRUTH EMERGES

### A. August 4-5, 2025: Investors Begin to Learn the Truth as Kyndryl Announces Cash Flow Below Market Expectations

181. The truth partially began to emerge on August 4, 2025. That day, after market close, Defendants surprised the market when they reported disappointing first-quarter 2026 financial results. Kyndryl reported net capital expenditures of $97 million, cash used in operating activities of $124 million, and free cash flow use of $222 million—which missed analysts' estimates that free cash flow use would be only $219 million. In other words, Kyndryl used ***more*** free cash than analysts had anticipated. Kyndryl also reported that there were no transaction-related payments, workforce rebalancing payments, significant litigation payments, or payments related to lease terminations that quarter, so adjusted free cash flow was equal to free cash flow.

182. The following day, during Kyndryl's premarket earnings call, Defendant Wyshner discussed the disappointing cash flow results, stating: "As expected and similar to last year, our first quarter was a seasonal user of cash due to annual software and broad-based incentive comp

payments, and our free cash flow was a $222 million outflow in the quarter." Wyshner later added that: "From a timing perspective, Q1 was a significant user of cash due to annual software and incentive compensation payments."

183. Analysts responded immediately to this negative news. For instance, analysts from J.P. Morgan reported on August 4 that "the magnitude of the F1Q decline" in revenue would "not be well received by investors." Those same analysts also noted that "investors need visibility into sustainable positive revenue growth to award KD a double-digit free cash flow multiple, so we expect a negative stock reaction," and also highlighted the fact that Kyndryl's free cash flow burn rate was greater than consensus expectations.

184. On these announcements, Kyndryl's stock price fell by $7.76, or approximately 21%, over the next trading day, from a closing price of $36.70 on August 4, 2025, the trading day prior to the financial results report, to a closing price of $28.94 on August 5, 2025.

185. Kyndryl's announcements, however, did not reveal the full truth concealed by Defendants. To the contrary, Defendants continued to make additional misrepresentations and conceal additional facts concerning Kyndryl's business and cash management.

186. For example, Defendant Schroeter assured investors during the earnings call that Kyndryl maintained a "strong conversion of our earnings to free cash flow," and that Kyndryl was "optimizing [its] capital allocation by investing in organic growth opportunities." Defendants also described Kyndryl's disappointing cash flow figures as the result of seasonal outflows.

187. Defendant Wyshner similarly continued his materially false and misleading statements. During the August 5 earnings call, in addition to showing a slide on "[i]nvestment-grade balance sheet metrics and cash flow seasonality," Defendant Wyshner assured investors that Kyndryl's "use of cash in the first quarter was what we anticipated and doesn't change our

expectation[.]" Wyshner later represented that the timing had simply been deferred to later in the year and that Kyndryl was "moving into the … cash flow generating portion of the year," which would create "additional cash flow to deploy."

188. Although Defendants did not reveal the full truth, the first quarter free cash flow use and miss was caused, in significant part, by Kyndryl deferring the payment of vendor invoices due at the end of fiscal year 2025 into the first quarter of 2026, such that it used more cash than investors had been expecting given their misimpression about Kyndryl's cash flow drivers.

189. Further, according to Defendant Wyshner, one significant use of cash in the first quarter of fiscal year 2026 was "incentive comp payments." As discussed below, Kyndryl's incentive compensation payments for fiscal year 2025, which would have been awarded in Q1 2026, were inflated by the fraud. *See infra* ¶¶ 246-57.

### B. February 9, 2026: Kyndryl is Forced to Make Bombshell Admissions, Finally Revealing the Truth

190. Before the market opened on February 9, 2026, Kyndryl was forced to make several shocking announcements in various public announcements and filings, finally revealing the truth that had been previously concealed by Defendants' misrepresentations and fraudulent scheme.

191. On February 9, 2026, Kyndryl filed a SEC Form 12b-25 with several disclosures.

192. ***First***, Kyndryl disclosed that it was under investigation by the SEC's Division of Enforcement relating to Kyndryl "cash management practices, related disclosures (including regarding the drivers of the Company's adjusted free cash flow metric), the efficacy of the Company's internal control over financial reporting, and certain other matters."

193. ***Second***, Kyndryl disclosed that the "Audit Committee of its Board of Directors" had been "reviewing its cash management practices, related disclosures (including regarding the

drivers of the Company's adjusted free cash flow metric), the efficacy of the Company's internal control over financial reporting, and certain other matters."

194. ***Third***, Kyndryl stated that it "anticipate[d] reporting material weaknesses in the Company's [ICFR] for the period covered in the [upcoming] Quarterly Report" (for the quarter ending December 31, 2025), "as well as for the full fiscal year ended March 31, 2025, and the first two fiscal quarters of fiscal year 2026, which are expected to include, but may not be limited to, the effectiveness and strength of certain functions at the Company, including with respect to controls related to information and communication and tone at the top."

195. ***Fourth***, as a result, Kyndryl's "assessment of internal control over financial reporting and the related opinion of PricewaterhouseCoopers LLP only with respect to the effectiveness of the Company's internal control over financial reporting as of March 31, 2025 included in [Kyndryl's 2025 Form 10-K] should no longer be relied upon."

196. ***Fifth***, Kyndryl disclosed that it would be "unable to file within the prescribed time period" its "Quarterly Report on Form 10-Q for the quarter ended December 31, 2025."

197. On February 9, 2026, Kyndryl also announced that two of the Individual Defendants and Sebold had lost the positions they held throughout the Class Period. Specifically, Kyndryl disclosed that, on February 5, 2026, Defendant "David Wyshner departed from his position as [CFO] … and Edward Sebold departed from his position as General Counsel of the Company, effective immediately. In addition, on the same date, [Defendant] Vineet Khurana stepped down from his position as Senior Vice President and Global Controller."

198. Finally, on February 9, 2026, Kyndryl issued a Press Release announcing the results of Kyndryl's operations for the third fiscal quarter of fiscal year 2026, ending on December 31, 2025, and filed a Form 8-K incorporating the release (the "February 9, 2026 Press Release"). The

February 9, 2026 Press Release slashed Kyndryl's free cash flow guidance for fiscal year 2026 to $325 to $375 million, down from $550 million—a decrease of 32% to 41%—despite Defendants having reaffirmed the $550 million guidance less than three months prior.

199. The decreased free cash flow guidance reflected, in significant part, Kyndryl now having to make vendor payments due in fiscal year 2026 that otherwise would have been deferred into subsequent reporting periods had the scheme continued.

200. On this news, Kyndryl's stock immediately fell $12.09 per share, or 55%, over the course of the next trading day, from a closing price of $23.49 on Friday, February 6, 2026 to a closing price of $10.59 on Monday, February 9, 2026, the next trading session.

201. Analysts were stunned, and numerous firms downgraded Kyndryl's stock rating. For instance, on February 9, 2026, Guggenheim analysts described Defendants' announcements as "The Four Horsemen," downgrading the stock from "Buy" to "Neutral" and noting that "[s]urprise management departures (CFO, General Counsel, Controller), F3Q26 results below expectations, a worse-than-anticipated negative outlook revision, and anticipatory reporting of material weaknesses in KD's internal controls over financial reporting" would "all point to greater uncertainty around an eventual path to stabilization." They also noted they "d[id] not believe investors were ready for" the executive departures, the "magnitude of the revision," or the "disclosure of an anticipated material weakness in KD's internal controls." Additionally, the Guggenheim analysts remarked with respect to Defendants' candor that they "expect[ed] investors to continue questioning execution and credibility until management provides an update on material weaknesses and greater certainty around path to FY28 targets."

202. Scotiabank analysts were similarly skeptical of Defendants' prior representations, and as a result of the Company's numerous disclosures, moved the stock to "Under Review" and

told investors that its "prior target price and estimates can no longer be relied upon." Analysts from Oppenheimer also downgraded Kyndryl from "Outperform" to "Perform," highlighting that "the departure of CFO David Wyshner adds uncertainty to the outlook." Oppenheimer analysts also emphasized that Kyndryl "delayed filing its Form 10-Q and anticipates reporting material weaknesses in the company's internal controls. The company noted it is reviewing its cash management practices and related disclosures after it received document requests from the SEC."

203. Kyndryl's announcements were so significant to J.P. Morgan that its analysts cut their price target for Kyndryl stock ***twice***: first, a more than 50% cut from $40 to $16 pre-market on February 9, and then again from $16 to $13 the following day, after more fully "digesting F3Q results and the earnings call." On February 10, J.P. Morgan also noted that they had "many questions" following Kyndryl's disclosures, focused on "the profit/FCF impact, the evolving IBM relationship, and of course the delayed 10-Q filing for an audit committee review of cash management and internal controls alongside the departures of CFO and General Counsel." They also noted that management's inability "to comment on the events that led to the delayed 10-Q filing" was "creating an overhang on the stock[,]" and specifically called out the "reduction to [Kyndryl's] free cash flow guidance" as a "change in trend" and "a reversal from many prior quarters." J.P. Morgan also directly connected the dots and reported that the Company's "material weakness may relate to free cash flow contributions from active working capital management."

## VII. POST-CLASS PERIOD DEVELOPMENTS

204. Events after the Class Period further corroborate Lead Plaintiff's allegations.

205. On February 17, 2026, Kyndryl made three amended filings: (1) the 2025 Form 10-K/A, amending the 2025 Form 10-K; (2) the Q1 2026 Form 10-Q/A, amending the Q1 2026 Form 10-Q; and (3) the Q2 2026 Form 10-Q/A, amending the Q2 2026 Form 10-Q (together, the "Amended Filings"). Each of the three Amended Filings was signed by Defendant Schroeter. The

Amended Filings made multiple admissions that further corroborate the materially false and misleading nature of Defendants' prior statements to investors.

206. In an amended MD&A section of the 2025 Form 10-K/A, Kyndryl added a new paragraph that disclosed that "our standard practice since the time of our spin-off from IBM is to actively manage our working capital, including … accounts payables." The 2025 Form 10-K/A disclosed these standard practices included "delaying certain cash payments (including ***deferring vendor payments quarter to quarter, in certain cases beyond vendor payment terms***)." And the 2025 Form 10-K/A disclosed that the "magnitude of these practices (including deferrals) has ***exceeded $100 million*** in current or prior periods." The Q1 and Q2 2026 Forms 10-Q/A incorporated that paragraph by reference, stating: "this Amendment should be read in conjunction with the Company's filings with the SEC that were made subsequent to the filing of the Original Form 10-Q, including the Form 10-K Amendment."

207. The Amended Filings also disclosed that three previously-undisclosed material weaknesses existed in Kyndryl's ICFR as of the relevant effective dates of those filings (March 31, 2025, June 30, 2025, and September 30, 2025, respectively) and that as a result, both Kyndryl's DCP and ICFR were ***ineffective*** as of those three dates—directly contrary to Defendants' prior misrepresentations that Kyndryl's DCP and ICFR were ***effective*** as of those dates.

208. The first previously undisclosed material weakness was that "[t]he Company's ***senior finance executives*** failed to set an appropriate ***tone at the top*** based on the principles associated with the control environment component of the COSO framework. Specifically, there was a lack of transparency with the Company's Chief Executive Officer, the Audit Committee of the Board and the Board, such that disclosure processes, ***including with respect to certain cash management practices regarding deferring vendor payments quarter to quarter***, were impacted."

209. The second undisclosed material weakness was that "[t]he Company did not design and maintain effective controls related to the information and communication component of the COSO framework to ensure appropriate communication pertaining to the disclosure process between certain functions within the Company, including the Company's Disclosure Committee and the Chief Executive Officer, as well as with the Audit Committee and the Board."

210. The third was that "[t]he aforementioned material weaknesses contributed to an additional material weakness. The Company did not design and maintain effective controls regarding the internal investigation, escalation and documentation of complaints made through the Company's ***reporting hotline and certain other available reporting channels, including with respect to appropriate escalation of certain complaints to the Audit Committee***."

211. The 2025 Form 10-K/A also disclosed that PricewaterhouseCoopers LLP had amended its audit report, originally set forth in Kyndryl's 2025 Form 10-K, to state that Kyndryl "did not maintain, in all material respects, effective internal control over financial reporting as of March 31, 2025, based on criteria established in *Internal Control - Integrated Framework* (2013) issued by the COSO because material weaknesses in internal control over financial reporting existed as of that date related to (i) the Company's senior finance executives failing to set an appropriate tone at the top within the control environment component of the COSO framework, including a lack of transparency such that disclosure processes were impacted and lacked an appropriate complement of finance personnel with sufficient understanding of their responsibilities as disclosure committee members; (ii) the Company not designing and maintaining effective controls to ensure appropriate communication pertaining to the disclosure process between certain functions within the Company; and (iii) the Company not designing and maintaining effective

controls regarding the internal investigation, escalation, and documentation of complaints made through the Company's reporting hotline and certain other available reporting channels."

212. On February 17, 2026, Kyndryl also filed its untimely Q3 2026 Form 10-Q. The untimely Q3 2026 Form 10-Q included the same new MD&A paragraph quoted above (¶ 206) and included management's conclusion that Kyndryl's DCP were not effective as of December 31, 2025 as a result of the same three material weaknesses in ICFR quoted above (¶¶ 208-10).

213. Kyndryl's untimely Q3 2026 Form 10-Q and its 2026 Form 10-K, filed on May 29, 2026, also confirm that the SEC investigation (disclosed on February 9, 2026) is ongoing.

214. Analysts remain focused on the additional fallout of Kyndryl's undisclosed cash management practices and material weaknesses.

215. For example, on March 24, 2026, J.P. Morgan wrote: "We remain Underweight on Kyndryl following ~200bps of recent spread widening, reflecting a material deterioration in confidence after recent results, management turnover, and the ongoing SEC probe. While a large portion of the repricing has likely already occurred, we do not view spreads as fully clearing the range of potential outcomes, particularly if the investigation were to uncover wrongdoing or lead to additional governance or financial restatements." On April 23, 2026, Scotiabank noted that its "downgrade reflect[ed]" the "ongoing SEC inquiry overhang."

216. Kyndryl's latest quarterly report, filed August 5, 2026, confirm that the SEC's investigation (disclosed on February 9, 2026) is ongoing and that the three material weaknesses in Kyndryl's ICFR have not been remediated.

217. Kyndryl's stock price traded at $12.38 as of August 19, 2026, and has never recovered to its price before the February 9, 2026 disclosure or to its Class Period high of $43.41.

## VIII. ADDITIONAL SCIENTER ALLEGATIONS

218. Numerous facts, including those set forth above and summarized below, collectively give rise to a strong inference that Defendants knew, or at minimum were reckless in not knowing, the true and omitted facts about Kyndryl's undisclosed use of Q blocks to defer vendor invoices from quarter to quarter beyond payment terms to inflate Kyndryl's free cash flow and, consequently knew or were reckless in not knowing the true and omitted facts about Kyndryl's three undisclosed material weaknesses in ICFR and how they rendered Kyndryl's DCP and ICFR ***not*** effective (or not effective for three additional undisclosed reasons).

219. ***First***, Defendants Schroeter, Wyshner, and Khurana had knowledge of the facts contradicting their materially false and misleading statements because their own conduct made their statements materially false and misleading.

220. Defendants Schroeter, Wyshner, and Khurana themselves caused the undisclosed material weaknesses. As to the first undisclosed material weakness (¶ 208), Kyndryl publicly stated that its "***senior finance executives*** failed to set an appropriate tone at the top." At the time of the conduct, Kyndryl's senior finance executives were Defendant Wyshner, Kyndryl's CFO and Principal Financial Officer, and Defendant Khurana, Kyndryl's Global Controller and Principal Accounting Officer. Wyshner departed Kyndryl and Khurana was demoted, both "effective immediately," and both on the same day (February 5, 2026). Wyshner's departure and Khurana's demotion were announced on February 9, 2026, the same day Kyndryl announced the devastating series of consequences arising from their undisclosed cash management practices. Moreover, the very first item described in a "remediation plan" (announced in the February 17, 2026 filings—the untimely 10-Q, and the Amended Filings, *see* § VII) was the replacement of Wyshner and Khurana with an Interim CFO and Interim Corporate Controller. Kyndryl has not publicly disclosed the departure or demotion of any "senior finance executive[]" other than Defendants Wyshner and

Khurana. Nor has Kyndryl otherwise publicly identified any "senior finance executive," other than Defendants Wyshner and Khurana, who was culpable for the internal controls, financial reporting, accounting, and other failures Kyndryl publicly identified on February 9 and 17, 2026.

221. Also as to the first undisclosed material weakness, Kyndryl stated that "there was a lack of transparency with the Company's Chief Executive Officer, the Audit Committee of the Board of Directors." And, as to the second undisclosed material weakness (¶ 209), Kyndryl stated that there was a lack of effective communication to "the Company's Disclosure Committee and the Chief Executive Officer, as well as with the Audit Committee and the Board." Kyndryl did not identify, with respect to either material weakness, that there was any lack of transparency with any "senior finance executive[]," or with Defendants Wyshner and Khurana.

222. As to the third undisclosed material weakness (¶ 210), regarding the failure to escalate whistleblower reports, Defendants Schroeter and Wyshner signed the SOX Certifications, with both stating in the first person "***I have disclosed***" to Kyndryl's auditors and Audit Committee all significant deficiencies and material weaknesses and any fraud that involves management or other employees who have a significant role in Kyndryl's ICFR. Yet, contrary to each of these personal certifications by Defendants Schroeter and Wyshner, any whistleblower report or reports received by the fourth quarter of fiscal year 2025 concerning Q blocks were ***not disclosed*** at minimum to the Audit Committee.

223. Defendants Schroeter and Wyshner either knew that any whistleblower report or reports had not been disclosed to, at minimum, Kyndryl's Audit Committee, and thus knowingly made a false certification to the contrary, or they were reckless in representing that they had disclosed all such reports when Kyndryl lacked an unfiltered reporting policy and they had made the decision not to continue IBM's prior practice of providing unfiltered reporting of financial

reporting whistleblower complaints to the Audit Committee, and Defendants Schroeter and Wyshner had not otherwise caused the whistleblower report or reports to be disclosed to, at minimum, Kyndryl's Audit Committee. In such circumstances, it was at minimum reckless for Defendants Schroeter and Wyshner to certify "I have disclosed."

224. Moreover, as numerous Former Employees confirmed, the directives to block vendor payments came from the Individual Defendants. In fact, a project of this magnitude and size, and affecting Kyndryl's critical relationships with its vendors, the "Alliances" component of Kyndryl's "3As," could only be directed by the highest levels of Kyndryl's management. If, to the contrary, these practices did escape Defendants' attention, particularly as the deferral of vendor payments resulted in threatened or actual credit holds and pervasive problems with those suppliers, then the Individual Defendants were reckless in repeatedly discussing these issues—the cash flow metrics and the importance of the "Alliances," among others—publicly with investors without informing themselves of the true facts.

225. ***Second***, Defendants Schroeter, Wyshner, and Khurana had knowledge of or recklessly disregarded the facts contradicting their materially false and misleading statements, because they and other Kyndryl management-level executives knew or had access to the true facts regarding Kyndryl's use of Q blocks and the material weaknesses.

226. Defendants Schroeter, Wyshner, and Khurana and other management-level executives knew about Kyndryl's cash management practices of deferring vendor payments—part of the core facts rendering their statements materially false and misleading—because they received at least quarterly reports reflecting Kyndryl's use of Q blocks to defer vendor payments between reporting periods and had access to other such reports as set forth herein.

227. As described by FE-6, Kyndryl produced "aging breakouts" of late payments by quarter; and late payments were disclosed in the management self-assessments and "controls packages." FE-6 stated that at least Kyndryl's COO (Chugh), the global process owner for the Operations Group, received and was required to sign-off on the management self-assessment for the Operations Group, the group that included Accounts Payable. In addition, as described by FE-6, at least Defendants Wyshner and Khurana (as well as other management-level executives, such as Group President Elly Keinan) would have been informed that the management self-assessment for Accounts Payable was "***unsat***" (unsatisfactory), which it was in each quarter for which Defendants Schroeter and Wyshner signed their SOX Certifications. As another example, the Individual Defendants received or had access to the Q block reports, which were generated through the SAP System at the end of each month and shared with Kyndryl leaders. *See* ¶ 136. As another example, the Individual Defendants had access to the SAP system itself, in which the Q blocks were implemented. Moreover, as set forth by the accounts of numerous former employees, the use of Q blocks to defer vendor payments was well-known inside of the Company, rendering any claim of ignorance by the Individual Defendants implausible.

228. The Individual Defendants either reviewed these reports when they received them each quarter, or they were reckless in not doing so while repeatedly discussing with investors the supposedly legitimate drivers behind Kyndryl's free cash flow figures and the Company's purportedly effective controls, including in legally required certifications filed with the SEC.

229. Defendant Khurana also had access to additional information reflecting the core facts underlying Kyndryl's use of Q blocks to defer vendor payments between reporting periods. As Kyndryl's Global Controller and Principal Accounting Officer, Khurana was responsible for Kyndryl's accounting and financial reporting processes, including the integrity of the general

ledger and accounts payable subledger, oversight of the accounting processes used to record vendor obligations, and the review and approval of material accounting entries. Those records and processes would have reflected recurring quarter-end increases in aged or unpaid vendor invoices, including invoices remaining unpaid beyond vendor payment terms. Given Khurana's role, experience, and responsibility for Kyndryl's accounting systems and financial reporting, those recurring period-end patterns would have alerted him—or at minimum rendered him reckless in failing to recognize—that Kyndryl was systematically deferring vendor payments from one reporting period to the next and that those deferrals were material to Kyndryl's reported cash flow metrics and control representations. Khurana also had responsibility for the SAP System in which the Q blocks were implemented.

230. As another example of Defendants having knowledge of and access to the facts contradicting their statements, Defendants Schroeter and Wyshner were responsible for Kyndryl's disclosure controls, including the decision not to continue IBM's practice of providing unfiltered reporting of financial-reporting whistleblower complaints to the Audit Committee. They also did not otherwise cause a highly relevant whistleblower report or reports concerning Q blocks and vendor payment deferrals to be disclosed at minimum to the Audit Committee. That failure is especially probative because the COSO *Framework* recognizes separate reporting channels and escalation procedures as fail safe mechanisms that allow employees to bypass conflicted management and communicate financial reporting concerns to the Audit Committee. By eliminating or failing to maintain those alternative reporting channels and then certifying that they had disclosed all fraud and material weaknesses involving management or employees with ICFR responsibilities, Schroeter and Wyshner knew or recklessly disregarded that Kyndryl's controls did not operate as represented and that Kyndryl had an undisclosed material weakness in ICFR.

231. As another example of Defendants having knowledge of and access to the facts contradicting their statements, Defendants Schroeter and Wyshner themselves each signed six SOX Certifications across six filings during the Class Period, specifically stating that they had "***designed***" or "caused" to be designed DCP to ensure that material information "***is made known***" to them each reporting quarter. If, on the other hand, Defendants Schroeter and Wyshner ***did not*** receive the material information of Kyndryl's cash management practices and the real drivers of the free cash flow metric Defendants Schroeter and Wyshner frequently discussed with investors, then the fact that they nevertheless (falsely) signed certifications stating that they did ensure all material information was made known to them bolsters the inference of scienter.

232. The Individual Defendants were not the only C-suite executives who knew about the payment deferral scheme. Kyndryl's COO, Harsh Chugh, and its CPO, Graham Wright, were also directly involved in managing and conducting Defendants' scheme. For instance, FE-1 explained that in late 2024 or early 2025, Kyndryl's relationship managers were pulled into a massive virtual meeting regarding vendor back payments. The attendees included Chugh and Wright. FE-4 was also personally in meetings where Wright stated how much they could pay their accounts. In addition, FE-2 stated that approval to release payments subject to a Q block had come from Chugh, and before that, from Wright. FE-2 knew the purpose and intent for withholding payments because it was openly discussed, including with Wright, and because FE-2 brought the issue up with Wright. Wright also told FE-2 that the decision to implement the Q block was being made at the top level. These facts confirm both Wright's knowledge of the scheme and that Wright's superiors (i.e., the Individual Defendants) were directing the scheme. Given their senior positions at Kyndryl—Chugh was the COO and Wright the CPO—their knowledge of the scheme and of the facts underlying the scheme is imputed to the Company.

233. ***Third***, Defendants personally and repeatedly focused investors' attention on Kyndryl's free cash flow metrics and drivers thereof—the specific items that were materially false and misleading stated during the Class Period. In nearly every Class Period investor call, SEC periodic filing, and press release, Defendants singled out Kyndryl's cash flow metrics as the appropriate measure of the Company's financial success. Over and over, they emphasized throughout the Class Period Kyndryl's cash flow figures. For example, Defendant Schroeter emphasized Kyndryl's free cash flow at ***every*** Kyndryl Class Period earnings call and overall highlighted the figures no fewer than seventeen (17) times at various presentations to investors during the Class Period. Similarly, at the beginning of the Class Period Defendants described their "evolving business mix" as "***driving*** increased profitability and free cash flow" and assured investors that there was a "[s]trong conversion of earnings to free cash flow."

234. To state but one additional example, on top of the numerous false and misleading statements at issue, during the March 4, 2025 Morgan Stanley TMT Conference, Defendant Wyshner stated, "we feel really good about where our balance sheet is and so generating the free cash flow that we are gives us an opportunity to invest in the business and be returning capital to shareholders." Schroeter followed up, "the cash flow is the triple part of the triple double single."

235. Included in the frequent public discussions of Kyndryl's free cash flow is when Kyndryl issued false denials of the Gotham City Report, which alleged that Kyndryl's free cash flow gave "misleading impressions" and failed to "accurately represent economic reality." In a Press Release published by Kyndryl on March 27, 2025, Kyndryl described the allegations in the Gotham City Report as "***inaccurate and deliberately misleading***" and stated that Kyndryl "rejects in the strongest possible terms the conclusion reached within the report." That Defendants issued false denials in direct response to reports about Kyndryl's cash flow reporting further strengthens

the strong inference of scienter. At minimum, the denials show that Defendants either investigated the allegations about misleading cash flow figures—and thus discovered the truth, even assuming they did not already know it by then—or were reckless in not doing so while issuing forceful denials to such serious allegations.

236. That Defendants focused attention on these issues so frequently strengthens the strong inference of scienter because it shows that either Defendants knew the true facts underlying the free cash flow figures they so frequently discussed publicly or were reckless in repeatedly discussing those figures with investors without informing themselves of the true facts.

237. ***Fourth***, Defendants Schroeter, Wyshner, and Khurana knew that securities analysts and investors were intently focused on Kyndryl’s cash flow and cash flow management and directly derived their understanding of Kyndryl’s stock value from these metrics.

238. In their 2023, 2024, and 2025 Proxy Statements, for example, Defendants explicitly acknowledged that investors “use” the cash flow metrics “to assess [Kyndryl’s] business,” and otherwise repeatedly told investors that Defendants’ ability to drive “value” to shareholders depended directly on their ability to achieve improving free cash flow metrics.

239. Moreover, throughout the Class Period, analysts published detailed reports that credited and repeated Defendants’ representations concerning Kyndryl’s cash flow and cash flow management, and repeatedly asked Defendants questions about these matters. For example, on August 2, 2024, Scotiabank analysts stated that, “Management showed increasing confidence in strengthening margin profile … with strong conversion of earnings into cash flow.” On August 22, 2024, Baptista Research stated that “[t]he gross capital expenditures were managed effectively, and the company maintained a strong liquidity position, with an expectation of generating about $300 million in adjusted free cash flow for the fiscal year.” Later, on May 8, 2025, J.P. Morgan

analysts wrote that "[m]argin expansion driven free cash flow growth could support a multi-year increasing capital returns story." And on July 28, 2025, a Scotiabank analyst stated, "Kyndryl's consistent cash flow generation and margin expansion continue to demonstrate its differentiated market positioning and strength in its defensive business model."

240. On August 5, 2025, during the Kyndryl earnings call for the first quarter of fiscal year 2026, a Susquehanna analyst asked about "visibility on the triple, double, single" and Defendant Schroeter stated in response, "we landed cash about where we thought we would, it's a seasonal structure here in Kyndryl. So, first quarter is an outflow, and then the next nine months are inflows. That keeps us on track for the $550 million."

241. Thus, Defendants knew the real drivers of Kyndryl's cash flow were important to investors, and either knew the true facts driving the figures during the Class Period or were reckless in failing to inform themselves of the true facts while answering questions about free cash flow and while knowing, including from the questions, the issue was important to investors.

242. ***Fifth***, Defendants Schroeter and Wyshner personally affirmed the effectiveness Kyndryl's DCP and ICFR throughout the Class Period (or their effectiveness other than based on the unrelated ITGC issues). In Kyndryl's 2025 Form 10-K, for example, Defendants Schroeter and Wyshner personally certified that they (i) were responsible for establishing and maintaining DCP and ICFR; (ii) had designed such DCP, or caused such DCP to be designed, to ensure that material information relating to Kyndryl was made known to them; (iii) designed such ICFR to provide reasonable assurance regarding the reliability of Kyndryl's financial reporting and the preparation of Kyndryl's financial statements during the Class Period; (iv) had evaluated the effectiveness of Kyndryl's DCP; and (v) had disclosed any change in Kyndryl's ICFR. Defendants further affirmed the effectiveness of their DCP and ICFR (other than as to the ITGCs) in Kyndryl's Class Period

Six Periodic Reports. These representations—whereby Defendants Schroeter and Wyshner specifically stated in SEC filings they were knowledgeable about, and responsible for, Kyndryl's DCP and its ICFR—further support a strong inference of scienter. Either they knew that Kyndryl's controls were deficient and had several undisclosed material weaknesses, or they were reckless in making the above representations in SEC filings without informing themselves of the facts that rendered the controls deficient, most critically the pervasive, long-running, and extensive use of Q blocks to defer vendor payments from quarter to quarter.

243. ***Sixth***, the size and pervasiveness of the scheme, including of the payment deferral practices, support an inference that Defendants were aware of or recklessly disregarded these practices, particularly given that the payment deferral practices affected Kyndryl's crucial free cash flow figures which Defendants repeatedly highlighted to the market and directed investors to focus on as the true measure of the Company's success since its inception. *See* §§IV and V.

244. These practices also impacted Kyndryl's critical relationships with its suppliers (the "Alliances" of the 3As), which Defendants repeatedly stated were important to Kyndryl's competitive standing in the market and as something that differentiated it from its competitors and were key to Kyndryl's profitability. These practices were highly unlikely to escape Defendants' attention, particularly as the deferral of vendor payments resulted in threatened or actual credit holds and pervasive problems with those suppliers, including consistent complaints from Kyndryl's vendors, as multiple former employees explained. *See* ¶¶ 116-45.

245. Moreover, the payment deferral practices were not isolated in time, discrete, or a one-off; they were systemic and pervasive, and occurred over the course of many years, as Kyndryl later was forced to admit. Similarly, as FE-6 explained (and Kyndryl has admitted), these practices began no later than 2022, making it highly implausible that Defendants were unaware of them.

246. ***Seventh***, although Lead Plaintiff need not plead any motive to allege a strong inference of scienter, Defendants Schroeter and Wyshner, as well as Sebold (the General Counsel), benefited personally, directly, and substantially from the fraud, specifically because their fraudulent conduct caused them to receive millions of dollars' worth of performance share units ("PSUs") under Kyndryl's 2023 Long-Term Equity Incentive Payout ("LTEIP").

247. Under the LTEIP, Schroeter, Wyshner, and Sebold would receive Kyndryl PSUs based on a formula. The formula turned on a "target" number of PSUs, allocated between three performance metrics and targets. Half of the target PSUs would vest based on Kyndryl's adjusted operating cash flow for the time period between April 1, 2022 to March 31, 2025; another one-fourth of the target PSUs would vest based on Kyndryl's relative total shareholder return ("TSR") during that same period; and the remaining one-fourth of the target PSUs would vest based on Kyndryl's customer signings during that same period. Defendants' fraudulent scheme inflated both its adjusted operating cash flow and relative TSR and, as a consequence, significantly inflated the number of PSUs awarded to Schroeter, Wyshner, and Sebold under the first two categories.

248. The number of PSUs awarded in each category turned upon Kyndryl's performance relative to a minimum threshold, target, and maximum. For the portion tied to Kyndryl's adjusted operating cash flow, the minimum threshold was $3.1 billion, the target was $3.9 billion, and the maximum was $4.6 billion. If Kyndryl's adjusted operating cash flow fell below the minimum threshold of $3.1 billion, Schroeter, Wyshner, and Sebold would receive no PSUs for the adjusted operating cash flow portion of the award. If the adjusted operating cash flow was $3.1 billion exactly, they would receive 50% of the PSU target for that portion. If the adjusted operating cash flow was $3.9 billion exactly, they would receive 100% of the PSU target for that portion of the

award. If the adjusted operating cash flow met or exceeded a maximum of $4.6 billion, they would receive 150% of the PSU target for that portion.

249. The portion tied to TSR worked similarly. The number of PSUs Schroeter, Wyshner, and Sebold received depended on Kyndryl's TSR relative to other companies in the S&P MidCap 400 Index, with returns measured as the change from the average closing stock price in the first five trading days starting on April 1, 2022 to the average closing stock price in the last five trading days of March 2025. The minimum threshold was the 25th percentile for companies in the index, the target was the 50th percentile, and the maximum was the 90th. If Kyndryl's TSR fell below the minimum threshold, Schroeter, Wyshner, and Sebold would receive no PSUs for the TSR portion of the award. If Kyndryl's relative TSR met the minimum threshold exactly, they would receive 50% of the PSU target for that portion of the award. If Kyndryl's TSR met the target of being within the 50th percentile exactly, they would receive 100% of the PSU target for that portion. If it met or exceeded the 90th percentile maximum, they would receive 200% of the PSU target for that portion.

250. If Kyndryl's actual performance—for adjusted operating cash flow or for relative TSR—fell between the threshold and target levels or the target and maximum levels, then the percentage of PSUs vesting would be determined by linear interpolation for each period.

251. The number of PSUs that Schroeter, Wyshner, and Sebold would receive under the LTEIP based on Kyndryl's adjusted operating cash flow is depicted in the following graph:

[Remainder of page left intentionally blank]




252. The number of PSUs that Schroeter, Wyshner, and Sebold would receive based on Kyndryl's relative TSR is depicted in the following graph:




253. By using Q blocks to defer payment on vendor invoices due in the fourth quarter of fiscal year 2025 (ending March 31, 2025) and in fiscal year 2025 until subsequent reporting periods, Defendants Schroeter and Wyshner, and Sebold were able to inflate the number of PSUs

awarded because the deferrals increased Kyndryl's adjusted operating cash flow during the period relevant to that award.

254. Kyndryl reported adjusted operating cash flow of $4 billion for FY 2023-2025, resulting in an attainment of 104% of the adjusted operating cash flow $3.9 billion target and a weighted payout percentage of 110% (for the 50% of the PSU awards tied to the adjusted operating cash flow portion). As a result, Defendants Schroeter and Wyshner, and Sebold, received 353,307, 134,593, and 50,473 PSUs, respectively, for the adjusted operating cash flow portion of the LTEIP award. If Kyndryl's adjusted operating cash flow had been less, Schroeter, Wyshner, and Sebold would have received fewer PSUs. For example, if it had fallen to about $3.9 billion based on a deferral of only $100 million in payments, then they would have received 321,480, 122,469, and 45,926 PSUs, respectively, for the adjusted operating cash flow portion. That is a reduction of 31,827 PSUs for Schroeter, 12,124 PSUs for Wyshner, and 4,547 PSUs for Sebold. Using the closing price for Kyndryl common stock on March 31, 2025, the additional PSUs for deferring $100 million in vendor invoices would be worth at least $1 million for Schroeter, $380,700 for Wyshner, and $142,800 for Sebold.

255. In addition, by maintaining the inflation in Kyndryl's stock price through the last five trading days of March 2025 (and then ultimately until February 9, 2026), Schroeter, Wyshner, and Sebold also increased the value of the PSUs that they were awarded for the relative TSR portion of the LTEIP by even greater amounts.

256. Kyndryl reported a relative TSR that was in the 97th percentile for companies in the S&P MidCap 400 Index during FY 2023-2025, resulting in a weighted payout percentage of 200% for the relative TSR portion. As a result, Defendants Schroeter and Wyshner, and Sebold, received 272,782, 103,918, and 38,970 PSUs, respectively, for the relative TSR portion of the

LTEIP payout. This portion of the award was worth $8,565,354 for Schroeter, $3,263,025 for Wyshner, and $1,223,658 for Sebold, respectively. If Kyndryl had disclosed the undisclosed cash management practices and undisclosed material weaknesses in or prior to the last five trading days of March 2025, Kyndryl's stock price would have fallen substantially—as it did on August 5, 2025 by $7.76 per share or 21% and on February 9, 2026 by $12.90 per share or almost 55%. If Kyndryl's stock price had fallen by about $18.40 to $19.70 per share (or 59% to 63%) in the last five trading days of March 2025—a drop comparable in magnitude to the corrective disclosures—Kyndryl's relative TSR for FY 2023-2025 would have fallen below the 25th percentile for companies in the S&P MidCap 400 Index, and the relative TSR portion of the PSU award would have been erased entirely, a personal loss of millions for each of Schroeter, Wyshner, and Sebold.

257. Accordingly, Defendants Schroeter and Wyshner, and Sebold, were personally financially motivated to inflate Kyndryl's adjusted operating cash flow for fiscal year 2025 and to keep Kyndryl's stock price high for the last five trading days of March 2025 when TSR was measured under Kyndryl's 2023 LTEIP, to increase the number of PSUs they were awarded.

258. ***Eighth***, Defendant Khurana and Sebold—who were both in possession of material non-public information about the fraud, and who were both terminated on February 5, 2026 "effective immediately" as part of Kyndryl's "remediation plan"—both additionally benefited personally, directly, and substantially from the fraud thanks to their unusual and suspicious sales of Kyndryl common stock during the Class Period at share prices inflated by their own misconduct.

259. During the Class Period, Defendant Khurana sold 88,557 shares of Kyndryl common stock for ill-gotten gains of ***$3,587,126***. Khurana's Class Period sales represented more than ***60%*** of the Kyndryl stock that he owned and could sell during the Class Period. Khurana's sales occurred at suspicious times. Specifically, Khurana sold 55,465 shares on February 6, 2025—

during the fourth quarter of fiscal year 2025, a quarter when Kyndryl was using Q blocks to defer the payment of vendor invoices from that quarter and from fiscal year 2025 into subsequent reporting periods and by which quarter Kyndryl received a whistleblower report or reports concerning that conduct. He sold 26,451 shares on June 2, 2025 (in the last month of Kyndryl's first quarter for the 2026 fiscal year), when Kyndryl was using Q blocks to defer the payment of vendor invoices from that quarter into subsequent reporting periods. And he sold 6,641 shares on December 5, 2025 (in the last month of Kyndryl's third quarter for the 2026 fiscal year), for which Kyndryl failed to timely file its 10-Q). ***None*** of Khurana's Class Period sales were made pursuant to any Rule 10b5-1 plan. During the Class Period as compared to the Control Period (the period with an equal number of trading days occurring immediately prior to the Class Period, January 23, 2023 to July 30, 2024), Khurana sold ***2.9 times*** the number of shares of Kyndryl stock for ***4.5 times*** the proceeds. During the Control Period, Khurana sold 30,430 shares of Kyndryl common stock for proceeds of ***$802,644***, or about 32% of the Kyndryl shares that Khurana owned and could sell.

260. During the Class Period, Sebold sold 27,500 shares of Kyndryl common stock for ill-gotten gains of ***$1,177,782***. Sebold's Class Period sales represented more than ***20%*** of the Kyndryl stock that he owned and could sell during the Class Period. Sebold's sales occurred at a suspicious time. Specifically, Sebold sold 27,500 shares on February 6, 2025—during the fourth quarter of Kyndryl's 2025 fiscal year, when Kyndryl was using Q blocks to defer the payment of vendor invoices from that quarter and from fiscal year 2025 into subsequent reporting periods, and by which quarter Kyndryl had received a whistleblower report or reports concerning that conduct. As noted, Defendant Khurana also sold shares on that same date. ***None*** of Sebold's Class Period sales were made pursuant to any Rule 10b5-1 plan. In contrast, during the Control Period, Sebold sold ***zero*** shares of Kyndryl stock.

261. ***Ninth***, Defendant Wyshner (Kyndryl's CFO), Defendant Khurana (Kyndryl's Global Controller), and Sebold (Kyndryl's General Counsel), exited their roles simultaneously and under suspicious circumstances, indicative of their personal culpability in the fraud. On February 9, 2026—the same day that Kyndryl publicly disclosed that it could not file its 10-Q on time, that the SEC and its Audit Committee were investigating its cash management practices, that certain prior statements in its SEC filings could not be relied upon and that it anticipated adding a material weakness, and that it was downgrading its free cash flow guidance (*see supra* § VI.B)—Kyndryl also announced that on February 5, 2026, "effective immediately," Kyndryl had terminated Wyshner and Sebold and demoted Khurana. The circumstances, including the timing of the terminations and demotion relative to the disclosures, the severity of the personnel actions, and the subject matter of the disclosures relative to Wyshner, Khurana, and Sebold's responsibilities, show that Kyndryl terminated Wyshner and Sebold and demoted Khurana for their own fraud-related misconduct, specifically relating to the undisclosed cash management practices and undisclosed material weaknesses during the Class Period and the related whistleblower report or reports, all disclosed at the same time Kyndryl announced the personnel actions.

262. Moreover, in the Q3 2026 Form 10-Q, Kyndryl stated that replacement of Defendants Wyshner and Khurana with an Interim CFO and Interim Corporate Controller, respectively, were part of the first item in Kyndryl's "remediation plan," and that Kyndryl's "senior finance executives" (Wyshner and Khurana) "failed to set an appropriate tone at the top."

263. ***Tenth***, in addition to the significant personal financial benefits the Individual Defendants enjoyed from their fraudulent conduct, Defendants had specific, highly particularized motives to mislead investors and engage in the fraudulent conduct described therein. Kyndryl had inherited certain intractable burdens from IBM, and the Individual Defendants had, in response,

historically and for many years directly tied investors' views of the Company to Kyndryl's free cash flow metrics. Defendants thus staked Kyndryl's and their own futures on the success of those metrics and positioned their own ability to deliver value to investors as founded on growing free cash flow metrics. All this provided Defendants with a powerful motive to inflate Kyndryl's free cash flow and recklessly disregard any material weaknesses in Kyndryl's ICFR and DCP.

264. ***Eleventh***, the SEC's Division of Enforcement has opened an investigation into, among other things, Kyndryl's cash management practices and representations to investors, further contributing to a strong inference of Defendants' scienter.

## IX. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

265. Throughout the Class Period, Defendants made numerous materially false and/or misleading statements, which were disseminated to investors through calls, public filings, press releases, presentations, Company statements, social media platforms, and news and media outlets. Each misstatement was either affirmatively false or was a misleading "half-truth" that omitted material information necessary to make the statement not misleading. Both are equally actionable.

266. Defendants' materially false and misleading statements fall into five principal categories: (i) the SOX Certifications concerning the effectiveness of Kyndryl's DCP and ICFR; (ii) the Six Periodic Reports' MD&A disclosures regarding and including Kyndryl net cash position and the drivers of this and related metrics; (iii) Defendants' denial of the Gotham City Report; (iv) other public statements about the drivers of Kyndryl's free cash flow and related metrics; and (v) Kyndryl's free cash flow guidance for fiscal year 2026.

### A. False and Misleading Statements Regarding the Effectiveness of Disclosure Controls and Internal Controls over Financial Reporting

267. Throughout the Class Period, Defendants Schroeter and Wyshner personally and repeatedly, in the Six Periodic Reports, certified that Kyndryl's DCP and ICFR were effective (or

were only not effective for a single reason not related to the deferral of vendor payments from quarter to quarter beyond payment terms), and that they had disclosed all material weaknesses and fraud to Kyndryl's auditor and Audit Committee. In reality, at the time of each certification, Kyndryl DCP and ICFR were ***not*** effective and instead suffered from at least three undisclosed material weaknesses, and Defendants had neither disclosed those weaknesses nor ensured that whistleblower complaints concerning financial reporting matters reached the Audit Committee—all as Kyndryl explicitly later admitted for three of the Six Periodic Reports and as those admissions and additional facts demonstrated for the other three.

268. As relevant here, Defendants Schroeter and Wyshner signed SOX Certifications pursuant to SOX Section 302, attached as Exhibits 31.1 (Schroeter) and 31.2 (Wyshner) to each of the Six Periodic Reports Kyndryl filed with the SEC during the Class Period.[4]

269. **Statements #1-#6**. In these SOX Certifications pursuant to SOX Section 302, Defendants Schroeter and Wyshner certified: (1) "I … have … [e]valuated the effectiveness of the registrant's disclosure controls and procedures and ***presented in this report our conclusions about the effectiveness of the disclosure controls and procedures***, as of the end of the period covered by this report based on such evaluation;" and (2) "***I have disclosed***, based on our most recent evaluation of internal control over financial reporting, ***to the registrant's auditors and the Audit Committee of the registrant's board of directors*** … : a) ***All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting*** which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and

[4] For convenience, Lead Plaintiff has numbered each statement alleged to be false or misleading. In connection with the statements regarding the effectiveness of DCP and ICFR, the numbering proceeds as follows and as set forth in the text below: Statement 1 (certifications in the Q1 2025 Form 10-Q); Statement 2 (Q2 2025 Form 10-Q); Statement 3 (Q3 2025 Form 10-Q); Statement 4 (2025 Form 10-K); Statement 5 (Q1 2026 Form 10-Q); and Statement 6 (Q2 2026 Form 10-Q).

report financial information; and b) ***Any fraud, whether or not material, that involves management*** or other employees who have a significant role in the registrant's [ICFR]."

270. Kyndryl's Q1, Q2, and Q3 2025 Forms 10-Q (**Statements #1-#3**) stated that Kyndryl's DCP were "not effective" as of the relevant dates (June 30, 2024, and September 30, 2024, and December 31, 2024) "due to a material weakness in internal control over financial reporting in the area of our [ITGCs]." That deficiency was "related to access and program development and change management controls associated with the Company's large-scale migration" of its operating systems during Kyndryl's spin-off. Other than the ITGCs material weakness, ***none of the SOX Certifications in these three reports or the periodic reports themselves disclosed any other material weakness as of those dates***.

271. Kyndryl's 2025 Form 10-K, and Q1 and Q2 2026 Forms 10-Q (**Statements #4-#6**) stated that Kyndryl's DCP "***were effective***" as of the relevant dates of those reports (March 31, 2025, June 30, 2025, and September 30, 2025), without qualification. ***None of the SOX Certifications in these three reports or the periodic reports themselves disclosed any material weakness as of their respective dates***. For example, Kyndryl's 2025 Form 10-K stated:

> The Company's management evaluated, with the participation of the Chief Executive Officer and Chief Financial Officer, the effectiveness of the Company's disclosure controls and procedures (as such term is defined in Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of March 31, 2025, the end of the period covered by this report. Based on that evaluation, ***the Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures were effective as of the end of the period covered by this report***.

and further stated that:

> Management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our internal control over financial reporting as of March 31, 2025. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in *Internal Control*

> - *Integrated Framework* (2013). Based on this evaluation, management concluded that, as of March 31, 2025, ***our internal control over financial reporting was effective***.

Kyndryl's Q1 and Q2 2026 Forms 10-Q contained equivalent statements with respect to Kyndryl's DCP and affirmed that there had "been no changes in the Company's [ICFR]," thus incorporating Defendants' previous representations that Kyndryl's ICFR were effective.

272. **Reasons for Falsity.** Statements #1-#6 were each materially false and misleading.

273. ***First***, as to Kyndryl's Q1, Q2, and Q3 2025 Forms 10-Q, it was materially false and misleading for Defendants Schroeter and Wyshner to certify they had "***presented in this report our conclusions about the effectiveness of the disclosure controls and procedures***," which incorporated by reference the Forms' statements that Kyndryl's ICFR and DCP were not effective as of the relevant effective dates due to ***only*** one material weakness related to ITGCs, while omitting three other material weaknesses in Kyndryl's ICFR and, therefore, its DCP. Specifically (i) senior finance executives failed to set an appropriate tone at the top based on the principles associated with the control environment component of the COSO *Framework*, which in turn impacted Kyndryl's DCP as to cash management practices regarding deferring vendor payments; (ii) Kyndryl did not design and maintain effective controls related to the information and communication component of the COSO *Framework* to ensure appropriate communication pertaining to the disclosure process between certain functions within Kyndryl; and (iii) Kyndryl did not design and maintain effective controls regarding the internal investigation, escalation and documentation of complaints made through its reporting hotline and other available channels, including with respect to appropriate escalation of certain complaints to the Audit Committee.

274. Although Kyndryl has not yet admitted that these three material weaknesses in Kyndryl's ICFR—which Kyndryl has admitted existed as of March 31, 2025, June 30, 2025, and September 30, 2025—***also*** existed as of June 30, 2024, and September 30, 2024, and December

31, 2024, the conduct underlying each of those admitted material weaknesses also existed as of those three prior dates. As Kyndryl admitted on February 17, 2026, the deferral of vendor payments was a "standard practice" for Kyndryl's entire history as an independent company. And, as described by a former Kyndryl employee, the widespread use of Q blocks and the absence of "unfiltered" reporting to the Audit Committee existed as of those dates. *See* ¶¶ 116-45, 170-80. Thus, as of June 30, 2024, and September 30, 2024, and December 31, 2024, Kyndryl's ICFR and, therefore, its DCP, were not effective due to three undisclosed material weaknesses in Kyndryl's ICFR (in addition to the one material weakness disclosed), and were severely deficient and did not provide reasonable assurance that Kyndryl's financial reporting was accurate, or that the information required to be disclosed by Kyndryl in its SEC filings was collected, communicated, and properly reported in Kyndryl's SEC filings for those three undisclosed reasons.

275. As to Kyndryl's 2025 Form 10-K and Q1 and Q2 2026 Forms 10-Q, it was similarly materially false and misleading for Defendants Schroeter and Wyshner to certify they had "***presented in this report our conclusions about the effectiveness of the disclosure controls and procedures***," which incorporated by reference the Forms' statements that Kyndryl ICFR and DCP were both "***effective***" as of the relevant dates. In reality, as of those dates, Kyndryl's ICFR and DCP were not effective, but instead were deficient and did not provide reasonable assurance that Kyndryl's financial reporting was accurate, or that the information required to be disclosed by Kyndryl in its SEC filings was collected, communicated, and properly reported in Kyndryl's SEC filings, given the three material weaknesses set forth above. *See* ¶¶ 170-80.

276. As Kyndryl ultimately admitted after the Class Period in the Amended Filings, three previously undisclosed "material weaknesses" in Kyndryl's ICFR existed as of March 31, June 30, and September 30, 2025—*i.e.*, the date of Statements #4-#6—and those material weaknesses

rendered Kyndryl's ICFR and DCP not effective as of those dates. In other words, Kyndryl has since ***admitted*** that Statements #4-#6 were materially false and misleading when made.

277. Specifically, as alleged *supra*, §§ VI.B and VII, Kyndryl has since admitted that its "senior finance executives failed to set an appropriate tone at the top based on the principles associated with the control environment component of the COSO framework," and as a result, Kyndryl's "disclosure processes, including with respect to cash management practices regarding deferring vendor payments quarter to quarter, were impacted." *See* ¶ 208.

278. Additionally, as Kyndryl admitted, "[t]he Company did not design and maintain effective controls related to the information and communication component of the COSO *Framework* to ensure appropriate communication pertaining to the disclosure process between certain functions within the Company." *See* ¶ 209. Kyndryl violated this principle because management concealed the use of Q blocks (an illegitimate management override) from its Audit Committee, repeatedly at the end of quarterly and annual reporting periods, thereby preventing it from exercising the independent oversight contemplated by the COSO *Framework*, such as questioning repeated period-end transactions and requiring follow-up or corrective action.

279. And finally, Kyndryl admitted to yet another material weakness: that "[t]he Company did not design and maintain effective controls regarding the internal investigation, escalation and documentation of complaints made through the Company's reporting hotline and certain other available reporting channels, including with respect to appropriate escalation of certain complaints to the Audit Committee." *See* ¶ 210. In fact, Kyndryl failed to provide whistleblower reports concerning financial reporting matters and management fraud to the Audit Committee—a change to IBM's legacy policy of unfiltered reporting designed by Defendants

Schroeter and Wyshner—resulting in the whistleblower report received by Q4 FY2025, concerning the improper and persistent deferral of vendor payments, not being properly escalated.

280. Moreover, other Kyndryl former employees have confirmed that Kyndryl's controls were deficient even before the Class Period; for example, FE-6 explained that throughout early 2022, when they attended Audit Committee meetings, reports from Kyndryl's internal whistleblower program were not presented while he was there. Former Employees also confirmed that the vendor payment deferrals, the very practice later tied to acknowledged material weaknesses in DCP and ICFR, occurred even before the Class Period. *See* ¶¶ 116-45; 170-80.

281. ***Second***, contrary to Defendants Schroeter and Wyshner's certifications that they had "***disclosed*** … to the registrant's auditors and the Audit Committee of the registrant's board of directors" "***[a]ll significant deficiencies and material weaknesses***" and "***[a]ny fraud … that involves management*** or other employees who have a significant role in the registrant's internal control over financial reporting," Kyndryl had no effective controls to cause the disclosure of whistleblower reports in those categories to its Audit Committee or auditor. Defendants Schroeter and Wyshner designed those controls, eliminating IBM's legacy policy of unfiltered reporting. This deficiency existed throughout the Class Period and resulted, by the fourth quarter of Kyndryl's fiscal year 2025 and continuing through the second quarter of Kyndryl's fiscal year 2026, in a whistleblower report or reports concerning the Q blocks being withheld from at minimum Kyndryl's Audit Committee. Nor had Defendants Schroeter and Wyshner disclosed to the Board the significant deficiencies and material weaknesses in Kyndryl's ICFR or the fraud involving management related to the practice of Q blocks and vendor payments deferrals.

### B. False and Misleading Statements in the MD&A Sections of Kyndryl's SEC Filings About Net Cash Provided by or Used in Operating Activities

282. Throughout the Class Period, in periodic SEC filings Defendants reported Kyndryl's cash performance metrics, which they attributed to seemingly legitimate factors—such as "higher margins" and "higher earnings"—while systematically and misleadingly omitting Kyndryl's undisclosed cash management practices, including the deferral of vendor payments, or disclosing their material impact on these metrics. By reporting these misleadingly inflated figures and by citing only seemingly legitimate drivers, Defendants created a materially misleading impression of Kyndryl's cash generation, including as to its source and sustainability.

283. During the Class Period, the MD&A sections of each of the Six Period Reports, each of which was signed by Defendants Schroeter, Wyshner, and Khurana, stated the amount of and described the supposed drivers behind or changes in Kyndryl's "net cash provided by operating activities," or "net cash used in" or "by operating activities." Net cash is free cash flow plus capital expenditures. "Provided by" indicates the number is positive; "used in" or "by" indicates the number is negative.

284. **<u>Statement #7</u>**. The MD&A section of Kyndryl's Q1 2025 Form 10-Q, which was dated August 7, 2024, stated the following:

> ***Net cash used in operating activities was $48 million*** in the three months ended June 30, 2024, compared to net cash used of $173 million in the prior-year period. ***This change was primarily driven by increased net income and collection of receivables outpacing billing in the current quarter***.

285. **Reasons for Falsity.** Statement #7 was materially misleading because it stated that Kyndryl's net cash used in operating activities was "***primarily driven by***" seemingly legitimate factors ("***increased net income and collection of receivables outpacing billing in the current quarter***") while omitting the critical role that Kyndryl's undisclosed cash management practices,

including the deferral of vendor payments from quarter to quarter beyond payment terms, played in driving that metric.

286. As Kyndryl later admitted and as described by the former employees interviewed by Lead Counsel, *see* ¶¶ 116-45, but unknown to investors at the time, Kyndryl's "standard practice" at this time was "deferring vendor payments quarter to quarter, in certain cases beyond vendor payment terms," with a "magnitude" that "exceeded $100 million in current or prior periods." If, for example, Kyndryl deferred $100 million of vendor payments due in the period covered by this report to subsequent reporting periods, making such payments when due would have increased Kyndryl's net cash used in operating activities from $48 million to $148 million—an increase of more than 208% that would have materially ***decreased*** the amount of cash on hand that Kyndryl appeared to have and materially ***weakened*** Kyndryl's apparent cash position.

287. Conversely, had Kyndryl disclosed—in any of the reports in this section—it had deferred $100 million of vendor payments due in the period to a subsequent period, that would have defeated the purpose of the fraudulent scheme: investors would have understood what Kyndryl kept from them—that the net cash used in or provided by operations Kyndryl reported was a mirage constructed on top of the undisclosed cash management practices.

288. For the same reasons as set forth immediately above, it was also materially misleading for Defendants to report "***[n]et cash used in operating activities was $48 million***." This misleadingly understated figure masked Defendants' practice of deferring vendor payments quarter to quarter, in a magnitude that "exceeded" $100 million in certain quarters and gave a materially misleading misimpression of Kyndryl's true cash position and liquidity.

289. **Statement #8**. The MD&A section of Kyndryl's Q2 2025 Form 10-Q, which was dated November 7, 2024, stated the following:

> ***Net cash provided by operating activities was $101 million*** in the six months ended September 30, 2024, compared to a net cash use of $127 million in the prior-year period ***mainly due to higher margins***.

290. **Reasons for Falsity.** Statement #8 was materially misleading because it stated that Kyndryl's net cash provided by operating activities was "***mainly due to***" a seemingly legitimate factor ("***higher margins***") while omitting the critical role that Kyndryl's undisclosed cash management practices, including the deferral of vendor payments from quarter to quarter beyond payment terms, played in driving that metric.

291. As Kyndryl later admitted and as described by the former employees interviewed by Lead Counsel, *see* ¶¶ 116-45, but unknown to investors at the time, Kyndryl's "standard practice" at this time was "deferring vendor payments quarter to quarter, in certain cases beyond vendor payment terms," with a "magnitude" that "exceeded $100 million in current or prior periods." If, for example, Kyndryl deferred $100 million of vendor payments due in the period referenced in this report to subsequent reporting periods, reversing that change would have decreased Kyndryl's net cash provided by operating activities from $101 million to $1 million—a decrease of more than 98%.

292. For the same reasons as set forth immediately above, it was also materially misleading for Defendants to report "***[n]et cash provided by operating activities was $101 million***." This misleadingly inflated figure masked Defendants' practice of deferring vendor payments quarter to quarter, in a magnitude that "exceeded" $100 million in certain quarters, and gave a materially misleading misimpression of Kyndryl's true cash position and liquidity.

293. **<u>Statement #9</u>**. The MD&A section of Kyndryl's Q3 2025 Form 10-Q, which was dated February 6, 2025, stated the following:

> ***Net cash provided by operating activities was $361 million*** in the nine months ended December 31, 2024, compared [to] net cash provided by

> operating activities of $309 million in the prior-year period, ***mainly due to higher margins***.

294. **Reasons for Falsity.** Statement #9 was materially misleading because it stated that Kyndryl's net cash provided by operating activities was "***mainly due to***" a seemingly legitimate factor ("***higher margins***") while omitting the critical role that Kyndryl's undisclosed cash management practices, including the deferral of vendor payments from quarter to quarter beyond payment terms, played in driving that metric.

295. As Kyndryl later admitted and as described by the former employees interviewed by Lead Counsel, *see* ¶¶ 116-45, but unknown to investors at the time, Kyndryl's "standard practice" at this time was "deferring vendor payments quarter to quarter, in certain cases beyond vendor payment terms," with a "magnitude" that "exceeded $100 million in current or prior periods." If, for example, Kyndryl deferred $100 million of vendor payments due in this period to subsequent reporting periods, reversing that change would have decreased Kyndryl's net cash provided by operating activities from $361 million to $261 million—a decrease of more than 27%.

296. For the same reasons as set forth immediately above, it was materially misleading for Defendants to report "***[n]et cash provided by operating activities was $361 million***." This misleadingly inflated figure masked Defendants' practice of deferring vendor payments quarter to quarter, in a magnitude that "exceeded" $100 million in certain quarters, and gave a materially misleading misimpression of Kyndryl's true cash position and liquidity.

297. **<u>Statement #10</u>**. The MD&A section of Kyndryl's 2025 Form 10-K, which was dated May 30, 2025, stated the following:

> ***Net cash provided by operating activities was $942 million*** for the year ended March 31, 2025, compared to net cash provided by operating activities of $454 million for the year ended March 31, 2024, ***mainly due to higher earnings***.

298. **Reasons for Falsity.** Statement #10 was materially misleading because it stated that Kyndryl's net cash provided by operating activities was "***mainly due to***" a seemingly legitimate factor ("***higher earnings***") while omitting the critical role that Kyndryl's undisclosed cash management practices, including the deferral of vendor payments from quarter to quarter beyond payment terms, played in driving that metric.

299. As Kyndryl later admitted and as described by the former employees interviewed by Lead Counsel, *see* ¶¶ 116-45, but unknown to investors at the time, Kyndryl's "standard practice" at this time was "deferring vendor payments quarter to quarter, in certain cases beyond vendor payment terms," with a "magnitude" that "exceeded $100 million in current or prior periods." If, for example, Kyndryl deferred $100 million of vendor payments due in this period to subsequent reporting periods, reversing that change would have decreased Kyndryl's net cash provided by operating activities for fiscal year 2025 from $942 million to $842 million—a decrease of more than 10%.

300. For the same reasons as set forth immediately above, it was also materially misleading for Defendants to report "***[n]et cash provided by operating activities was $942 million***." This misleadingly inflated figure masked Defendants' practice of deferring vendor payments quarter to quarter, in a magnitude that "exceeded" $100 million in certain quarters, and gave a materially misleading misimpression of Kyndryl's true cash position and liquidity.

301. **<u>Statement #11</u>**. The MD&A section of Kyndryl's Q1 2026 Form 10-Q, which was dated August 5, 2025, stated the following:

> ***Net cash used by operating activities was $124 million*** in the three months ended June 30, 2025, compared to net cash used of $48 million in the prior-year period, ***mainly due to a decline of $117 million in accounts receivables as a source of cash in the current quarter compared to the prior-year quarter when the collection of receivables outpaced revenues, partially offset by $45 million higher earnings in the current quarter***.

302. **Reasons for Falsity.** Statement #11 was materially misleading because it stated that Kyndryl's net cash used by operating activities was "***mainly due to***" seemingly legitimate factors ("***a decline of $117 million in accounts receivables as a source of cash in the current quarter compared to the prior-year quarter when the collection of receivables outpaced revenues, partially offset by $45 million higher earnings in the current quarter***") while omitting the critical role that Kyndryl's undisclosed cash management practices, including the deferral of vendor payments from quarter to quarter beyond payment terms, played in driving that metric, including the deferral of a large amount of vendor payments from the last quarter of the prior year into the first quarter of the 2026 fiscal year, covered by this section of the Form 10-Q, and as former employees stated occurred.

303. As Kyndryl later admitted and as described by the former employees interviewed by Lead Counsel, *see* ¶¶ 116-45, but unknown to investors at the time, Kyndryl's "standard practice" at this time was "deferring vendor payments quarter to quarter, in certain cases beyond vendor payment terms," with a "magnitude" that "exceeded $100 million in current or prior periods." If, for example, Kyndryl deferred $100 million of vendor payments due in the period covered by this report to subsequent reporting periods, reversing that change would have increased Kyndryl's net cash used by operating activities from $124 million to $224 million—an increase of more than 80%, that would have materially ***decreased*** the amount of cash on hand that Kyndryl appeared to have and materially ***weakened*** Kyndryl's apparent cash position.

304. For the same reasons as set forth immediately above, it was also materially misleading for Defendants to report "***[n]et cash used by operating activities was $124 million***." This misleadingly understated figure masked Defendants' practice of deferring vendor payments

quarter to quarter, in a magnitude that "exceeded" $100 million in certain quarters, and gave a materially misleading misimpression of Kyndryl's true cash position and liquidity.

305. **Statement #12**. The MD&A section of Kyndryl's Q2 2026 Form 10-Q, which was dated November 5, 2025, stated the following:

> ***Net cash provided by operating activities was $22 million*** in the six months ended September 30, 2025, compared to $101 million in the prior-year period ***mainly due to a decline of $187 million in accounts receivables as a source of cash in the current year compared to the prior year when the collection of receivables outpaced revenues, partially offset by $161 million in higher earnings in the current year.***

306. **Reasons for Falsity.** Statement #12 was materially misleading because it stated that Kyndryl's net cash provided by operating activities was "***mainly due to***" seemingly legitimate factors ("***a decline of $187 million in accounts receivables as a source of cash in the current year compared to the prior year when the collection of receivables outpaced revenues, partially offset by $161 million in higher earnings in the current year***") while omitting the critical role that Kyndryl's undisclosed cash management practices, including the deferral of vendor payments from quarter to quarter beyond payment terms, played in driving that metric.

307. As Kyndryl later admitted and as described by the former employees interviewed by Lead Counsel, *see* ¶¶ 116-45, but unknown to investors at the time, Kyndryl's "standard practice" at this time was "deferring vendor payments quarter to quarter, in certain cases beyond vendor payment terms," with a "magnitude" that "exceeded $100 million in current or prior periods." If, for example, Kyndryl deferred $100 million of vendor payments due in this period to subsequent reporting periods, reversing that change would have decreased Kyndryl's net cash provided by operating activities from $22 million to approximately $78 million in net cash used—turning Kyndryl's modest positive cash position to a significant negative cash position.

308. For the same reasons as set forth immediately above, it was also materially misleading for Defendants to report "***[n]et cash provided by operating activities was $22 million***." This misleadingly inflated figure masked Defendants' practice of deferring vendor payments quarter to quarter, in a magnitude that "exceeded" $100 million in certain quarters, and gave a materially misleading misimpression of the Kyndryl's true cash position and liquidity.

**C. False Statement Denying the Gotham City Reports**

309. On March 27, 2025, Gotham City Research, a due diligence-based investor, published the Gotham City Report—a two-part report raising questions about Kyndryl's free cash flow titled "*Kyndryl – Like the old IBM*, except with an Undisclosed Cost Problem: Part I*" and "*Kyndryl – A Melting Ice Cube with a Consulting Mirage Part II*." The Gotham City Report alleged that Kyndryl's "pro forma metrics," including "Adjusted Free Cash Flow," "give investors the misleading impressions that (i) margins have improved and are higher than pre-spin, and (ii) the company generates free cash flow." The Gotham City Report further stated: "We don't find these metrics to accurately represent economic reality," particularly since management's compensation was tied to these metrics.

310. **<u>Statement #13</u>**. A few hours after the Gotham City Report was published, March 27, 2025, Kyndryl published a Press Release on its website denying the Gotham City Report. Kyndryl stated the Gotham City Report "***contains claims that are inaccurate and deliberately misleading***," that "***Kyndryl rejects in the strongest possible terms the conclusion reached within the report***," and that "[*w*]***e believe that our accounting and disclosures are correct, accurate and in accordance with all applicable reporting requirements***" whereas the report contained "***many inaccuracies and falsehoods … in [its] so-called analysis***."

311. **Reasons for Falsity.** Statement #13 was materially false and misleading. It was materially false and misleading to state that the Gotham City Report "***contains claims that are***

***inaccurate and deliberately misleading*** " and " ***many inaccuracies and falsehoods*** " because the Gotham City Report ***correctly asserted*** that Kyndryl's statements about free cash flow "give investors … misleading impressions," that Kyndryl's reported free cash flow failed to "accurately represent economic reality," and that Kyndryl management was manipulating adjusted free cash flow to increase their own incentive compensation. As Kyndryl later disclosed but was unknown to investors at the time, Kyndryl's "standard practice" at this time was "deferring vendor payments quarter to quarter, in certain cases beyond vendor payment terms," with a "magnitude" that "exceeded $100 million in current or prior periods." By forcefully denying the claims in the Gotham City Report without disclosing the cash management practices, Defendants left investors with the false and misleading impression that there was no basis whatsoever for the report's conclusions. It was also materially false and misleading for Defendants to state, " ***we believe that our accounting and disclosures are correct, accurate and in accordance with all applicable reporting requirements*** " when Kyndryl's DCP and ICFR ***were not effective*** due to three undisclosed material weaknesses that existed by March 27, 2025 (and as Defendants admitted after the Class Period existed as of a few days later, March 31, 2025, *see* ¶¶ 204-12).

312. To the extent that any part of Statement #13 is an opinion, that statement is actionable because it was subjectively false, did not fairly align with the information in the possession of Kyndryl's management level executives—including the Individual Defendants, as well as Sebold, Wright, Rutledge, and Chugh—at the time, and contained false embedded facts. Kyndryl's management level executives did not believe the denial of the Gotham City Report, as evidenced by Defendants' and certain other management level executives' scheme to conceal the use of Q blocks from vendors and investors, and to suppress a whistleblower report from the Audit Committee, *see* ¶¶ 116-45, 170-80, and by Defendant Khurana's and Sebold's trading. *See* ¶¶ 258-

60. Statement #13 also did not fairly align with the information in Defendants' and its managing executives' possession at the time because Kyndryl had a standard practice of using Q blocks to defer vendor payments quarter to quarter beyond payment terms and had three undisclosed material weaknesses in its ICFR, which rendered the Company's ICFR and DCP ineffective. Those omitted facts substantially undermined the basis for the statement and would have undermined a reasonable investor's belief in it. Finally, that the Gotham Report "***contains claims that are inaccurate and deliberately misleading***" and "***many inaccuracies and falsehoods***," and that Kyndryl's "***accounting and disclosures are correct, accurate and in accordance with all applicable reporting requirements***" are all embedded facts that are false for the reasons stated herein, additionally rendering Statement #13 materially false and misleading.

### D. Additional False and Misleading Statements Regarding Free Cash Flow and Related Metrics

313. Throughout the Class Period, in SEC filings, press releases, and on earnings calls and other investor events, Defendants consistently attributed Kyndryl's adjusted free cash flow and free cash flow performance to seemingly legitimate business drivers while omitting the material impact of Kyndryl's cash management practices, including systematic deferral of vendor payments. By repeatedly citing seemingly legitimate drivers without disclosing the artificial inflation of adjusted free cash flow and free cash flow caused by vendor payment deferrals, Defendants created a materially misleading impression of Kyndryl's cash generation, including as to its source and sustainability, and of Kyndryl's ability to convert revenue into cash.

314. **Statement #14**. On July 31, 2024, Kyndryl issued a Press Release announcing the results of Kyndryl's operations for the first fiscal quarter of fiscal year 2025, ending on June 30, 2024, and filed a Form 8-K incorporating the release (the "July 31, 2024 Press Release"). The July 31, 2024 Press Release was reviewed and approved by Defendants Schroeter and Wyshner, who

were quoted in the release, and Defendant Khurana, who signed the Form 8-K incorporating it. The July 31, 2024 Press Release stated that "***[c]ash flow used*** in operations was $48 million in this ***seasonally weak quarter for cash flow***."

315. **Statement #15**. On August 1, 2024, Kyndryl held an earnings call for the quarter ended June 30, 2024. As part of his opening remarks, Defendant Schroeter stated:

> [W]e remain on track to deliver significant cash flow this year. ***Our performance was once again powered by strong growth in Kyndryl Consult and hyperscaler related revenue, as well as our ability to drive efficiency through automation and deliver innovation through Kyndryl Bridge, our AI powered open integration platform.***

During the call, Defendants Schroeter and Wyshner also showed investors a slide from the first quarter 2025 earnings presentation, on Kyndryl's "[c]ontinuing to build a strong track record of successful execution," which listed Kyndryl's progress under four headings: (1) "Progress on our financials"; (2) "Progress on our differentiation," including "Kyndryl Bridge: Delivering AI-enabled insights and resiliency to customers"; (3) "***Progress on our 3A's***"; and (4) "Progress on our culture." The presentation was reviewed and approved by Defendants Schroeter and Wyshner, who were identified by name and with their pictures at the beginning of the deck as the "Speakers."

316. **Statement #16**. Defendant Wyshner also stated during his opening remarks, that, "[o]ver the medium-term, we remain committed to ***delivering significant margin expansion in generating free cash flow growth***," and that the "game plan to ***drive*** [this] strategic progress … starts with the ***steps we've already taken to expand our technology alliances, manage our costs, and earn a return on all of our revenues***."

317. **Statement #17**. During the call, Defendants Schroeter and Wyshner showed investors a slide from the first quarter 2025 earnings presentation which stated that Kyndryl's "***evolving business mix is driving*** increased profitability and ***free cash flow***" and that Kyndryl had

experienced a "***[s]trong conversion of earnings to free cash flow***." Defendant Schroeter further emphasized in his remarks that Kyndryl had "***strong conversion of our earnings into cash flow***."

318. **Reasons for Falsity.** Statement #14 was materially false and misleading. It was materially false and misleading to attribute depressed cash flow to seemingly innocuous "***seasonal***[]" trends, while omitting that, as a "standard practice," Kyndryl deferred vendor payments from quarter to quarter beyond vendor payment terms, including in amounts greater than $100 million. The practice was heightened at the end of the fiscal year—*e.g.*, deferring vendor payments from the fourth quarter of 2024 into the first quarter of 2025. Defendants therefore created the false impression that Kyndryl's disappointing cash flow was driven by "***seasonal***[]" trends rather than intentional deferral of expenses from the end of the prior fiscal year to the start of the fiscal year to which Statement #14 related.

319. Statements #15 through #17 were also each materially false and misleading. It was materially false and misleading to state that legitimate business factors—such as "***strong growth in Kyndryl Consult and hyperscaler related revenue***," "***efficiency through automation***," "***innovation through Kyndryl Bridge***," "***significant margin expansion***," expanding "***technology alliances***," managing "***costs***," earning "a ***return on … revenues***," an "***evolving business mix***," and "***[s]trong conversion of earnings to free cash flow***"—were "***driv[ing]***" or "***power[ing]***" free cash flow. In each instance, Defendants attributed the Company's cash flow performance to seemingly legitimate business factors while omitting that a material portion of Kyndryl's cash flow was attributable to undisclosed cash management practices, including the deferral of vendor payments quarter to quarter, which was greater than $100 million in some reporting periods. By citing only seemingly legitimate performance drivers, Defendants created the false impression that Kyndryl's cash flow trajectory was sustainable and driven entirely by organic business

fundamentals. Similarly, and for the same reasons, it was materially false and misleading to omit the foregoing practices while highlighting "***steps***" supposedly "***already … taken to expand our technology alliances, manage our costs, and earn a return on all our revenues***."

320. In addition, it was materially misleading for Defendant Wyshner to highlight the "***steps we've already taken to expand our technology alliances***" and for Defendants Schroeter and Wyshner to highlights in the earnings presentation the "***Progress on our 3A's***," while concealing that Kyndryl was using Q blocks to block payments to the critical counterparties with whom Kyndryl had "alliances" (such as Cisco and Dell), resulting in actual and threatened credit holds and other problems with those counterparties, as described by multiple former employees. For example, as described by FE-2 (who departed in September 2024, the second month of the Class Period), Kyndryl had received multiple credit holds from vendors such as Cisco and Dell.

321. **Statement #18**. On November 6, 2024, Kyndryl issued the November 6, 2024 Press Release. The November 6, 2024 Press Release was reviewed and approved by Defendants Schroeter and Wyshner, who were quoted it, and Defendant Khurana, who signed the Form 8-K incorporating it. The November 6, 2024 Press Release stated: "In the quarter, adjusted EBITDA was $557 million, and ***adjusted free cash flow*** was $56 million. ***Both figures reflect workforce rebalancing actions implemented in the quarter***." After discussing the cash flow results, the November 6, 2024 Press Release also highlighted that Kyndryl "***continued to execute on our three-A initiatives*** to increase our earnings" and "[o]ver the last twelve months, we've consistently grown our signings to incorporate a broader scope of services, while we continually enhance relationships to generate higher margins." The November 6, 2024 Press Release then noted "[r]ecent [d]evelopments," including, "***Alliances initiative***," "[s]trong projected margin on recent signings," "[d]ouble-digit growth in Kyndryl Consult," and others.

322. **Statement #19**. On November 7, 2024, Kyndryl held an earnings call for the quarter ended September 30, 2024. As part of his opening remarks Defendant Schroeter stated:

> [W]e remain on track to deliver significant cash flow this year. ***Our performance was once again led by double-digit growth in Kyndryl Consult and strong momentum in hyperscaler-related revenue as well as our ability to continue to drive efficiency and deliver innovation through automation and Kyndryl Bridge, our AI-enabled open integration platform***. In addition, ***our 3A's initiatives, alliances***, accounts and advanced delivery ***continued to generate significant incremental benefits in the quarter***.

During the call, Defendants Schroeter and Wyshner showed investors a slide from the second quarter 2025 earnings presentation, on Kyndryl's "[k]ey sources of top-line growth," which included "[o]ngoing growth of Kyndryl Consult" and "Kyndryl Bridge enabled by AI." The presentation was reviewed and approved by Defendants Schroeter and Wyshner, who were identified by name and with their pictures at the beginning of the deck as the "Speakers."

323. **Statement #20**. Defendants Schroeter and Wyshner also showed investors a slide about Kyndryl's "[s]trong balance sheet metrics and cash flow," and a slide reiterating that Kyndryl's "***evolving business mix is driving*** increased profitability and ***free cash flow***" and that there is a "***[s]trong conversion of earnings to free cash flow***."

324. **Statement #21.** During the call, Defendant Wyshner stated during his opening remarks, that, "[o]ver the medium-term, we remain committed to ***delivering significant margin expansion in generating free cash flow growth***," and that the "game plan to ***drive*** [this] strategic progress … starts with the ***steps we've already taken to expand our technology alliances, manage our costs, and earn a return on all of our revenues***."

325. **Reasons for Falsity.** Statement #18 was materially false and misleading. It was materially false and misleading to attribute seemingly improving cash flow to the seemingly innocuous reason of "***workforce rebalancing actions***," while also discussing supposed steps taken

to achieve "higher margins" and other purported "developments," while omitting that, as a "standard practice," Kyndryl deferred vendor payments from quarter to quarter, and in some reporting periods in amounts greater than $100 million. Defendants therefore created the misleading impression that Kyndryl's cash flow in the quarter was driven by innocuous workforce rebalancing and other actions rather than intentional and unsustainable deferral of expenses from quarter to quarter, with no legitimate business purpose.

326. Statements #19 through #21 were also each materially false and misleading. It was materially false and misleading to state that legitimate business factors—such as "***double-digit growth in Kyndryl Consult and strong momentum in hyperscaler-related revenue***," a supposed "***ability to continue to drive efficiency and deliver innovation through automation and Kyndryl Bridge***," an "***evolving business mix***," "***[s]trong conversion of earnings to free cash flow***," "***significant margin expansion***," expanding "***technology alliances***," managing "***costs***," and earning "a ***return on … revenues***" —were "***le[ading]***" or "***driving***" free cash flow while omitting the undisclosed driver of deferring vendor invoices. In each instance, Defendants attributed the Company's cash flow performance to seemingly legitimate business factors while omitting that a material portion of Kyndryl's cash flow was attributable to undisclosed cash management practices, including the deferral of vendor payments quarter to quarter, which was greater than $100 million in some reporting periods. By citing only seemingly legitimate performance drivers, Defendants created the false impression that Kyndryl's cash flow trajectory was sustainable and driven entirely by organic business fundamentals. Similarly, and for the same reasons, it was materially false and misleading to omit the foregoing practices while highlighting "***steps***" supposedly "***already … taken to expand our technology alliances, manage our costs, and earn a return on all our revenues***."

327. In addition, it was materially misleading for Defendant Schroeter to state that "***our 3A's initiatives, alliances***, … ***continued to generate significant incremental benefits in the quarter***,**"** for the November 6, 2024 Press Release to highlight the "***Alliances initiative***" and state that Kyndryl "***continued to execute on our three-A initiatives*** to increase our earnings," and for Defendant Wyshner to highlight the "***steps we've already taken to expand our technology alliances***," all while concealing that Kyndryl was using Q blocks to block payments to the critical counterparties with whom Kyndryl had "alliances" (such as Cisco and Dell), resulting in actual and threatened credit holds and other problems with those counterparties, as described by multiple former employees. For example, as described by FE-2 (who departed in September 2024, the second month of the Class Period), Kyndryl had received multiple credit holds from vendors such as Cisco and Dell. As described by FE-1, by late 2024 or early 2025, vendor complaints had gotten very bad and Kyndryl's GSRMs were pulled in to help manage vendor complaints.

328. **Statement #22**. On November 21, 2024, Kyndryl held an Investor Day Conference, during which Defendants discussed Kyndryl's free cash flow with investors. As part of his planned remarks, Defendant Wyshner stated that the Company's "***3A's***"— ***Alliances***, Advanced Delivery, and focus Accounts—would "***continue to be a core part of how [Kyndryl is] delivering earnings and cash flow growth***."

329. **Reasons for Falsity.** Statement #22 was materially false and misleading. It was materially false and misleading to state that legitimate business factors, such as the "***3A's***" were "***delivering***" free cash flow growth, while omitting that a material portion of Kyndryl's cash flow was attributable to undisclosed cash management practices, including the deferral of vendor payments quarter to quarter, which was greater than $100 million in some reporting periods. By citing only seemingly legitimate performance drivers Defendants created the false impression that

Kyndryl's cash flow trajectory was sustainable and driven entirely by organic business fundamentals.

330. In addition, it was materially misleading for Defendant Wyshner to discuss that the "***3A's***" would "***continue to be a core part of how [Kyndryl is] delivering earnings and cash flow growth***" while concealing that Kyndryl was using Q blocks to block payments to the critical counterparties with whom Kyndryl had "Alliances" (such as Cisco and Dell), resulting in actual and threatened credit holds and other problems with those counterparties, as described by multiple former employees. For example, as described by FE-2 (who departed in September 2024, the second month of the Class Period), Kyndryl had received multiple credit holds from vendors such as Cisco and Dell. As described by FE-1, by late 2024 or early 2025, vendor complaints had gotten very bad and Kyndryl's GSRMs were pulled in to help manage vendor complaints.

331. **Statement #23**. On February 3, 2025, Kyndryl issued the February 3, 2025 Press Release. The February 3, 2025 Press Release was reviewed and approved by Defendants Schroeter and Wyshner, who were quoted in the release, and Defendant Khurana, who signed the Form 8-K incorporating it. The February 3, 2025 Press Release quoted Defendant Schroeter as stating:

> ***With sustained momentum in our signings coupled with higher operating margins***, we remain on track to deliver constant-currency revenue growth in the fourth quarter of this fiscal year ***and are raising our full-year outlook*** for adjusted earnings ***and adjusted free cash flow***.

332. **Statement #24**. After discussing that "*[c]ash flow from operations was $260 million, and adjusted free cash flow was $171 million,*" the February 3, 2025 Press Release quoted Defendant Wyshner as stating:

> Once again, ***we delivered strong progress on our three-A's initiatives and robust signings growth*** that demonstrate customer demand for the essential services and insights we offer. ***The margins associated with our signings continue to support our outlook for future earnings and free cash flow growth***.

The February 3, 2025 Press Release then goes on to note "[r]ecent [d]evelopments," including, "***Alliances initiative***," "[a]dvanced [d]elivery initiative," "[a]ccounts initiative," "[s]trong projected margins on recent signings," "[d]ouble-digit growth in Kyndryl Consult," and others.

333. **Statement #25**. On February 4, 2025, Kyndryl held an earnings call for the third quarter ended December 31, 2024. As part of his opening remarks, Defendant Schroeter stated:

> [W]e generated ***more than $170 million of adjusted free cash flow*** in the quarter. Once again, ***our performance was led by double-digit revenue growth in Kyndryl Consult and demand for modernization, cloud security and AI services***. Hyperscaler-related revenue surpassed $300 million in the quarter tracking ahead of our nearly $1 billion full year target. ***Our 3A's initiatives; alliances, accounts and advanced delivery continue to generate incremental signings, revenue and earnings*** … pre-tax margins on our signings continue to be in the high-single digits, ***which is a leading indicator of our future earnings and cash flow trajectory***.

During the call, Defendants Schroeter and Wyshner also showed investors a slide from the third quarter 2025 earnings presentation, about Kyndryl's continuation to "build a strong track record of successful execution," which listed Kyndryl's progress under four headings: (1) "Progress on our financials"; (2) "Progress on our differentiation," including "Kyndryl Consult" and "Kyndryl Bridge"; (3) "***Progress on our 3A's***"; and (4) "Progress on our culture." The presentation was reviewed and approved by Defendants Schroeter and Wyshner, who were identified by name and with their pictures at the beginning of the deck as the "Speakers."

334. **Statement #26**. During the call, Defendant Wyshner stated during his opening remarks, that, "[o]ver the medium term, we remain committed to ***delivering significant margin expansion and growing free cash flow***," and that the "game plan to ***drive*** [this] strategic progress … starts with the ***steps we've already taken to expand our technology alliances, manage our costs, and earn a return on all of our revenues***."

335. **Reasons for Falsity.** Statements #23 through 26 were materially false and misleading. It was materially false and misleading to state that legitimate business factors—such

as "***sustained momentum in our signings coupled with higher operating margins***," "***Kyndryl Consult and demand for modernization, cloud security and AI services***," the "***3A's***," "***significant margin expansion***," expanding "***technology alliances***," managing "***costs***," and earning "a ***return on … revenues***"—were "***le[ading]***" or "***driv[ing]***" free cash flow, or to state that Defendants had already "***delivered strong progress on our three-A's initiatives and robust signings growth***" as supposed then-existing "***support***" for future cash flow growth, or to discuss cash flow results together with purported supporting "developments," all while omitting the undisclosed driver of deferring vendor invoices. In each instance, Defendants attributed the Company's cash flow performance to seemingly legitimate business factors while omitting that a material portion of Kyndryl's cash flow was attributable to undisclosed cash management practices, including the deferral of vendor payments quarter to quarter, which was greater than $100 million in some reporting periods. By citing only seemingly legitimate performance drivers, Defendants created the false impression that Kyndryl's cash flow trajectory was sustainable and driven—or "support[ed]"—entirely by organic business fundamentals and improvements. Similarly, and for the same reasons, it was materially false and misleading to omit the foregoing practices while highlighting supposed "***steps***" supposedly "***already … taken to expand our technology alliances, manage our costs, and earn a return on all our revenues***."

336. In addition, it was materially misleading for the February 3, 2025 Press Release to highlight the "***Alliances initiative***," for the third quarter 2025 earnings presentation the "***Progress on our 3A's***," and for Defendant Wyshner to highlight the "***steps we've already taken to expand our technology alliances***" while concealing that Kyndryl was using Q blocks to block payments to the critical counterparties with whom Kyndryl had "Alliances" (such as Cisco and Dell), resulting in actual and threatened credit holds and other problems with those counterparties, as

described by multiple former employees. For example, as described by FE-2 (who departed in September 2024, the second month of the Class Period), Kyndryl had received multiple credit holds from vendors such as Cisco and Dell. As described by FE-1, by late 2024 or early 2025, vendor complaints had gotten very bad and Kyndryl's GSRMs were pulled in to help manage vendor complaints.

337. **Statement #27**. On May 8, 2025, Kyndryl held an earnings call for the fourth quarter and fiscal year ended March 31, 2025. As part of his opening remarks, Defendant Wyshner stated:

> From a timing perspective and similar to last year, ***Q1 will be a significant user of cash due to annual software and incentive payments***. In subsequent quarters, [it] will be more favorable. … Over the medium term, we remain committed to ***delivering significant margin expansion and generating free cash flow growth***. We have a solid game plan to ***drive*** our strategic progress, and this game plan starts with the ***steps we've already taken to expand our technology alliances, manage our costs and earn a return on all of our revenues.***

338. **Reasons for Falsity.** Statement #27 was materially false and misleading. It was materially false and misleading to state that legitimate business factors—such as "***annual software and incentive payments***," "***significant margin expansion***," expanding "***technology alliances***," managing "***costs***," and earning "***a return on … revenues***" were "***driv[ing]***," or "***delivering***" free cash flow. Defendants attributed the Company's cash flow performance to seemingly legitimate business factors while omitting that a material portion of Kyndryl's cash flow was attributable to undisclosed cash management practices, including the deferral of vendor payments quarter to quarter, which was greater than $100 million in some reporting periods. By citing only seemingly legitimate performance drivers, Defendants created the false impression that Kyndryl's cash flow trajectory was sustainable and driven entirely by organic business fundamentals. Similarly, and for the same reasons, it was materially false and misleading to omit the foregoing practices while

highlighting "***steps***" supposedly "***already … taken to expand our technology alliances, manage our costs, and earn a return on all our revenues***."

339. In addition, it was materially misleading for Defendant Wyshner to highlight the "***steps we've already taken to expand our technology alliances***" while concealing that Kyndryl was using Q blocks to block payments to the critical counterparties with whom Kyndryl had "Alliances" (such as Cisco and Dell), resulting in actual and threatened credit holds and other problems with those counterparties, as described by multiple former employees. For example, as described by FE-2 (who departed in September 2024, the second month of the Class Period), Kyndryl had received multiple credit holds from vendors such as Cisco and Dell. As described by FE-1, by late 2024 or early 2025, vendor complaints had gotten very bad and Kyndryl's GSRMs were pulled in to help manage vendor complaints.

340. **Statement #28**. On July 31, 2025, Kyndryl held its 2025 annual meeting of stockholders. Defendants Schroeter, Wyshner, and Khurana attended. As part of his remarks, Defendant Schroeter stated:

> We reported strong, full year results in fiscal 2025 as we significantly ***grew earnings and adjusted free cash flow, demonstrating our focus on margin expansion and cash generation*** that will support our long-term strategy and goals. ***We've transformed our business through our three As initiatives, alliances***, advanced delivery and accounts.

341. **Reasons for Falsity.** Statement #28 was materially false and misleading. It was materially false and misleading to state that free cash flow "***grew***" based on seemingly legitimate business factors ("***margin expansion***," the "***three As***") while omitting the undisclosed driver of deferring vendor invoices. Defendants attributed the Company's cash flow performance to seemingly legitimate business factors while omitting that a material portion of Kyndryl's cash flow was attributable to undisclosed cash management practices, including the deferral of vendor payments quarter to quarter, which was greater than $100 million in some reporting periods. By

citing only seemingly legitimate performance drivers, Defendants created the false impression that Kyndryl's cash flow trajectory was sustainable and driven entirely by organic business fundamentals and improvements or a "transform[ation]."

342. In addition, it was materially misleading for Defendant Schroeter to state that "***[w]e've transformed our business through our three As initiatives***," including "***alliances***," while concealing that Kyndryl was using Q blocks to block payments to the critical counterparties with whom Kyndryl had "alliances" (such as Cisco and Dell), resulting in actual and threatened credit holds and other problems with those counterparties, as described by multiple former employees. For example, as described by FE-2 (who departed in September 2024, the second month of the Class Period), Kyndryl had received multiple credit holds from vendors such as Cisco and Dell. As described by FE-1, by late 2024 or early 2025, vendor complaints had gotten very bad and Kyndryl's GSRMs were pulled in to help manage vendor complaints.

343. **<u>Statement #29</u>**. On August 5, 2025, Kyndryl held an earnings call for the first quarter ended June 30, 2025. As part of his opening remarks, Defendant Wyshner stated:

> From a timing perspective, ***Q1 was a significant user of cash due to annual software and incentive compensation payments***. Subsequent quarters will be more favorable. … Over the medium term, we remain committed to ***delivering significant margin expansion and generating free cash flow growth***. We have a solid game plan to ***drive*** our strategic progress and this game plan starts with the ***steps we've already taken to expand our technology alliances, realize the numerous growth opportunities available to us, manage our costs, and earn a return on all of our revenues.***

344. **Reasons for Falsity.** Statement #29 was materially false and misleading. It was materially false and misleading to state that legitimate business factors—such as "***annual software and incentive compensation payments***," "***significant margin expansion***," expanding "***technology alliances***," realizing "***numerous growth opportunities***," managing "***costs***," and earning "***a return on … revenues***"—were "***driv[ing]***," or "***delivering***," free cash flow. Defendants attributed the

Company's cash flow performance to seemingly legitimate business factors while omitting that a material portion of Kyndryl's cash flow was attributable to undisclosed cash management practices, including the deferral of vendor payments quarter to quarter, which was greater than $100 million in some reporting periods. By citing only seemingly legitimate performance drivers, Defendants created the false impression that Kyndryl's cash flow trajectory was sustainable and driven entirely by organic business fundamentals. Similarly, and for the same reasons, it was materially false and misleading to omit the foregoing practices while highlighting supposed "***steps***" supposedly "***already … taken to expand our technology alliances, realize the numerous growth opportunities available to us, manage our costs, and earn a return on all of our revenues.***"

345. In addition, it was materially misleading for Defendant Wyshner to highlight the "***steps we've already taken to expand our technology alliances***" while concealing that Kyndryl was using Q blocks to block payments to the critical counterparties with whom Kyndryl had "Alliances" (such as Cisco and Dell), resulting in actual and threatened credit holds and other problems with those counterparties, as described by multiple former employees. For example, as described by FE-2 (who departed in September 2024, the second month of the Class Period), Kyndryl had received multiple credit holds from vendors such as Cisco and Dell. As described by FE-1, by late 2024 or early 2025, vendor complaints had gotten very bad and Kyndryl's GSRMs were pulled in to help manage vendor complaints.

346. **Statement #30**. On September 3, 2025, Defendants Schroeter and Wyshner attended the Citi Global TMT conference. In response to a question about how analysts or the investment community should think about progress on the triple, double, single goal and about Defendant Schroeter's visibility into that goal, Defendant Schroeter answered:

> [T]ripling cash flow is – I wouldn't call it physics, but I would call it the fact base. And it's really driven by this idea that we were spun out with a horrible tax position ... [a]nd the result of that is that over the next few years, as profit grows, we will not be paying a ton more in cash taxes. So, our cash tax payments will basically be flat over the next few years, while our profit moves to $1.2 billion, right? Profit is the double. So … ***cash taxes are the driver that allows us to triple cash flow while profits double.***

347. **Reasons for Falsity.** Statement #30 was materially false and misleading. It was materially false and misleading to state that a legitimate business factor, such as "***cash taxes***," was "***driv[ing]***" free cash flow while omitting the undisclosed driver of deferring vendor invoices. Defendants attributed the Company's cash flow performance to a seemingly legitimate business factor while omitting that a material portion of Kyndryl's cash flow was attributable to undisclosed cash management practices, including the deferral of vendor payments quarter to quarter which was greater than $100 million in some reporting periods. By citing only a seemingly legitimate performance driver, Defendants created the false impression that Kyndryl's cash flow trajectory was sustainable and driven entirely by organic business fundamentals and improvements.

348. **<u>Statement #31</u>**. On November 4, 2025, Kyndryl issued the November 4, 2025 Press Release. The November 4, 2025 Press Release was reviewed and approved by Defendants Schroeter and Wyshner, who were quoted in the release, and Defendant Khurana, who signed the Form 8-K incorporating it. The following day, during Defendant Wyshner's opening remarks at the earnings call for that quarter, he stated:

> Turning to our cash flow and balance sheet, we generated free cash flow of $22 million in the second quarter. Our net capital expenditures were $125 million. ***Working capital was the use of cash in the quarter***, driven by the timing of receivables and vendor payments that we expect to reverse in the back half of the year.

During the call, Defendants Schroeter and Wyshner showed investors a slide from the second quarter 2026 earnings presentation, about Kyndryl's "[f]iscal second quarter 2026 adjusted EBITDA and free cash flow." The slide listed adjusted EBITDA, net capital expenditures, deferred

costs, interest paid, cash taxes paid, and "***[w]orking capital*** (excl. deferred costs) & other," noting that "[w]orking capital was use of cash primarily due to the timing of receivables and vendor payments, which is expected to reverse in the second half of fiscal 2026." The slide presented these metrics as contributing to $22 million in free cash flow. The presentation was reviewed and approved by Defendants Schroeter and Wyshner, who were identified by name and with their pictures at the beginning of the deck as the "Speakers."

349. **<u>Statement #32</u>**. As part of his opening remarks during that call, Defendant Wyshner also stated that "we remain committed to delivering ***significant margin expansion and generating free cash flow growth*** over the medium term" and that the "game plan to ***drive*** [this] strategic process … starts with the ***steps we've already taken to expand our technology alliances, realize the numerous growth opportunities available to us, manage our costs and earn a return on all of our revenues***."

350. **<u>Statement #33</u>**. As part of his planned remarks, Defendant Schroeter stated, "***[w]ith strong conversion of earnings to free cash flow***, we're optimizing our capital allocation by investing in organic growth opportunities …."

351. **Reasons for Falsity.** Statements #31 through #33 were each materially false and misleading. It was materially false and misleading to state that legitimate business factors, such as "***[w]orking capital***," "***significant margin expansion***," expanding "***technology alliances***," realizing "***numerous growth opportunities***," managing "***costs***," and earning "a ***return on … revenues***," and "***strong conversion of earnings to free cash flow***," were "***driv[ing]***," or "***delivering***," free cash flow, all while omitting the undisclosed driver of deferring vendor invoices. In each instance, Defendants attributed the Company's cash flow performance to seemingly legitimate business factors while omitting that a material portion of Kyndryl's cash flow was

attributable to undisclosed cash management practices, including the deferral of vendor payments quarter to quarter, which was greater than $100 million in some periods. By citing only seemingly legitimate performance drivers, Defendants created the false impression that Kyndryl's cash flow trajectory was sustainable and driven entirely by organic business fundamentals and improvements. Similarly, and for the same reasons, it was materially false and misleading to omit the foregoing practices while highlighting "***steps***" supposedly "***already … taken to expand our technology alliances, realize the numerous growth opportunities available to us, manage our costs and earn a return on all of our revenues.***"

352. In addition, it was materially misleading for Defendant Wyshner to highlight the "***steps we've already taken to expand our technology alliances***" while concealing that Kyndryl was using Q blocks to block payments to the critical counterparties with whom Kyndryl had "Alliances" (such as Cisco and Dell), resulting in actual and threatened credit holds and other problems with those counterparties, as described by multiple former employees. For example, as described by FE-2 (who departed in September 2024, the second month of the Class Period), Kyndryl had received multiple credit holds from vendors such as Cisco and Dell. As described by FE-1, by late 2024 or early 2025, vendor complaints had gotten very bad and Kyndryl's GSRMs were pulled in to help manage vendor complaints.

**E. False and Misleading Statements Relating to Financial Guidance for Fiscal Year 2026**

353. Starting on May 7, 2025 and for the remainder of the Class Period, Defendants issued, reiterated, and raised financial guidance for free cash flow for fiscal year 2026, which ran from April 1, 2025 through March 31, 2026. These statements were materially misleading when made because they did not disclose that prior period results had been achieved through undisclosed cash management practices, including deferring vendor payments beyond their due dates, and did

not disclose that, accordingly, the FY2026 financial projection figures could not be achieved or sustained without continuing or expanding these undisclosed practices. By omitting the use of undisclosed cash management practices, including the vendor payment deferrals, Defendants created the false and misleading impression that Kyndryl's prior figures had been achieved, and that its guided figures could be achieved, by legitimate business endeavors. As set forth herein, certain of these statements were additionally false and misleading because they included materially false and misleading statements of past and present facts about what had previously "driven" Kyndryl's free cash flow results.

354. **Statement #34**. On May 7, 2025, Kyndryl issued the May 7, 2025 Press Release. The May 7, 2025 Press Release was reviewed and approved by Defendants Schroeter and Wyshner, who were quoted in the release, and Defendant Khurana, who signed the Form 8-K incorporating it. The May 7, 2025 Press Release noted "[r]ecent [d]evelopments," including, "***Alliances initiative***," "[a]dvanced [d]elivery initiative," "[a]ccounts initiative," "[s]trong projected margins on recent signings," "[d]ouble-digit growth in Kyndryl Consult," and "[h]igher cash balance." The Company then provided an "outlook for its fiscal year 2026," including "***free cash flow of approximately $550 million***, reflecting the Company's projected adjusted pretax income less cash taxes."

355. **Statement #35**. On May 8, 2025, Kyndryl held an earnings call for the fourth quarter and fiscal year ended March 31, 2025. As part of his opening remarks, Defendant Schroeter stated:

> ***With strong conversion of earnings to free cash flow***, we'll balance our approach to capital allocation by investing in organic growth opportunities and occasional tuck-in acquisitions. … It should be clear that the fiscal 2026 outlook we published yesterday is consistent with the path we previously laid out for our growth from fiscal 2025 to fiscal 2028. And as David will discuss in fiscal 2026, ***we expect to generate approximately***

> ***$550 million in adjusted free cash flow***, will grow our pre-tax earnings by more than $240 million to at least $725 million, and will generate positive constant currency revenue growth.

During the call, Defendants Schroeter and Wyshner showed investors a slide from the fourth quarter 2025 earnings presentation, titled "[f]ocused on delivering an impactful 'triple, double, single.'" The slide listed Kyndryl's free cash flow projection FY26E of "~$550M" and noted "[s]ources of our revenue," as "[p]ost-spin signings (higher-margin[s])." The presentation was reviewed and approved by Defendants Schroeter and Wyshner, who were identified by name and with their pictures, at the beginning of the deck as the "Speakers."

356. Statement #35 included false and misleading statements of past and present facts, including that Kyndryl had "***strong conversion of earnings to free cash flow***."

357. **Statement #36**. As part of his opening remarks during the May 8, 2025 earnings call, Defendant Wyshner stated:

> ***The concepts underlying the 3As continue to be an important source of margin expansion and value creation*** for us and are now integral part of our operational and go-to-market approach.
>
> ***
>
> Looking at the first quarter in particular … [o]n the topic of cash flow … ***[w]e expect … adjusted free cash flow of approximately $550 million.***

During the call, Defendants Schroeter and Wyshner also showed investors a slide from the fourth quarter 2025 earnings presentation on Kyndryl's "[f]inancial highlights," including "[r]esults reflect continued progress and consistent execution," "[s]trategic initiatives driving significant margin expansion," "[c]apital returns to shareholders powered by free cash flow," and "[p]rojecting substantial earnings growth again."

358. Statement #36 included false and misleading statements of past and present facts, including that "[t]he ***concepts underlying the 3As continue to be an important source of margin expansion and value creation***."

359. **Statement #37**. The fourth quarter 2025 earnings presentation also contained "[f]iscal 2026 outlook," sharing the same projections the Company had in the May 7, 2025 Press Release, including ***free cash flow of approximately $550 million***. *See* ¶ 354.

360. **Statement #38**. On August 4, 2025, Kyndryl issued the August 4, 2025 Press Release. The August 4, 2025 Press Release was reviewed and approved by Defendants Schroeter and Wyshner, who were quoted in it, and Defendant Khurana, who signed the Form 8-K incorporating it. The August 4, 2025 Press Release noted recent developments such as: "[h]yperscaler-related revenue," "[s]trong projected margin on recent signings," "[d]ouble-digit growth in Kyndryl Consult," "***[i]ncremental contribution from three-A's initiatives***," and "[l]aunched Kyndryl Agentic AI Framework." The Company then "***reaffirm[ed] its outlook for its fiscal 2026***," including ***free cash flow of approximately $550 million***. *See* ¶ 354.

361. **Statement #39**. On August 5, 2025, Kyndryl held an earnings call for the first fiscal quarter ended June 30, 2025. As part of his opening remarks, Defendant Schroeter stated that the Company was "***reaffirming [its] outlook for fiscal 2026***." Additionally, Defendant Schroeter stated:

> ***Our expanding scope in large- and mid-sized accounts is fueling growth in key financial metrics for fiscal 2026 and beyond***. As a reminder, by fiscal 2028, which for us begins less than 20 months from now, ***we expect to deliver more than $1 billion in adjusted free cash flow***, we expect to deliver more than $1.2 billion and adjusted pre-tax income, and achieving these earnings and cash flow targets only requires us to reach the mid-single digit revenue growth that we'll progress toward by fiscal 2028. ***With strong conversion of our earnings to free cash flow***, we're optimizing our capital allocation by investing in organic growth opportunities … Also, with our free cash flow adjustments having become minimal as

> anticipated, you'll hear us talking about free cash flow rather than adjusted free cash flow.
>
> And importantly, our fiscal 2026 outlook is consistent with our expected growth trajectory from fiscal 2025 to fiscal 2028. As David will discuss, ***we're expecting to generate approximately $550 million in free cash flow***, grow our adjusted pre-tax earnings by more than $240 million to at least $725 million, and generate positive 1% constant currency revenue growth this fiscal year.

During the call, Defendants Schroeter and Wyshner showed investors slides from the first quarter 2026 earnings presentation, titled "[f]ocused on delivering an impactful 'triple, double, single.'" The slides list Kyndryl's adjusted free cash flow of $446M for FY25 and projected ~$550M for FY26. The slides also note "[s]ources of our revenue," as "[p]ost-spin signings (higher-margin[s])." The presentation was reviewed and approved by Defendants Schroeter and Wyshner, who were identified by name and with their pictures at the beginning of the deck as the "Speakers."

362. Statement #39 included false and misleading statements of past and present facts, including that "[o]ur ***expanding scope in large- and mid-sized accounts is fueling growth in key financial metrics***" and that Kyndryl had "***strong conversion of earnings to free cash flow***."

363. **<u>Statement #40</u>**. As part of his opening remarks during the August 5, 2025 earnings call, Defendant Wyshner stated:

> On the topic of cash flow, for the year as a whole, we're forecasting roughly 100% conversion of adjusted pre-tax income less cash taxes into free cash flow. With cash taxes of roughly $175 million, ***this implies free cash flow of approximately $550 million.*** We also project roughly $700 million of net capital expenditures and about $700 million of depreciation expense.

364. **<u>Statement #41</u>**. The first quarter 2026 earnings presentation "***[r]eaffirm[ed] [Kyndryl's] fiscal 2026 outlook***," sharing the same projections the Company had in the May 7, 2025 Press Release, including ***free cash flow of approximately $550 million***. *See* ¶ 354.

365. **Statement #42**. On November 4, 2025, Kyndryl issued the November 4, 2025 Press Release. The November 4, 2025 Press Release was reviewed and approved by Defendants Schroeter and Wyshner, who were quoted in the release, and Defendant Khurana, who signed the Form 8-K incorporating it. The November 4, 2025 Press Release quoted Defendant Schroeter as stating, "[w]e expect activity to strengthen in the second half of fiscal 2026, ***supported by our pipeline and the constructive discussions we're having with new and existing customers***." The November 4, 2025 Press Release further noted recent developments such as: "[h]yperscaler-related revenue," "[s]trong projected margin on recent signings," "[d]ouble-digit growth in Kyndryl Consult," "***[i]ncremental contribution from three-A's initiatives***," and "[a]rtifical intelligence." The Company then "***reaffirm[ed] its outlook for its fiscal 2026***," including ***free cash flow of approximately $550 million***. *See* ¶ 354.

366. **Statement #43**. On November 5, 2025, Kyndryl held an earnings call for the second fiscal quarter ended September 30, 2025. As part of his opening remarks, Defendant Schroeter stated that the Company was "***reaffirming [its] outlook for fiscal 2026***." Additionally, Defendant Schroeter stated:

> ***Expanding and winning new scope in our accounts is a key factor behind our positive financial trajectory in fiscal 2026*** and beyond. As a reminder, by fiscal 2028, which for us, begins less than 17 months from now, we expect to deliver more than $1 billion in adjusted free cash flow. We expect to deliver more than $1.2 billion in adjusted pre-tax income, and achieving these earnings and cash flow targets only requires us to reach the mid-single digit revenue growth that will progress toward by 2028. ***With strong conversion of earnings to free cash flow***, we're optimizing our capital allocation by investing in organic growth opportunities…
>
> Importantly, our fiscal 2026 outlook is consistent with our expected growth trajectory from fiscal 2025 to fiscal 2028 … ***[W]e'll continue to expect to generate approximately $550 million of free cash flow this year***.

During the call, Defendants Schroeter and Wyshner showed investors a slide from the second quarter 2026 earnings presentation shown to investors during the November 5, 2025 earnings call, titled "[f]ocused on delivering an impactful 'triple, double, single.'" The slide listed Kyndryl's adjusted free cash flow of $446M for FY25 and projected "~$550M" for FY26. The slides also note "[s]ources of our revenue," as "[p]ost-spin signings (higher-margin[s])." The presentation was reviewed and approved by Defendants Schroeter and Wyshner, who were identified by name and with their pictures at the beginning of the deck as the "Speakers."

367. Statement #43 included false and misleading statements of past and present facts, including that Kyndryl had "***strong conversion of earnings to free cash flow***."

368. **<u>Statement #44</u>**. As part of his opening remarks during the November 5, 2025 earnings call, Defendant Wyshner stated:

> Our outlook for ***adjusted pre-tax income this year continues to be at least $725 million*** … We continue to estimate that our adjusted ***EBITDA margin in fiscal 2026 will be approximately 18%*** … [W]e're ***forecasting roughly 100% conversion of adjusted pre-tax income, less cash taxes, into free cash flow***. With cash taxes of roughly $175 million, this implies ***free cash flow of approximately $550 million***. Our outlook for ***constant current revenue growth in fiscal 2026 continues to be positive 1%***.

369. **<u>Statement #45</u>**. The second quarter 2026 earnings presentation stated that Kyndryl's "***[g]rowth drivers***," included: "***Alliances***," "[m]ission-critical," "Kyndryl Consult," "Kyndryl Bridge," and "[m]odernization." During the earnings call, Defendant Schroeter also discussed "***growth drivers*** like Kyndryl Consult and hyperscaler-related revenue," "margin expansion," "signings growth," "***triple, double, single fiscal year 2028 objectives***," "infrastructure modernization," and "Kyndryl Bridge."

370. Statement #45 included false and misleading statements of past and present facts, including that Kyndryl's "***[g]rowth drivers***," included: "***Alliances***," "[m]ission-critical," "Kyndryl Consult," "Kyndryl Bridge," and "[m]odernization."

371. **Statement #46**. The second quarter 2026 earnings presentation "***[r]eaffirm[ed] [Kyndryl's] fiscal 2026 outlook***," sharing the same projections the Company had in the May 7, 2025 Press Release including ***free cash flow of approximately $550 million***. *See* ¶ 354.

372. **Reasons for Falsity.** Statements #34 through #46 were each materially false and misleading.

373. In each instance, Defendants stated guided figures for fiscal year 2026 while omitting that the Company's prior-period and current-period cash flows were inflated by systematic vendor payment deferrals, and the guided figures could not be achieved without continuing or expanding these undisclosed practices—by deferring vendor invoices from fiscal year 2026 to subsequent reporting periods. By omitting the use of undisclosed cash management practices, Defendants created the false and misleading impression that Kyndryl's guided figures for 2026 could be achieved by legitimate business endeavors.

374. Statements #35, 36, 39, 43, and 45 were additionally materially false and misleading in that they stated false and misleading statements of past and present facts, namely that legitimate business factors, such as "***strong conversion of earnings to free cash flow***," "***the 3As***," "***expanding scope in large- and mid-sized accounts***," and "***[g]rowth drivers***" were "***fueling***" free cash flow while omitting the undisclosed driver of deferring vendor invoices. In each instance, Defendants attributed the Company's cash flow performance, the purported basis for the Company's future projections, to seemingly legitimate business factors while omitting that a material portion of Kyndryl's cash flow was attributable to undisclosed cash management practices, including the deferral of vendor payments quarter to quarter, which was greater than $100 million in some reporting periods. By citing only seemingly legitimate performance drivers, Defendants created the false impression that Kyndryl's cash flow trajectory was sustainable and

driven entirely by organic business fundamentals and improvements, and that Kyndryl's guided figures for 2026 assumed and could be achieved by legitimate business endeavors.

375. Ultimately, after Defendants admitted they had been engaged in undisclosed cash management practices, had failed to set a proper tone at the top, that Kyndryl's internal controls suffered from material weaknesses, and that they did not create proper procedures for the disclosure of whistleblower reports, *see* ¶¶ 204-17, on February 9, 2026, Defendants also slashed their free cash flow guidance by approximately 36% (from ~$550 million to $325-$375 million)—despite having repeatedly "[r]eaffirm[ed]" the guidance during the entire period the undisclosed cash managed practices and material weaknesses existed, including less than three months prior.

376. Statements #34, 36, 38, 42, and 45 were additionally materially false and misleading because they cited "***Alliances***," the "***Alliances initiative***," and "***3As***" or "***three-A's***" as purported support for Kyndryl's guidance while concealing that Kyndryl was using Q blocks to block payments to the critical counterparties with whom Kyndryl had an "Alliance" (such as Cisco and Dell), resulting in actual and threatened credit holds and other problems with those counterparties, as described by multiple former employees. For example, as described by FE-2 (who departed in September 2024, the second month of the Class Period), Kyndryl had received multiple credit holds from vendors such as Cisco and Dell. As described by FE-1, by late 2024 or early 2025, vendor complaints had gotten very bad and Kyndryl's GSRMs were pulled in to help manage vendor complaints.

377. To the extent that any part of Statements #34 through 46 is an opinion, they are actionable because they were subjectively false, did not fairly align with the information in Defendants Schroeter, Wyshner, and Khurana's possession at the time, and contained false embedded facts (including those quoted in ¶¶356, 358, 362, 367, 370). Defendants knew that the

fiscal year 2026 guidance could not be achieved without continuing the undisclosed cash management practices to defer expenses for fiscal year 2026 into subsequent periods. Their knowledge is confirmed by Defendant Khurana's (and Sebold's) trading. *See* ¶¶ 258-60. These statements also did not fairly align with the information in Defendants' possession at the time because Kyndryl had a standard practice of using Q blocks to defer vendor payments quarter to quarter beyond payment terms. That omitted fact substantially undermined the basis for the guidance and would have undermined a reasonable investor's belief in the guidance.

## X. LOSS CAUSATION

378. Defendants' fraud, as alleged herein, directly and proximately caused the economic losses under the federal securities laws, i.e., damages, suffered by Lead Plaintiff and the Class. There was a causal connection between Defendants' fraud and the losses described herein.

379. Throughout the Class Period, Lead Plaintiff and the Class members purchased or otherwise acquired Kyndryl common stock at artificially inflated prices and were damaged thereby when the price of Kyndryl common stock declined in response to the corrective disclosures. Kyndryl's stock was or remained artificially inflated until the disclosures because of Defendants' materially false and misleading statements and Defendants' scheme to defraud.

380. The artificial inflation in Kyndryl's stock price was removed—and Kyndryl's stock price significantly declined, causing investors to suffer extensive losses—when the facts and/or conditions concealed from investors by Defendants' material misrepresentations and scheme to defraud were revealed to the market by two disclosures concerning or connected to the facts misrepresented or concealed by Defendants, and to Defendants' scheme to defraud. These disclosures occurred on August 4-5, 2025 and February 9, 2026.

381. ***First***, after the market closed on Monday, August 4, 2025, Defendants reported disappointing first-quarter 2026 financial results, including free cash flow use of $222 million,

which missed analysts' estimates of $219 million—meaning Kyndryl had used more free cash than analysts had anticipated. The following day, during Kyndryl's premarket earnings call, Defendant Wyshner attempted to minimize the Company's "significant use[] of cash" in the first quarter, attributing it to Kyndryl's "annual software and incentive compensation payments."

382. But the free cash flow use miss was caused, in significant part, by Kyndryl deferring the payment of vendor invoices due at the end of fiscal year 2025 into the first quarter of 2026, such that it used more cash than analysts had been expecting. Thus, through this disclosure, the consequences of Kyndryl's deferral of vendor payments began to come to light.

383. Analysts were surprised by this news and disappointed by the results. Immediately following these announcements, Kyndryl's stock price fell by $7.76 or approximately 21% over the next trading day, from a closing price of $36.70 on August 4, 2025, the trading day prior to the financial results report and earnings call, to a closing price of $28.94 on August 5, 2025.

384. While this corrective disclosure began to dissipate some of the inflation in Kyndryl's stock, it did not dissipate all of it or reveal the full truth. In fact, Defendants made additional false statements and continued to conceal facts concerning Kyndryl's business and cash management. For example, Defendant Schroeter again assured investors during the Company's August 5 earnings call that Kyndryl maintained a "strong conversion of our earnings to free cash flow," and that Kyndryl was "optimizing [its] capital allocation by investing in organic growth opportunities." Moreover, in none of their August 4 and 5 statements did Defendants disclose their still hidden cash management practices—including the deferral of vendor payments to quarters subsequent to those in which they were due—or any of the three material weaknesses in Kyndryl's ICFR. Accordingly, and including because of the foregoing additional misstatements, Kyndryl's stock price remained artificially inflated following the August 4 and 5 corrective disclosures.

385. ***Second***, before the market opened on February 9, 2026, Kyndryl was forced to make several shocking announcements in various public filings, finally revealing the truth that had been previously concealed by Defendants' misrepresentations and fraudulent scheme. Those announcements disclosed various facts, including that: (i) Kyndryl was under investigation by the SEC's Division of Enforcement relating to Kyndryl "cash management practices, related disclosures (including regarding the drivers of the Company's adjusted free cash flow metric), the efficacy of the Company's internal control over financial reporting, and certain other matters"; (ii) the Company's "Audit Committee of its Board of Directors" had been "reviewing its cash management practices, related disclosures (including regarding the drivers of the Company's adjusted free cash flow metric), the efficacy of the Company's internal control over financial reporting, and certain other matters"; (iii) Kyndryl "anticipate[d] reporting material weaknesses in the Company's internal control over financial reporting for the period covered in the Quarterly Report" for the quarter ending December 31, 2025, "as well as for the full fiscal year ended March 31, 2025, and the first two fiscal quarters of fiscal year 2026, which are expected to include, but may not be limited to, the effectiveness and strength of certain functions at the Company, including with respect to controls related to information and communication and tone at the top"; (iv) Kyndryl's "assessment of internal control over financial reporting and the related opinion of PricewaterhouseCoopers LLP only with respect to the effectiveness of the Company's internal control over financial reporting as of March 31, 2025 included in the Company's Annual Report on Form 10-K for the full fiscal year ended March 31, 2025 should no longer be relied upon"; (v) the Company would be "unable to file within the prescribed time period" its "Quarterly Report on Form 10-Q for the quarter ended December 31, 2025"; (vi) Defendant "Wyshner departed from his position as Chief Financial Officer of the Company, and Edward Sebold departed from his

position as General Counsel of the Company, effective immediately. In addition, on the same date, [Defendant] Vineet Khurana stepped down from his position as Senior Vice President and Global Controller of the Company and assumed a different role at the Company"; and (vii) Kyndryl slashed its guidance for fiscal year 2026 to $325-375 free cash flow (down from $550 million).

386. Analysts were stunned by these disclosures, and numerous firms downgraded Kyndryl's stock rating. On this news, Kyndryl's stock fell $12.09 per share, or 55%, over the course of a single trading day, from a closing price of $23.49 on Friday February 6, 2026 to a closing price of $10.59 on Monday February 9, 2026, the subsequent trading session.

387. It was entirely foreseeable that Defendants' materially false and misleading statements and their scheme to defraud discussed herein would artificially inflate or maintain the existing artificial inflation of Kyndryl's stock price. It was also foreseeable to Defendants that the disclosures described above would cause Kyndryl's stock price to fall as the artificial inflation caused by Defendants' misstatements and scheme was removed. Thus, the stock price declines described above were directly and proximately caused by Defendants' materially false and misleading statements and by their scheme to defraud.

## XI. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

388. The statutory safe harbor or the bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the materially false or misleading statements pleaded in this Complaint. The statements complained of herein: (i) were historical statements or statements of purportedly current facts and conditions at the time the statements were made; (ii) were mixed statements of present and/or historical facts and future intent; and/or (iii) omitted to state material current or historical facts necessary to make the statements not misleading.

389. Further, to the extent that any of the misrepresentations alleged herein could be construed as forward-looking or the statutory safe harbor otherwise would apply, the statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. Moreover, as alleged in detail above, given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Defendants were not sufficient to insulate them from liability for their materially false and misleading statements.

390. In addition, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, the Defendants are liable for those false and misleading forward-looking statements because at the time each of those statements was made, the speaker knew the statement was false or misleading, or the statement was authorized and/or approved by a Kyndryl executive officer who knew that the statement was materially false or misleading when made.

391. Moreover, to the extent that Kyndryl or the other Defendants issued any disclosures purporting to warn or caution investors of certain "risks," those disclosures were also materially false or misleading because they did not disclose that the risks that were the subject of the warnings had materialized, or that Kyndryl and the other Defendants had actual knowledge of or recklessly disregarded undisclosed material adverse facts that rendered the purportedly cautionary disclosures materially false or misleading.

## XII. THE PRESUMPTION OF RELIANCE

392. The Class is entitled to a presumption of reliance on Defendants' materially false or misleading statements pursuant to the fraud-on-the-market doctrine because, at all relevant times, the market for Kyndryl's common stock was efficient for the following reasons, among others:

- Kyndryl's common stock met the requirements for listing, and was listed and actively traded, on the NYSE, a highly efficient and automated market;
- Kyndryl's common stock traded at high weekly volumes;
- as a regulated issuer, Kyndryl filed periodic public reports with the SEC;
- Kyndryl regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as public and publicized appearances at investor conferences and communications with the financial press, securities analysts, and other similar reporting services;
- several securities analysts employed by major brokerage firms followed Kyndryl and wrote reports that were distributed to the sales force and certain customers of the respective brokerage firms, and were otherwise available and entered the public marketplace; and
- there was a cause-and-effect relationship between unexpected corporate events or financial releases and movements in Kyndryl's stock price.

393. As a result of the foregoing, the market for Kyndryl's common stock reasonably and promptly digested current information regarding Kyndryl from all publicly accessible sources and reflected such information in Kyndryl's stock price during the Class Period. Under these circumstances, all purchasers of Kyndryl common stock during the Class Period suffered similar injuries through their purchase of Kyndryl common stock at artificially inflated prices, and a presumption of reliance applies.

394. A Class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated in part upon omissions of material fact for which there is a duty to disclose. Because this action involves Defendants' failure to disclose material adverse information regarding Kyndryl's business—information that Defendants were obligated to disclose—positive proof of reliance is not required. All that is necessary is that the facts withheld be material in that a reasonable investor might have considered them important in making investment decisions. Given the importance of the cash flow metrics and of the three undisclosed material weaknesses, that requirement is satisfied here.

## XIII. CLASS ACTION ALLEGATIONS

395. Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) on behalf of the Class—all persons who purchased or otherwise acquired Kyndryl common stock during the Class Period, and who were damaged thereby.

396. Excluded from the Class are Defendants and their immediate families, the officers and directors of the Company at all relevant times, members of their immediate families, and Defendants' legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

397. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Kyndryl shares were actively traded on the NASDAQ stock market. As of August 7, 2024, there were approximately 231 million shares of Kyndryl shares outstanding. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are thousands of Class members. Class members who purchased Kyndryl common stock may be identified from records maintained by Kyndryl or its transfer agent(s) and may be notified of this

class action using a form of notice like that customarily used in securities class actions. Disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

398. Lead Plaintiff's claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws as complained of herein.

399. Lead Plaintiff will fairly and adequately protect Class members' interests and has retained competent counsel, experienced in class actions and securities litigation. Lead Plaintiff has no interest that conflicts with the interests of the Class.

400. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of fact and law common to the Class are:

- whether Defendants' misrepresentations as alleged herein violated the federal securities laws;
- whether Defendants' scheme as alleged herein violated the federal securities laws;
- whether the Individual Defendants are personally liable for the alleged misrepresentations, omissions, and scheme described herein;
- whether Defendants' misrepresentations and fraudulent scheme as alleged herein caused the Class members to suffer a compensable loss; and
- whether the members of the Class have sustained damages, and the proper measure of damages.

401. A class action is superior to all other available methods for the fair and efficient adjudication of this action. Joinder of all Class members is impracticable. Additionally, the damages suffered by some individual Class members may be relatively small, such that the burden

and expense of individual litigation would make it practically impossible for those such members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XIV. CLAIMS FOR RELIEF

**COUNT ONE**
**For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5(b)**
**(Against All Defendants)**

402. Lead Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein.

403. During the Class Period, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b) issued thereunder by making untrue or misleading statements of material fact or omitting to state material facts necessary to make their statements, in light of the circumstances under which they were made, not misleading. Defendants' actions: (i) deceived the investing public, including Lead Plaintiff and other Class members, as alleged herein; and (ii) caused Lead Plaintiff and other Class members to purchase Kyndryl common stock at artificially inflated prices.

404. Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, intentionally or with reckless disregard for the truth, in connection with the purchase or sale of securities, made various untrue and/or misleading statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, which did: (i) deceive the investing public, including Lead Plaintiff and the Class, regarding Kyndryl's cash management practices, including deferring vendor payments beyond the quarters in which they were due; the effectiveness of Kyndryl's DCP and its ICFR; the Company's MD&A disclosures regarding its cash flows; the statements in the Gotham City Report; Kyndryl's free cash flow performance; and Defendants' financial guidance for fiscal year 2026; (ii)

artificially inflate and maintain the market price of Kyndryl's common stock; and (iii) cause Lead Plaintiff and other members of the Class to purchase Kyndryl common stock at artificially inflated prices and suffer losses when the true facts became known.

405. The Individual Defendants had actual knowledge of the misrepresentations of material fact set forth herein or were reckless in not knowing the true facts that were available to them. Defendants engaged in this misconduct to conceal Kyndryl's true condition from the investing public and to support the artificially inflated prices of Kyndryl's common stock. The Individual Defendants' state of mind, and the state of mind of other high-ranking Kyndryl executives, such as Sebold, Wright, and Chugh, is imputed to Kyndryl.

406. Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Kyndryl's common stock. Lead Plaintiff and the Class would not have purchased Kyndryl's common stock at the prices they paid, or at all, had they been aware that the market prices for Kyndryl's common stock had been artificially inflated by Defendants' fraudulent course of conduct.

407. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of Kyndryl's common stock during the Class Period.

408. Each and every Defendant is sued as a primary participant in the wrongful and illegal conduct charged herein.

409. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

**COUNT TWO**
**For Violations of Section 10(b) of the Exchange Act and SEC Rules 10b-5(a) and (c)**
**(Against All Defendants)**

410. Lead Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein.

411. During the Class Period, Defendants violated Section 10(b) of the Exchange Act and SEC Rules 10b-5(a) and (c) issued thereunder, in that Defendants: (1) employed devices, schemes, and artifices to defraud; and (2) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of Kyndryl common stock during the Class Period in an effort to maintain artificially inflated prices for Kyndryl common stock.

412. Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, intentionally or with reckless disregard for the truth, employed devices, schemes, and artifices to defraud and engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Kyndryl's common stock, which did (i) deceive the investing public, including Lead Plaintiff and the Class, regarding, among other things, the true nature of Kyndryl's cash management practices, the factors driving Kyndryl's free cash flow, including delaying vendor payments, and the true facts regarding material weaknesses in Kyndryl's DCP and ICFR; (ii) artificially inflate and maintain the market price of Kyndryl's common stock; and (iii) cause Lead Plaintiff and other members of the Class to purchase Kyndryl common stock at artificially inflated prices and suffer losses when the true facts became known.

413. As part of their scheme to defraud investors in violation of Exchange Act Section 10(b) and Rules 10b-5(a) and (c) issued thereunder, Defendants:

- blocked vendor payments to create a misleading impression regarding Kyndryl's cash flow during the Class Period;
- gave or instructed employees to give false reasons to vendors for the blocked payments, to prevent the truth of their systemic practices from emerging;
- failed to disclose three material weaknesses in Kyndryl's disclosure controls and procedures and internal control over financial reporting, which disclosure was required by SOX and SEC regulations;
- failed to design and maintain effective disclosure controls and procedures and internal control over financial reporting;
- failed to disclose the true facts to the Company's Board of Directors (including the Audit Committee);
- made additional false and misleading statements to investors, as alleged ¶¶265-377; and
- in the case of Khurana, engaged in insider stock sales while in possession of material non-public information.

414. As described above, Defendants acted with scienter throughout the Class Period, in that they either had actual knowledge of the scheme and the misrepresentations or omissions of material facts set forth herein, acted with reckless disregard for the truth, or acted with intent to deceive. Moreover, Defendants engaged in this misconduct to conceal Kyndryl's true condition from the investing public and to support the artificially inflated prices of Kyndryl's common stock. The Individual Defendants' state of mind, and the state of mind of other high-ranking Kyndryl executives, such as Sebold, Wright, and Chugh, is imputed to Kyndryl.

415. Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Kyndryl's common stock, which artificial inflation was removed from the stock when the true facts became known. Lead Plaintiff and the Class would not have purchased Kyndryl's common stock at the prices they paid, or at all, had they been aware that the market prices for Kyndryl's common stock had been artificially inflated by Defendants' fraudulent course of conduct. It was also foreseeable to Defendants that misrepresenting and concealing these material facts from the public and engaging in a scheme to defraud the public would artificially inflate Kyndryl's common stock's price and that the revelation of the truth would correct the artificial inflation and cause the price of Kyndryl's common stock to decline.

416. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages attributable to the fraud alleged herein in connection with their respective purchases of Kyndryl's common stock during the Class Period.

417. Each and every Defendant is sued as a primary participant in the wrongful and illegal conduct charged herein.

418. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) promulgated thereunder.

## COUNT THREE
## For Violations of Section 20(a) of the Exchange Act
## (Against the Individual Defendants)

419. Lead Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein.

420. The Individual Defendants each acted as a controlling person of Kyndryl within the meaning of Section 20(a) of the Exchange Act, as alleged herein.

421. By reason of their high-level positions of control and authority as Kyndryl's most senior officers, the Individual Defendants had the authority to influence and control, and did influence and control, the decision-making and activities of Kyndryl and its employees, and to cause Kyndryl to engage in the wrongful conduct complained of herein. The Individual Defendants were able to influence and control, and did influence and control, directly and indirectly, the content and dissemination of the public statements made by Kyndryl during the Class Period, thereby causing the dissemination of the materially false and misleading statements and omissions of material fact as alleged herein. The Individual Defendants were virtually the exclusive Kyndryl officers who communicated with investors on earnings calls and at investor conferences on Kyndryl's behalf. Individual Defendants Schroeter and Wyshner signed six SOX Certifications each, and Individual Defendant Khurana signed twelve SEC filings on Kyndryl's behalf that contained materially false and misleading statements. The Individual Defendants were provided with, or had unlimited access to, copies of Kyndryl's press releases, public filings, and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after those statements were made and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

422. As set forth above, Kyndryl violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.

423. By virtue of their positions as a controlling person of Kyndryl and as a result of their own aforementioned conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, Kyndryl is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiff and the other members of the Class who purchased or otherwise acquired Kyndryl common stock. As

detailed above, during all relevant times; Defendant Schroeter served as Kyndryl's CEO and Chairman of its Board for the Class Period; Defendant Wyshner served as Kyndryl's CFO for the Class Period; and Defendant Khurana served as Kyndryl's Global Controller for the Class Period.

424. As a direct and proximate result of the Individual Defendants' conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchase or acquisition of Kyndryl common stock.

## XV. PRAYER FOR RELIEF

425. WHEREFORE, Lead Plaintiff prays for judgment:

a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b) Awarding compensatory damages in favor of Lead Plaintiff and the Class against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c) Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

d) Awarding such equitable, injunctive or other further relief as the Court may deem just and proper.

## XVI. JURY DEMAND

426. Lead Plaintiff hereby demands a trial by jury.

DATED: August 19, 2026

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER & GROSSMANN, LLP**

*/s/ Jorge G. Tenreiro*
Salvatore J. Graziano
John Rizio-Hamilton
Jorge G. Tenreiro
Shane D. Avidan
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400
salvatore@blbglaw.com
johnr@blbglaw.com
jorge.tenreiro@blbglaw.com
shane.avidan@blbglaw.com

## APPENDIX

| ABBREVIATION | DEFINITION |
|---|---|
| Q1 2024 Form 10-Q | Form 10-Q for the period ending June 30, 2023, filed August 8, 2023 |
| Q1 2025 Form 10-Q | Form 10-Q for the period ending June 30, 2024, filed August 7, 2024 |
| Q2 2025 Form 10-Q | Form 10-Q for the period ending September 30, 2024, filed November 7, 2024 |
| Q3 2025 Form 10-Q | Form 10-Q for the period ending December 31, 2024, filed February 6, 2025 |
| 2025 Form 10-K | Form 10-K for the period ending March 31, 2025, filed May 30, 2025 |
| Q1 2026 Form 10-Q | Form 10-Q for the period ending June 30, 2025, filed August 5, 2025 |
| Q2 2026 Form 10-Q | Form 10-Q for the period ending September 30, 2025, filed November 5, 2025 |
| Q3 2026 Form 10-Q | Form 10-Q for the period ending December 31, 2025, filed February 17, 2026 |
| 2025 Form 10-K/A | Form 10-K/A for the period ending March 31, 2025, filed February 17, 2026 |
| Q1 2026 Form 10-Q/A | Form 10-Q/A for the period ending June 30, 2025, filed February 17, 2026 |
| Q2 2026 Form 10-Q/A | Form 10-Q/A for the period ending September 30, 2025, filed February 17, 2026 |